**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| TURNER CONSTRUCTION COMPANY | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:15-cv-000368-WDQ |
| | : |
| BFPE INTERNATIONAL, INC. | : |
| | : |
| Defendant. | : |

**BFPE INTERNATIONAL INC.'S MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS AGAINST BFPE AND ON BFPE'S COUNTER-CLAIM AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY AND MOTION FOR SUMMARY JUDGMENT ON BFPE'S COUNTER-CLAIM**

Respectfully submitted,

*/s/  George D. Bogris*
George D. Bogris (Bar. No. 10458)
Sandra T. Carson (Bar No. 24699)
WHITNEY & BOGRIS, LLP
Twelfth Floor
401 Washington Avenue
Towson, MD  21204
(410) 583-8000 (ph)
(800) 893-1239 (fax)
gbogris@whitneybogris.com
scarson@whitneybogris.com
**Attorneys for Defendant
BFPE International, Inc.**

## **Table of Contents**

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 1

SUMMARY OF ARGUMENT ............................................................................................ 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................................... 4

SUMMARY JUDGMENT STANDARD ............................................................................. 13

APPLICABLE LAW ........................................................................................................... 14

ARGUMENT ....................................................................................................................... 15

    I.   BFPE is Entitled to Summary Judgment on Plaintiff's Claims ................................... 15

        A.     Turner Lacks Standing to Sue ..................................................................... 15

        B.     Turner Has Waived its Claims Against BFPE ............................................. 16

             1. The Waiver Applies to Claims Against BFPE by Turner .......................... 18

             2. Turner's Waiver Applies to All Damages Claimed,
                Whether to "The Work" or to Adjacent Property,
                To the Extent Covered by Insurance ...................................................... 21

             3. The Losses Claimed Are Covered by UMMC's Property Insurance ....................... 23

        C.     Turner is Not Entitled to Indemnity from BFPE Because the
             Prerequisites for Indemnification under Article XXIII Have
             Not Occurred ............................................................................................. 23

             1. No Third-Party Claims for Damage or Injury Were Made
                 Against Turner ....................................................................................... 26

             2. There is No Admissible Evidence Establishing BFPE's Actions
                 Or Work as the Cause of the Water Discharge ....................................... 28

    II.  BFPE is Entitled to Summary Judgment on its Counterclaim ...................................... 30

        A.     Turner Had no Right to Withhold Final Payment ........................................ 30

B.      All Conditions Precedent for Final Payment Were Met .................................................. 31

C.      Turner's Failure to Produce Admissible Evidence Establishing BFPE
        As The Cause of the Discharge Precludes Summary Judgment
        In Turner's Favor on BFPE's Counterclaim ................................................................. 32

CONCLUSION   ............................................................................................................................... 33

## INTRODUCTION

The issues in this case arise out of – and are determined by – contracts:  what they say, what they mean, to whom they apply, and what they cover.  The questions of whether BFPE can be held liable for the losses claimed by Plaintiff and whether it is entitled to be paid in full for its work on the UMMC Anesthesia Offices project are ones that can be determined by this Court as a matter of law by looking to the parties' intent as reflected in the language of *all* of the relevant contracts: First, the contract between the University of Maryland Medical Center (hereinafter "UMMC") and Turner Construction Company (hereinafter "Turner"), and second, the subcontract between Turner and BFPE. A third contract, the applicable property insurance policy maintained by UMMC covering the project at issue and the building in which it was being performed, is the final piece of the picture.  There is no dispute over the relevant language of these contracts and that language is unambiguous.

The sole reasonable interpretation of the applicable contracts reveals that Turner has no right to maintain its claims against BFPE arising out of the January 21, 2014, water discharge at the UMMC building at 22 S. Greene Street, Baltimore. As a result, BFPE is entitled to judgment as a matter of law on the issue of liability and Turner is not.  Those same contracts establish that Turner had no right to withhold BFPE's final payment of $27,863.02 and that the prerequisites for making final payment to BFPE were, in fact, met. As a result, BFPE is entitled to summary judgment on its Counterclaim and Turner is not.

## BACKGROUND

In 2013, BFPE subcontracted with Turner to perform work on the fire protection systems on the 11th Floor at the UMMC Anesthesia Offices. On January 21, 2014, during that project, water escaped from a pipe in the fire protection system that BFPE had been given the go-ahead to demolish because the necessary outage – the shutting down and draining of a portion of the sprinkler system required to allow work to be performed without damage – was not properly implemented by others and pressurized water remained in the pipe. On the UMMC Anesthesia Offices project, as on all others that BFPE had previously performed at UMMC, there was a particular process by which sprinkler system outages were

requested and put into place.  That process, followed for the January 21st outage, required the General Contractor (Turner, in this instance)  to submit a written outage request to UMMC in advance of the work, and required UMMC personnel to actually shut down and drain the requested portion of the system on the date of the work.  BFPE coordinated with both Turner and UMMC about the January 21st outage prior to and on that date, and Turner and UMMC also coordinated among themselves.  All three entities were aware on the morning of January 21st of what work BFPE was there to do, where in the building it was going to be done, what portions of the system were being worked on and removed, and that an appropriate outage was needed.  Unfortunately, the outage was not properly put into place, yet BFPE was given affirmative permission by UMMC to put wrench to pipe, and unbeknownst to BFPE, the portion of the system that everyone knew BFPE was there to demolish was still in service and filled with water.

In its rush to be the first party to file for summary judgment, Turner declined to provide the Court with necessary and available evidence relevant to its position.  Not only did Turner identify and rely on just one of several applicable contract provisions bearing on the issue of BFPE's potential liability and entitlement to full payment under the subcontract, with regard to that one provision, it neglected to bring to the Court's attention critical language contained within it that renders its position untenable.  Further, instead of providing the Court with admissible evidence regarding the actual cause of the water loss, relies on bald allegations unsupported by admissible evidence and on the mistaken conclusion that the mere fact that water escaped when BFPE loosened a coupling is enough to allow this Court to hold BFPE liable under the indemnity provision of the subcontract and to preclude BFPE from recovering on its counterclaim.  When viewed in the light of the totality of the relevant evidence as set forth herein, Turner's motions must fail and BFPE's cross-motions must be granted.

## SUMMARY OF ARGUMENT

Turner lacks standing to bring the claims it has asserted in this case. Turner did not actually pay the amounts to repair property damage resulting from the water discharge that it seeks to recover from BFPE. Those sums were paid by an insurer. As a result, Turner has no right to recover those payments

and no right to seek them from BFPE.  Since Turner has no right to the claimed damages, it likewise has no right to its legal fees or costs expended in an effort to force BFPE to pay those damages.

Additionally, Turner expressly waived its right to pursue property damage claims against BFPE. The General Contract between Turner and UMMC incorporates an industry-standard waiver of subrogation provision in which Turner and UMMC expressly waive all such claims against each other *and against their subcontractors* to the extent losses incurred are covered by UMMC's property insurance. This waiver expressly applies to entities that would otherwise have a duty to indemnify Turner and/or UMMC. BFPE is an intended third-party beneficiary of that waiver and the waiver is incorporated into the subcontract between Turner and BFPE. Since the undisputed evidence establishes that the losses for which Turner seeks recovery against BFPE, both those that were part of the ongoing Work itself and those occurring in other portions of the UMMC building, were covered by UMMC's property insurance, Turner's waiver precludes the present action and BFPE is entitled to judgment as a matter of law.

Because BFPE is entitled to summary judgment on liability, Turner is not and Turner's Motion for Partial Summary Judgment on Liability must be denied.  Turner's motion not only fails to acknowledge that Turner did not actually incur the expenses at issue, it also wholly ignores the existence of the waiver of subrogation given by Turner.  It chooses instead to focus solely on the indemnity provision in Article XXIII of the BFPE/Turner subcontract (hereinafter "the subcontract").  However, Turner's waiver of subrogation expressly supersedes any indemnity obligation under the subcontract to the extent of insurance coverage for the claimed loss.

Finally, Turner's motion for partial summary judgment on liability, which is based solely on the subcontract's Article XXIII indemnity provision, must fail because the contractual prerequisites for any duty of indemnity by BFPE under that provision have not been met.  It is undisputed that there has not been any "claim" for damage or injury arising out of the water discharge asserted against Turner sufficient to trigger the terms of the indemnity provision, and thus, Turner has no right to any recovery from BFPE pursuant to that provision, whether for damages allegedly paid or for attorney's fees and costs allegedly incurred.

As to BFPE's counter-claim, Article XXIII of the subcontract did not provide Turner a right to withhold final payment from BFPE.  That right arises only when there is a "claim" asserted or threatened against Turner that would trigger BFPE's obligation to indemnify Turner under that provision.  Because no such "claim" was ever made or threatened, no right to withhold any amount of payment from BFPE existed.

In addition, BFPE did satisfy all conditions precedent necessary to obligate Turner to make final payment.  Turner has claimed that the only unmet condition precedent was "satisfaction of all claims, demands, and disputes and all obligations and responsibilities of Subcontractor, arising out of or related to the Subcontract, including those as between Contractor and Subcontractor . . ."  However, because Turner expressly waived its claims against BFPE, there was no valid "claim, demand and dispute" that was unsatisfied between Turner and BFPE and Turner's demand that BFPE pay for repairs to the insured property of UMMC was unwarranted. Moreover, the existence of the waiver, covering as it did claims between Turner and BFPE, between UMMC and Turner, and UMMC and BFPE, prevented there from being any "obligation and responsibility" on the part of BFPE to pay for any damages that were covered by UMMC's insurance. Thus, Turner's reliance on the "failure" to satisfy claims, demands and disputes" is mere pretext and does not entitle it to summary judgment.  BFPE is entitled to receive payment for its work as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

On or about April 15, 2013, Turner entered into a contract with UMMC for construction services to be performed at the UMMC Anesthesia Faculty Offices, located at 22 S. Greene Street, Baltimore, MD 21201 (hereinafter "the General Contract").  (Exhibit A, Standard Form Agreement Between Owner and Construction Manager as Constructor, p. 1, p., 18).  The Project involved renovating the Anesthesia offices of the 11th Floor South Hospital. (*Id.* at p. 1). Under the General Contract, UMMC is identified as "the Owner" and Turner is identified as "the Construction Manager."  (*Id.* at p. 1).

The General Contract expressly identifies the "Contract Documents" that govern the relationship between Turner and UMMC.  (Ex. A, § 1.1, § 12.2.2).  Specifically identified as one of the "Contract

Documents," and incorporated by reference therein, is a document known as AIA A201-2007, "General Conditions of the Contract for Construction." (Ex. A, §1.1, § 1.3, § 12.2.2).  The General Contract specifies that "[t]he term 'Contractor' as used in A201-2007 shall mean the Construction Manager."  (*Id.* at § 1.3).

Among the terms and conditions contained within AIA A201-2007, are the following:

**§ 11.3 PROPERTY INSURANCE**
**§ 11.3.1** Unless otherwise provided*, the Owner shall purchase and maintain . . . property insurance written on a builder's risk "all–risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract Modifications and cost of materials supplied or installed by others, comprising total value for the entire Project at the site on a replacement cost basis **without optional deductibles.** Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made . . . or until no person or entity other than the Owner has an insurable interest in the property required by this Section 11.3 to be covered, whichever is later. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-Subcontractors in the Project.

\*        \*        \*        \*

 **§ 11.3.7 WAIVERS OF SUBROGATION**
The Owner and Contractor waive all rights against (1) each other **and any of their subcontractors**, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary.  The Owner or contractor, as appropriate, shall require of …the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements ... similar waivers each in favor of other parties enumerated herein.  The policies shall provide such waivers of subrogation by endorsement or otherwise**.  A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise,** did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

\*        \*        \*        \*

**§ 11.3.5**  If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project,  . . ., the Owner **shall waive all rights in accordance with the terms of § 11.3.7 for damages caused by fire or other causes of loss covered by this separate property insurance.**  All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

(Exhibit B, AIA A201-2007 General Conditions of the Contract of Construction, §§ 11.3, 11.3.1, 11.3.5, 11.3.7) (emphases added).  AIA A201-2007 defines "The Work" as "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations.  The Work may constitute the whole or part of the Project." (*Id.* at § 1.1.3).[1]

On or about August 27, 2013, Turner and BFPE entered into a subcontract under which BFPE agreed to "perform and furnish all the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary for Fire Protection and any other work listed under the Additional Provisions, . . . .," as part of Turner's overall work at the UMMC Anesthesia Offices project.  (Exhibit C, subcontract, at Article I, "Description of Work," p. BFPE 0371).  BFPE agreed to perform the work in accordance with "the Plans, Specifications, General Conditions, Special Conditions and Addenda thereto…and with the terms and provisions of the General Contract … between Contractor and the University of Maryland Medical Center . . . dated April 15, 2013 …." (*Id.*).

The subcontract also specified as follows:

> With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to Contractor by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward Contractor all of the duties, obligations and responsibilities that Contractor by those Contract Document assumes toward the Owner, and the Subcontractor agrees further that ***Contractor shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against Contractor*** with the same force and effect *as though every such duty, obligation, responsibility, right or remedy were set forth herein in full.*  The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.
>
> This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted. . . .

---

[1] "The Project" is defined as "the total construction of which the Work performed under the Contract may be the whole or a part and which may include construction by the Owner and by separate contractors." (Ex. B, § 1.1.4).

(*Id.*, Article II, "Contract Documents," at p. BFPE 0371).   Article XXIII of the subcontract states,

in relevant part:

> The Subcontractor hereby assumes the entire responsibility and liability for any and all actual or potential damage or injury of any kind or nature whatsoever (including death business interruption or loss of use resulting therefrom) to all persons and entities, whether employees of the Subcontractor, or any tier of the Subcontractor or otherwise, or to all property; or as a result of a perceived risk of such damage or injury (including actions taken to avoid or contain such actual or potential damage or injury, whether required or incurred by a public authority or otherwise*): caused by, resulting from, arising out of or occurring in connection with the execution of the Work, or in preparation for the Work, or any extension, modification or amendment to the Work* by change order or otherwise. ***Should any claims*** for such actual or potential damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon an Indemnified Party's alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of an Indemnified Party, the Subcontractor agrees to indemnify and save harmless the Indemnified Party from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, that the Indemnified Party may directly or indirectly sustain, suffer or incur ***as a result thereof*** and the Subcontractor agrees to and does hereby assume, on behalf of the Indemnified Party, the defense of any action at law or in equity which may be brought against the Indemnified Party ***upon or by reason of such claims*** and to pay on behalf of the Indemnified Party, upon demand, the amount of any judgment that may be entered against the Indemnified Party in any such action. *In the event that any such claims, loss, cost, expense, liability, damage, penalties, fines or injury arise or are made, asserted or threatened against the Indemnified Party*, Contractor shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in its judgment to protect and indemnify the Indemnified Party from and against any and all such claims, loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, . . . .

(*Id.*, Article XXIII, "Assumption of Liability & Indemnity," p. BFPE 0381) (italics and bold typeface

added, all other emphasis in original).

On the subject of final payment, the subcontract states, in relevant part,

> [F]inal payment by the Contractor to the Subcontractor shall not become due and payable until the following other express conditions precedent have been met: (1) the completion and acceptance of the Work by Contractor and the Architect; (2) provision by the Subcontractor of evidence satisfactory to Contractor that there are no claims, obligations or liens outstanding or unsatisfied for labor, services, materials, equipment, taxes or other items performed, furnished, or incurred for or in connection with the Work; (3) execution and delivery by the Subcontractor. . . of a general release running to and in favor of Contractor and the Owner; and (4) complete and full satisfaction of all claims, demands and disputes and all obligations and responsibility of Subcontractor arising out of or related to the Subcontractor, including those as between Contractor and Subcontractor as well as those between Subcontractor and any third party.

(*Id.* at Article IV, "Final Payment", p. BFPE 0373).

On January 21, 2014, water escaped from a coupling on a portion of sprinkler system piping in the 11th Floor C wing, which pipe fed to a hose cabinet that BFPE was to dismantle on that date.  Turner contends that the escaping water caused damage to certain areas of UMMC's property, (Complaint, ¶ 21), and that Turner "incurred costs of repair in the approximate amount of $240,000"). (Complaint, ¶ 20-24). The damages allegedly resulting from the water discharge included the following:

- Damage to carpet requiring replacement of the same on 10th floor, $4,224.92 (Exhibit D, repair invoices, p. 1-2);

- Damage/dirtying of all walls, doors, floors, windows, mullions, and cabinets requiring cleaning of same, $1,370.00 (*Id.* at p. 3);

- Damage to drywall, flooring, requiring demolition, clean up and removal, $31,620.00 (*Id.* at p. 4-5);

- Potential water damage in IT and electrical closets on the 11th through ground floors requiring investigation of all floors, $534.00 (*Id.* at p. 6-7);

- Damage to ceiling tiles and drywall on 10th and 11th floor B wing requiring repair, $62,067.00 (*Id.* at p. 8);

- Damage to ductwrap insulation on the 11th Floor requiring replacement, $7,267.67 (*Id.* at p. 9-13);

- Damage to the elevators serving all floors requiring repair, $110,854.72 (*Id.* at p. 14-15);

- Water damage to walls requiring paint on 10th floor requiring repair, $1,342.00 (*Id.* at p. 16-18);

- Damage to various medical supplies maintained in office area having an alleged replacement cost of $2,530.26 (Exhibit E, personal property replacement cost documents, p. 1-7); and

- Damage to furniture in office area(s) $3,193.37 (*Id.* at p. 8-9).

Much of the damage allegedly resulting from the water loss was repaired and/or remediated by subcontractors of Turner who were already working on the UMMC Anesthesia Offices project under change orders to their respective contracts. (Exhibit F, Contract Change Orders). The elevator repairs were made pursuant to proposals submitted by Otis Elevator Company.  (Exhibit G).

Turner was asked by BFPE to identify each expense or pecuniary loss paid, sustained or incurred by Turner as a result of the occurrence and in response, Turner referred to its produced documents. (Exhibit H, Turner's Answers to BFPE Interrogatories, Ans. No. 14).  The documents produced by Turner included invoices, change orders, bids and claimed personal property replacement costs, but did not include any evidence of payment made by Turner of any amount to any person or entity in connection with the claimed damages except payment of $27, 863.02 made to Otis. (Exhibit I, Declaration of Sandra T. Carson, Esquire, ¶ 4).  In fact, as reflected in change orders issued to Turner's subcontractors related to the water damage repairs, their invoices were covered by an "insurance recovery." (Ex. F). The "insurance recovery" amounts were not paid by Turner, as those "recoveries" paid to the subcontractors did not result in any change to the total amount to be paid by Turner under any of the respective agreements referenced.  (*Id.*).  The partial payment to Otis Elevator in the amount of $27,863.02 was admittedly paid with the funds that constituted the balance of payment owed by Turner to BFPE for its work under the subcontract, which funds were withheld by Turner from BFPE.  (Turner's Motion for Summary Judgment Regarding BFPE's Counterclaim, Doc. No. 19, Stortstrom Decl., ¶ 10).

On the date of the alleged loss, UMMC maintained builder's risk coverage for the Anesthesia Office project with coverage limits of $5 million under policy No. LQ096.  (Ex. J, Evidence of Property Insurance).  That coverage had an effective date of July 1, 2013 and an expiration date of July 1, 2014. (*Id.*). There is no deductible identified as applicable to the builder's risk coverage policy on the certificate of insurance provided by UMMC to Turner, (*id.*), consistent with the requirements of A201 § 11.3.1. (*See* Ex. B, § 11.3.1). Policy No. LQ096 also provided all-risk property insurance coverage to UMMC.  (Ex. K, Policy No. LQ096 with Declarations and Successive Renewal Agreement).  Specifically, under Article I "Property Insured", policy no. LQ096 states:

> This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, located at an **insured location** or within 1,000 feet/300 metres thereof, to the extent of the interest of the insured in such property.
>
> A.  Real Property, including new buildings and additions under construction, in which the insured has an insurable interest.

B.   Personal Property:

    1)       owned by the Insured….

    *     *     *     *

    3)       of officers and employees of the Insured.

*     *     *     *

    This Policy also insures the interests of contractors and subcontractors in insured property during construction at an **insured location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.   Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

(Ex. K, Article 1, "Property Insured," p. 9).  That policy insured numerous UMMC locations, including but not limited to the building at 22 S. Greene Street, Baltimore, MD, in which the Work at issue was being performed.  (Ex. K, Appendix A – Schedule of Locations, Loc. No. 1).

    Policy LQ096 did not exclude from coverage losses resulting from the discharge of water from a fire protection/fire suppression system, so such losses were covered under the policy. (Ex. K, Article 3, "Exclusions," pp. 10-14).  Likewise, the policy does not exclude coverage for any of the types of property that allegedly sustained damage as a result of the water discharge. (*Id.*, Article 2, "Property Excluded," p. 9-10). The coverage limit under the "all-risk" policy at the time of the events at issue was well in excess of the damages claimed herein. (*Id.*, Declarations, "Limits of Liability"). The "all-risk" property insurance carried a deductible of $25,000 for damages/causes of loss not otherwise specifically itemized in the policy.  (*Id.*, Declarations, p. 7).  However, for damages caused by water discharged from a fire protection system, that deductible is reduced by 50%. (*Id.*, p.8).  Thus, any deductible applicable to the losses in this case covered by the all-risk property insurance would have been $12,500.

    When asked to identify "all claims made against Turner by UMMC, its tenants, its insurer(s), any other contractor of Turner, or any other third party arising out of or related to the Occurrence," Turner stated as follows: "UMMC demanded that Turner fix the damage to the facility," and then referred to documents it had produced in response to BFPE's Request for Production of Documents. (Ex. H, Ans.

No. 10).  The documents produced by Turner did not include any documents reflecting or referring to "claims" or lawsuits asserted against Turner by any entity, any documents threatening such claims, or reveal any disputes over any damage or injury allegedly resulting from the water discharge.  (Ex. I, ¶ 3). Turner's document production included proposals, invoices, work orders and change order requests submitted by various subcontractors seeking to be paid for work performed by them to repair water damage from the January 21, 2014 incident, (Exs. D, G), and proof that submitted invoices were paid in the amounts requested. (Ex. F).  None of the subcontractors sought to recover, or were paid, any sum from Turner for the contractor's own "damage or injury" arising out of the water discharge. (Exs. D, G).

For the UMMC Anesthesia Offices project, BFPE's project superintendent was Dennis Reter, Sr., a 14-year veteran employee of BFPE who had been BFPE's primary superintendent for jobs at UMMC for essentially his entire employment.  (Exhibit L, Declaration of Dennis Reter, Sr., ¶¶ 1-2, 4).  Mr. Reter spoke with Craig Coulter of Turner on or around January 9, 2014 about the demolition of the sprinkler cabinets on the 11th Floor C wing.  Mr. Coulter advised that the work was to be performed on January 20 (later changed to the 21st) and Mr. Coulter prepared and submitted the sprinkler outage request and submitted it to UMMC as required by UMMC procedures.  (*Id.* at ¶ 5).  Mr. Reter did not provide any wording for the outage request and Mr. Coulter did not seek his input into the wording to be used.   The men agreed that BFPE would demolish the 11th Floor C Wing hose cabinets on the date selected and that the portion of the sprinkler system feeding the hose cabinets would be placed into outage by UMMC on that date for BFPE to do its work.  (*Id.* at ¶ 6).  Once Reter confirmed with Mr. Coulter the work BFPE would be performing on January 21st, no one from Turner and no one from UMMC contacted him at any time to ask, specifically, what portion of the sprinkler system need to be shut down on January 21st or to ask what BFPE would be doing, where it would be working or what pipes were going to need to be shut down and drained.  (*Id.* at ¶ 7).  On prior jobs, BFPE was not provided with a copy of outage requests by general contractors, including Turner, and Mr. Reter did not see and was not given a copy of the outage request for January 21st at any time before BFPE began work on that date.  (*Id.* at ¶ 8).

On the morning of January 21st, BFPE employees Joe Palle, Dennis Rivera and Kaylin Ortiz met Turner's Craig Coulter on the 11th Floor C Wing and walked the area where Turner wanted BFPE to work that day. Mr. Coulter advised BFPE's employees that they were to demolish hose cabinets on that floor/wing and also do some work on the sprinkler pipe. Mr. Palle, in coordinating the work to be performed, advised Mr. Coulter that BFPE would begin with the hose cabinets and then perform the sprinkler pipe work. Mr. Coulter advised that the outage request necessary for BFPE to do the identified work had already been submitted to UMMC and approved. (Ex. M, ¶ 6; Ex. N, ¶ 5-7). Neither Mr. Coulter nor anyone from UMMC made any inquiry to BFPE's employees regarding the requested outage or implementation of that outage. (Ex. M, ¶ 6). Mr. Palle then placed a call to Keith Geffen, UMMC's outage coordinator. (Ex. M, ¶ 7; Ex. N, ¶ 9).

When Mr. Geffen arrived at the work location on the 11th Floor C wing, he and Mr. Rivera walked the entire area where BFPE was to be working that day. During the walk-through, Mr. Rivera, who had worked on projects at UMMC for BFPE for several years, (Ex. N, ¶ 3-4), confirmed with Mr. Geffen all work that BFPE had been told by Turner to perform that day and pointed out all areas where that work was to take place. Mr. Geffen did not seem confused or have any questions about what he was told and after his discussion with Mr. Rivera, Mr. Geffen left the work area. (Ex. N, ¶ 11). When Mr. Geffen later returned to the work area, he told Mr. Rivera that BFPE was good to go – that BFPE could begin its work. (Ex. N, ¶ 12).

On every prior project at UMMC that Mr. Rivera and Mr. Palle had worked on for BFPE, when the UMMC outage coordinator told BFPE that the outage was in place and BFPE could begin its work, the appropriate outage had, in fact, been implemented. (Ex. M, ¶ 11; Ex. N, ¶ 18). Neither BFPE employee had ever experienced a situation at UMMC where UMMC's representative told them that a sprinkler system outage was in place and BFPE could begin work where they did so and found that the necessary portion of the system had not actually been shut down and drained. (Ex. M, ¶ 11; Ex. N, ¶ 18).

BFPE personnel did not submit outage requests to UMMC and were not permitted to implement sprinkler outages in that facility. Outage requests were made by the general contractor, including Turner,

and the physical operation of the sprinkler valves necessary to put requested outages in place was always performed solely by UMMC personnel.  (Ex. L, ¶ 9; Ex. M, ¶ 9; Ex. N, ¶ 16; *see also* Exhibit P, UMMC Outage/Intervention and Hot Work Permits Procedure, § 8.8.3, § 8.8.5(2), (8), (9), (10)).  BFPE personnel were not permitted to operate any valves that shut down any portion of the fire protection system or to assist UMMC personnel in doing so.  All valves affecting the water supply to the fire protection system were chained and locked, with keys maintained by UMMC's outage coordinator(s).  (Ex. M, ¶ 10; Ex. N, ¶ 17).

Turner's deadline for identifying experts and producing expert reports in this matter was July 17, 2015.  (Ex. O, Scheduling Order).  Turner did not identify any experts or produce any expert reports on that date and has not done so since. (Ex. I, ¶ 6). BFPE's expert witness, William E. Koffel, P.E., has opined that the outage request form prepared by Craig Coulter of Turner did not clearly and correctly indicate the work to be performed and the portion of the system that would be out of service.  (Exhibit Q, Koffel Report, § 4.2.1). He also reports that after the loss, it was determined that Mr. Geffen shut down the control valve that was past the point where the standpipe serving the 11th Floor C Wing hose cabinets were connected and drained the portion of the system downstream from the control valve that he closed. (*Id.* at § 4.1.8).  Finally, Mr. Koffel opines that BFPE exercised due care and caution in performing its assigned work on January 21st, that BFPE coordinated the outage with Turner and UMMC, and that Mr. Rivera slowly loosened the coupling at issue to first check for possible leaks.  (*Id.* at §§4.2.2, 4.2.2.3, 4.2.2.6). Finally, Mr. Koffel opines that if the outage procedures in place at UMMC had been properly implemented using an outage request form that clearly and correctly stated the work to be performed and the area impacted by the work, the water discharge of January 21, 2014 would not have occurred.  (*Id.* at § 4.2.3)

## SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(a). The moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-324, 106 S. Ct. 2548 (1986). 256, 262-263, 2008 U.S. App. LEXIS 6827, *13-14 (4th Cir. Md. 2008). Once it has done so, the non-moving party must present evidence that there is a genuine issue of material fact, and in doing so, may not simply rest on the pleadings, but must go beyond the pleadings in presenting evidence of a dispute of fact. *Id.* at 323-324.   A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," but must produce competent evidence supporting its opposition.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). When deciding a motion for summary judgment, the evidence and all reasonable inferences to be drawn therefrom are to be viewed in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 254, 106 S. Ct. 2505.

## APPLICABLE LAW

BFPE agrees that Maryland law applies to this dispute, including to the interpretation of the contracts at issue. (*See* Doc. 18, p. 6 of 9). Under Maryland law, "as a general rule, the construction or interpretation of all written instruments is [initially] a question of law for the court . . . ." *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 306, 596 A.2d 1069, 1075 (Md. 1991) (*quoting Gordy v. Ocean Park, Inc.*, 218 Md. 52, 60, 145 A.2d 273, 277 (Md. 1958)). *See also Rothman v. Silver*, 245 Md. 292, 296, 226 A.2d 308, 310 (1967) ("If a written contract is susceptible of a clear, unambiguous, and definite understanding, . . . its construction is for the court to determine.")

Maryland applies the principle of the objective interpretation of contracts.  *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 710 (Md. 2007).  The court will give effect "to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean."  *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (Md. 2006) (quoting *Towson Univ. v. Conte*, 384 Md. 68, 77, 862 A.2d 941, 946-47 (2004)).  Thus, to determine the meaning of a contract, the court confines itself to a review of the four corners of the document.  *Cochran*, 398 Md. At 17, 919 A.2d at 710 (*citing Walton v. Mariner Health*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006)).  In determining the meaning of a contract, the Court will construe the contract as a whole, *Gordon v. Gordon*, 342 Md. 294, 313, 675 A.2d 540, 550 (1996), giving effect to each clause and avoiding an interpretation that

renders any provision superfluous. *Bausch & Lomb Inc. v. Utica Mutual Ins. Co.,* 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993).

A contract is ambiguous if, "to a reasonable person, [it] is susceptible of more than one meaning or is of doubtful meaning." *Cochran,* 398 Md. at 17, 919 A.2d at 709.  In deciding whether a contract is ambiguous, the court is to consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985).

## ARGUMENT

### I.   BFPE is Entitled to Summary Judgment on Plaintiff's Claims.

#### A.   Turner Lacks Standing to Sue.

Turner seeks to recover from BFPE in excess of $200,000 that it claims to have "incurred" in order to repair damages resulting from the January 21, 2014 water discharge, plus legal fees and costs associated with its efforts to recover those amounts. (Complaint, ¶ 24). However, the undisputed evidence shows that other than $27,863.02 paid to Otis Elevator, the sums charged by Turner's subcontractors (all of whom except Otis were already on site as part of the Anesthesia Office renovation project) to repair the water damage at UMMC resulting from the January 21, 2014 incident were recovered from insurance and were not paid by Turner.  The Change Orders issued by Turner to the contracts with those subcontractors specifically identify "insurance recovery" for the amounts submitted by each subcontractor for the repairs made and also reflect that there was no change in the overall amount of the agreement between the subcontractor and Turner as a result of the repair work. (Ex. F).

As to Otis Elevator, Turner paid only $27,863.02 of the total $110,854.72 charged for the elevator repairs.  However, Turner has acknowledged the $27,863.02 it paid to Otis was actually the amount of the balance owed by Turner to BFPE under its subcontract and that Turner withheld that amount from BFPE and paid it to Otis instead.  (Turner's Motion for Summary Judgement Regarding

Counterclaim, Doc. No. 19, Storstrom Decl., ¶ 10). Since Turner paid Otis with funds originally intended for BFPE for this portion of its alleged damages, Turner has no right to seek to recover it from BFPE again.  Tuner did not pay the $27,863.02 out of its own funds, but rather out of funds that it admittedly owed to BFPE.  Turner cannot premise its standing to sue on a payment of claimed damages which was made with funds originally intended to be paid to the very party it is suing.

Finally, there is no evidence that Turner paid UMMC to replace its claimed personal property losses.  Turner was asked to identify all expenses it incurred and it referred to its document production. (Ex. H, Ans. No. 14).  Those documents include no evidence of any payment by Turner to UMMC for its personal property, such as a copy of a check or a receipt. (Ex. I, ¶ 5). At best, Turner's documents show that UMMC allegedly suffered damage to certain personal property and provided an estimated replacement cost for that property. However, a cost estimate, without proof of payment by Turner of the estimated amounts, is insufficient to establish Turner's right to recover the sums identified in those documents.

Because Turner has not incurred any actual costs or expenses as a result of the property damage caused by the January 21st water discharge, it has no standing to sue.  Since it cannot seek recovery of the amounts that were paid for repairs to or replacement of property, Turner has no right to seek legal fees or expenses incurred as a result of its efforts to recover those sums from BFPE, whether before filing suit or as a result of the present action.  BFPE is therefore entitled to judgment as a matter of law on Plaintiff's claims.[2]

B.       Turner Has Waived its Claims Against BFPE.

By the unambiguous terms of the General Contract, Turner has expressly waived its right to pursue claims against BFPE to the extent that the losses claimed are covered by UMMC's property

---

[2] As to amounts paid by an insurer, it is worthwhile to note that under principles of subrogation, the rights of any insurer who made payments on Turner's behalf are limited to the rights that Turner itself would have had if it made the payments.  That insurer "stands in the shoes" of Turner and is subject to all of the same defenses.  *See Hill v. Cross Country Settlement,* LLC, 402 Md. 81, 313, 936 A.2d 343 (Md. 2007) (*quoting George L. Schnader, Jr., Inc. v. Cole Bldg. Co.*, 236 Md. 17, 23, 202 A.2d 326, 30 (1964). As such, each and every one of the arguments set out below would apply with equal force to the insurer who paid the damages claimed in this case and the outcome would be the same: summary judgment in favor of BFPE.

insurance, regardless of the existence of the indemnity provision in the subcontract on which Turner's Motion for Partial Summary Judgment (Doc. No. 18) rests.

Turner's express waiver is found in "The General Conditions of the Contract of Construction," Document AIA A201-2007 (hereinafter "A201-2007"), which is expressly incorporated into the General Contract between Turner and UMMC. (Ex. A, § 1.1, § 1.3, § 12.2.2).  In relevant part, A201-2007 states that "The Owner and Contractor waive all rights against (1) each other ***and any of their subcontractors***, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work." (Ex. B, § 11.3.7) (emphases added).  That provision goes on to state that "[a] ***waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise . . . .*" (*Id.*) (emphases added).  It also states that, "[i]f during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project,  . . ., the Owner ***shall waive all rights in accordance with the terms of § 11.3.7 for damages caused by fire or other causes of loss covered by this separate property insurance*." (Ex. B, § 11.3.5).

Maryland Courts have long recognized and upheld waivers of subrogation. *See Gen. Cigar Co. v. Lancaster Leaf Tobacco Co.*, 323 F. Supp. 931, 942 (D. Md. 1971). Specifically with regard to waivers of subrogation in construction contracts, the Maryland Court of Special Appeals has recognized that there is a valid purpose behind waivers of subrogation in construction contacts:

> [S]ubrogation waiver[s] encourage [] parties [] to anticipate risks and to procure insurance covering those risks and also facilitate [] and preserve [] economic relations and activity. Because a property owner can generally acquire insurance to protect the property against fire and other perils, in the context of a construction contract, the waiver of subrogation clause shifts the ultimate risk of loss resulting from such perils to the owner to the extent the damages are covered by insurance.  The intent is to avoid disruption during construction and provide certainty and eliminate litigation by having the contracting parties look only to the owner's insurance for protection in the event of a loss resulting from fire or other perils.  In other words, a waiver of subrogation clause substitutes the protection of insurance for the uncertain and expensive protection of liability litigation.

*Harford Underwriters Ins. Co. v. Phoebus*, 187 Md. App. 668, 677, 979 A.2d 299,304 (Md. App. 2009)

(quoting *Tx. C.C. Inc v. Wilson/Barnes Gen. Contractors, Inc.*, 233 S.W.3d 562, 567-68 (Tx. App. 2007)).

The *Phoebus* Court also recognized that, "[g]enerally, waiver of subrogation clauses are included in

construction contracts 'to cut down the amount of litigation that might otherwise arise due to the existence

of an insured loss.'" *Id.* (*quoting* 4 PHILIP L. BRUNER & PATRICK J. O'CONNOR, JR., BRUNER &

O'CONNOR ON CONSTRUCTION LAW, § 11:100 at 306-07 (2002). Maryland Courts have

recognized that the existence of insurance requirements and waivers of subrogation clauses in a contract

reflect the parties' contemplation that the risk of property damage resulting from a covered cause of loss

"would be covered by insurance, and not by either of the parties." *Brodsky v. Princemont Constr. Co.*, 30

Md. App. 569, 576-577, 354 A.2d, 440, 445 (Md. App. 1976).

Looking at the plain language of the waiver, it is evident not only that it applies to claims by

Turner against BFPE, but also that it encompasses claims as to all of the damages to UMMC's real and

personal property, whether to property included within "The Work" on the 11th Floor or to damage

occurring outside of the "Work" on other floors of the building.

### 1. The Waiver Applies to Claims Against BFPE by Turner.

Turner's waiver of subrogation explicitly applies to claims by Turner against BFPE, a

subcontractor. "[T]he AIA provision from which the subrogation waiver in this case is drawn 'applies

expressly to subcontractors. Therefore, subcontractors are protected from subrogation actions by virtue

of the clause.'" *Great Am. Ins. Co. v. W. States Fire Prot. Co.*, 739 F.Supp.2d 1308, 1324 (D.N.M. 2009)

(quoting P. Brunei & P. O'Connor, Jr., *Brunei and O'Connor on Construction Law* § 5:231, Standard

Construction Contract Forms: Analysis of the AIA General Conditions (2009)). There can be no other

reasonable interpretation of the plain language of § 11.3.7. Moreover, under factual situations similar to

the one in this case, where Turner has brought suit against its own subcontractor, courts interpreting

identical or substantively identical waivers of subrogation in other AIA documents and other contracts

have held that the language is effective to waive claims by a General Contractor (or its insurer) against

its own subcontractors.  *See, e.g., Great Am. Ins. Co.*, 730 F.Supp. 2d 1308, 1323-1324 (D.N.M. 2009); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 Del. Super LEXIS 13, *4 (Del. Super. Jan. 17, 2003); *Gray Ins. Co. v. Old Tyme Builders, Inc.*, 878 So.2d 603, 607 (La. App. 2004).

Though BFPE is not expressly identified by name in the General Contract, the inclusion of the class of "subcontractors" as among those against whom claims are waived clearly expresses the intent of the contracting parties to confer a benefit upon that class of persons. Since BFPE is a member of the class of subcontractors, it is an intended third-party beneficiary of the waiver of subrogation provision. *See Weems v. Nanticoke Homes, Inc.*, 37 Md. App. 544, 555, 378 A.2d 190, 196 (1077) ("Where the contract clearly indicates an intent that third parties should receive a direct benefit, there is no question that they may seek enforcement against the promisor."); *see also Great Am. Ins. Co.*, 730 F.Supp. 2d at 1322-1323; *RLI Ins. Co. v. Southern Union Co.*, 341 S.W.2d 821, 831 (Mo. App. 2011); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 730 (Tex. App. 1992).

That the waiver of subrogation applies to Turner's claims against BFPE is further evidenced by the incorporation of the General Contract and Contract Documents into BFPE's subcontract with Turner. Specifically, BFPE is required to perform its Work under the subcontract in strict accordance with, *inter alia*, "the terms and provisions of the General Contract. . . ."  (Ex. C, Article II, "Description of Work), p. BFPE 0371).  Moreover,

> [w]ith respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to Contractor by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward Contractor all of the duties, obligations and responsibilities that Contractor by those Contract Document assumes toward the Owner, and the Subcontractor agrees further that ***Contractor shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against Contractor*** with the same force and effect ***as though every such duty, obligation, responsibility, right or remedy were set forth herein in full.***  The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.
>
> This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted. . . .

(*Id.*, Article II, "Contract Documents," at p. BFPE 0371) (emphases added).   The reasonable interpretation of this language is that the parties intended the waiver of subrogation, together with the other terms and conditions of the General Contract, to apply to the relationship between Turner and BFPE.   Under Article II, Turner's remedies against BFPE under the subcontract are no greater than UMMC's rights against Turner under the General Contract.   Since UMMC has no remedy against Turner for losses covered by UMMC's property insurance as a result of the waiver contained in § 11.3.7, Turner likewise has no remedy against BFPE for the same losses.

Further, the fact that an indemnity provision exists in the subcontract does not negate or invalidate the waiver of subrogation given by Turner in the General Contract.   This fact is most strongly evidenced by the express statement in § 11.3.7 that the waiver of subrogation is "effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise. . . ." (Ex. B, § 11.3.7).   This language can only be interpreted to reflect an intent that the waiver of subrogation as to losses covered by insurance take precedence over a co-existing indemnity obligation. The logical interplay between these provisions is that there will be no indemnity as to property damage claims for which there is existing insurance coverage, but as to claims for non-covered property damage or for other types of harm not addressed by the waiver of subrogation provision, the indemnity provision remains in effect.   This is the only way to read and interpret these elements of the General Contract and subcontract "to supplement and complement each other" as required by the subcontract, (Ex. C, Article II, "Contract Documents," p. BFPE 0371).   *See Liberty Mut. Ins. Co. v. CB Richard Ellis, Inc.*, 242 Fed. Appx. 32, 36, 2007 U.S. App. LEXIS 15563, **8-9 (4th Cir. Jun. 29, 2007) (holding that indemnity provision and waiver of subrogation provision in property management agreement, "when read together, plainly demonstrate the parties' intent to indemnify each other for *uncovered* losses arising from their own negligence but to look to their insurers, and not to each other, in the event of a covered loss."); *see also Summit Constr., Inc. v. Gen. Heating & Air Conditioning, Inc.*, 595 S.E.2d 472, 475-76 (S.C. 204) (holding no conflict between indemnification clause and waiver

of subrogation clause); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 Del. Super LEXIS 13, *24-25 (Del. Super., Jan. 17, 2003) (holding that waiver of subrogation provision relieved subcontractor of indemnity obligation for losses covered by insurance, but not of obligation to indemnify for applicable deductible).

  2.  Turner's Waiver Applies to All Damages Claimed, Whether to "The Work"
       or to Adjacent Property, to Extent Covered by Insurance.

Turner has waived all claims against BFPE "to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work."  (Ex. B, § 11.3.7). It has also waived claims to the same degree to the extent UMMC maintained separate property insurance covering losses to real or personal property at or adjacent to the site of the Work.  (*Id.* at § 11.3.5).  Thus, regardless of whether the damages that Turner seeks to recover in this action are to property located in the 11th Floor to areas included as part of the "Work" or to property on other floors considered non-"Work" areas, claims for those damages are waived to the extent the losses were covered by Policy No. LQ096.

Here, the evidence indicates that UMMC used its existing all-risk policy to provide the builder's risk coverage for the Anesthesia project.  (Ex. G, H).  In such a situation, the language of the waiver makes clear that the waiver will encompass both "Work" and non-"Work" losses covered by that policy.  This is because the scope of the waiver is defined by the extent of the insurance coverage provided, and not defined by the nature of the property harmed.  (Ex. B, § 11.3.7).  If the coverage is only for the "Work," such as with a separate policy purchased pursuant to § 11.3, then that is the scope of the waiver.  However, if the "property insurance applicable to the Work" is provided by a policy that encompasses not just the "Work" but other areas as well, then the waiver extends to the full scope of that coverage.  The majority of courts interpreting the scope of waiver language identical to that in A201 § 11.3.7 have so held. *See, e.g. Church Mut. Ins. Co. v. Palmer Constr. Co.*, 153 Fed.Appx. 805, 809 (3d Cir. 2005); *Rahr Malting Co. v. Climatic Control Co.,* 150 F.3d 835, 837 (8th Cir. 1998); *Westfield Ins. Group v. Affina Devl. LLC*, 2012 Ohio App. LEXIS 4674, **31-36 (Ohio.App. Nov. 14,

2012); *Lexington Ins. Co. v. Entrex Commun. Servs.*, 749 N.W.2d 124, 134-135 (Neb. 2008); *Fed Ins. Co. v. Woodruff Constr.*, 2012 Iowa App. LEXIS 1023, *6-9, 2012 WL 5954588 (Iowa App. Nov. 29, 2012); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 Del. Super. LEXIS 13, *4 (Del. Super. Ct. Jan. 17, 2003); *Lloyd's Underwriters v. Craig & Rush, Inc.*, 26 Cal. App. 4th 1194, 1199-1201, 32 Cal. Rptr. 2d, 144, 147-149 (Cal. App. 4th Dist. 1994); *Haemonetics Corp. v. Brophy & Phillips Co.*, 501, N.E.2d 524, 526 (Mass.App. 1986).

However, even if UMMC's builder's risk coverage for the "Work" and the all-risk coverage for the remaining non-"Work" portions of the building are considered two separate policies, the outcome is the same. The presence of § 11.3.5 in A201-2007 expressly extends the waiver of subrogation set out in § 11.3.7 to claims for damage to adjacent, "non-work" property covered by separate insurance maintained by the Owner. Thus, the purchase of two separate policies, one applicable to the "Work" and one to adjacent non-"Work" property has the same result as purchasing one policy that covers both - waiver of claims for all damages to the extent covered by insurance. *Lloyd's Underwriters*, 26 Cal.App. 4th at 1200, n.5, 32 Cal. Rptr.2d at 148 n.5 (noting that under a provision substantively identical to § 11.3.5, if a separate policy covering losses to "Work"-adjacent properties was purchased by the Owner, claims for injuries to non-"Work" property was also intended to be waived); *MU Chapter of the Sigma Pi Fraternity of the U.S., Inc. v. Northeast Constr. Servs.*, 709 N.Y.S.2d 677, 680 (A.D.3 Dept. 2000) (claims against contractor for damages to adjacent property, covered by separate insurance purchased by the Owner, are waived under § 11.3.5); *see also AIA Document Commentary, A201-2007 General Conditions of the Contract for Construction,* § 11.3.5, "Commentary" ("This section extends the provisions for waiver of subrogation to other property insurance the owner may purchase. Such policies may cover property at or adjacent to the project site or they may replace the

property insurance that was in effect on the work during construction").[3]

### 3. The Losses Claimed Are Covered by UMMC's Property Insurance.

The damages that resulted from the water discharge in this case were, without dispute, caused by a "covered cause of loss" under UMMC's applicable insurance. Policy No. LQ096 is an "all-risk" policy that covers any cause of loss not expressly excluded. That policy contains no exclusions for damages caused by the release of water from a fire protection system. (Ex. K, p. 10-14). Likewise, it provides coverage for damage to all types real and personal property allegedly resulting from the water discharge. (Ex. K, pp. 9-10). UMMC's coverage limits under the builder's risk portion of the policy covering the "Work" was $5 million, (Ex. J), well in excess of the claimed damages. The coverage limit for the all-risk property insurance covering the non-"Work" areas was $10 million. (Ex. K, Declarations, p. 3). Given that the total damages sought are alleged to be approximately $240,000, all of those damages were covered by applicable insurance.

Based on the language of the waiver of subrogation, the alleged cause of the loss, the nature of the damages claimed, and the existing and applicable insurance coverage, the objective intent of the parties was that no claims for covered losses occurring during the course of the UMMC Anesthesia Project would be pursued against BFPE or any other contractor or subcontractor and that the parties would, in the event of such losses, look to UMMC's insurance as the exclusive remedy. For that reason, and all others set out above, BFPE is entitled to summary judgment on Plaintiff's claims.

### C. Turner is Not Entitled to Indemnity from BFPE Because the Prerequisites for Indemnification Under Article XXIII Have Not Occurred.

Assuming, *arguendo*, that Turner has standing to pursue its claims despite the evidence to the contrary and to the extent that UMMC had a $12,500 deductible applicable to the loss, Turner is still not

---

[3] BFPE acknowledges that to the extent that UMMC had a deductible under policy LQ096, which would be no more than $12, 500 (Ex. K, "Declarations," p. 7-8), any such deductible would be considered an "uninsured" portion of the loss for which BFPE might, under the appropriate circumstances and with adequate factual proof, be called upon to indemnify Turner under the terms of the subcontract. However, as set out in § III, below, the prerequisite events triggering an obligation to indemnify Turner for any portion of the claimed losses, including UMMC's property damage deductible, have not occurred and thus, BFPE is entitled to judgment as matter of law on Turner's claims against it and Turner is not entitled to summary judgment as to any portion of its liability claim against BFPE.

entitled to indemnity from BFPE.  Before any obligation on the part of BFPE to indemnify Turner under

Article XXIII of the subcontract can arise, there are certain prerequisites that must occur and those

prerequisites are not met in this case.

The prerequisites are spelled out in the unambiguous language of Article XXIII itself.

Objectively, that Article contains two sections.  The first is the initial sentence:

> The Subcontractor hereby assumes the entire responsibility and liability for any and all
> actual or potential *damage or injury* of any kind or nature whatsoever (including death
> business interruption or loss of use resulting therefrom) *to all persons and entities*, whether
> employees of the Subcontractor, or any tier of the Subcontractor or otherwise, *or to all
> property*; or as a result of a perceived risk of such damage or injury (including actions
> taken to avoid or contain such actual or potential damage or injury, whether required or
> incurred by a public authority or otherwise*)*: caused by, resulting from, arising out of or
> occurring in connection with the execution of the Work, or in preparation for the Work, or
> any extension, modification or amendment to the Work by change order or otherwise.

(Ex. C, Art. XXIII, "Assumption of Liability & Indemnity," p. BFPE 0381).   This sentence does not

confer any obligation to indemnify or identify when such an obligation arises or to whom it is owed.

Rather, it establishes two prerequisites that must occur before BFPE will assume any responsibility or

liability:  1) actual or potential damage or injury to persons or property, 2) "caused by, resulting from,

arising out of or occurring in connection with the execution of" BFPE's Work, "or in preparation for the

Work." If there is no actual or potential damage or injury, or such damage or injury is not "caused by,

resulting from, arising out of or occurring in connection with the execution" of BFPE's work, there is no

assumption of responsibility and liability under Article XXIII and BFPE has no indemnity obligation.

The second section of Article XXIII defines the circumstances under which BFPE will be

required to indemnify Turner following the occurrence of the two above-referenced prerequisites:

> ***Should any claims*** for such actual or potential damage or injury (including death resulting
> therefrom) be made or asserted, whether or not such claims are based upon an Indemnified
> Party's alleged active or passive negligence or participation in the wrong or upon any
> alleged breach of any statutory duty or obligation on the part of an Indemnified Party, the
> Subcontractor *agrees to indemnify and save harmless the Indemnified Party **from and
> against any and all such claims** and further from and against any and all loss, cost,
> expense, liability, damage, penalties, fines or injury, including legal fees and
> disbursements**, that the Indemnified Party may directly or indirectly sustain, suffer or
> incur as a result thereof*** and the Subcontractor agrees to and does hereby assume, on
> behalf of the Indemnified Party, the defense of any action at law or in equity which may be
> brought against the Indemnified Party ***upon or by reason of such claims*** and to pay on

behalf of the Indemnified Party, upon demand, the amount of any judgment that may be entered against the Indemnified Party in any such action. . . .

(*Id.*) (emphases added). This section unambiguously expresses the intent that BFPE is only obligated to indemnify 1) when a claim is made for "such actual or potential damage or injury" against Turner or another indemnified party, or litigation against Turner results from such a claim, and 2) there are costs, expenses, liability, judgments, or other sums incurred as a result of such claims or litigation.

When interpreting indemnity provisions under Maryland's objective standard of contract interpretation, the "claims" for which indemnity is required are understood to be claims by third-parties against an indemnified party, not the indemnified party's own claims against the indemnitor. *See, e.g., Nat'l Labor College, Inc. v. Hillier Group Architecture N.J., Inc.*, 739 F.Supp.2d 821, 829-830 (D. Md. 2010) (holding that indemnity provision required a claim against the indemnified party by a third party before triggering a right to indemnity and that indemnified party's own loss of use claim did not give rise to a right to indemnity under the applicable provision); *Levin v. Septodent, Inc.*, 34 Fed. Appx. 65, 76 (4th Cir. 2002) (holding that "garden variety indemnification clause" could not reasonably be read to cover expenses incurred in litigation between the contracting parties); *see also Tony Guiffre Distributing CO. v. Washington Metropolitan Area Transit Authority*, 740 F.2d 295 (4th Cir. 1984) (holding that purpose of indemnity clause was to save indemnified party harmless from "any liability, including costs and attorney's fees, that it incurred because of an action against it by a third party whose damages were caused by the [indemnitor's] negligence" and would not encompass the indemnified party's attorney's fees in an action to recover under the indemnity provision); *accord., St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 Del. Super. LEXIS 13, *25 (Sup. Ct. of Del, New Castle, Jan 17, 2003) ("Indemnity clauses…are commonly found in construction contracts and are clearly intended to protect the general contractor (as well as the owner and architect) from suits brought by third parties who are injured by acts of the subcontractors, as opposed to claims among the contracting parties against each other.")

1.  <u>No Third-Party Claims for Damage or Injury Were Made Against Turner.</u>

No third party has made any claim against Turner for actual or potential damages or injury, whether to person or property.  Thus, a necessary prerequisite to BFPE's obligation to indemnify Turner under Article XXIII is missing and Turner's motion for partial summary judgment must be denied.

Turner's sole allegation is that its damages are the result of payments made to repair the water damage sustained by UMMC or to replace UMMC's property. (Complaint, ¶ 24). Even if Turner had made such payments and incurred some loss as a result, which it did not, none of the subcontractors who made repairs alleged, and none were paid, for any damage to their own property or injury to any of their employees as a result of the water discharge. Those subcontractors merely submitted invoices/work orders for services rendered in performing repairs to UMMC's property.  (Ex. D).  The submission of an invoice by a contractor, in the ordinary course of business and in conformity with a pre-existing practice, cannot reasonably be considered the assertion of a "claim" against the party who hired that contractor.  Since none of the contractors suffered or alleged actual or potential damage or injury as a result of the water discharge, none of the requests for payment made by Turner's other subcontractors meet the necessary prerequisites to trigger an obligation on the part of BFPE to indemnify Turner under Article XXIII and Turner is not entitled to judgment as a matter of law as to any such payments.

For purposes of BFPE's motion and opposition, it is not disputed that UMMC did suffer actual damage to personal property as a result of the water discharge on January 21, 2014. (*See* Ex. E). However, it is impossible for UMMC to assert a "claim" against Turner for that damage. UMMC expressly waived all claims against Turner to the extent covered by UMMC's insurance in the General Contract.  (Ex. A, § 11.3.5, 11.3.7). All of the personal property damages sustained by UMMC are covered by policy no. LQ096, *see* §I(B)(3), *supra*; thus, UMMC's waiver of claims against Turner is valid and effective.  Since UMMC waived its right to all claims against Turner to the extent covered by insurance, no payment by Turner to UMMC for its personal property damage is sufficient to trigger BFPE's indemnity obligation under Article XXIII because no "claim" for such damage could be made.

Finally, to the extent UMMC's personal property damages were subject to a deductible (and thus not covered by insurance), Turner is still precluded from seeking indemnity from BFPE under Article XXIII for such amounts.  First, there is no evidence of record that UMMC ever demanded that Turner pay UMMC for its damaged personal property, that is, made a "claim."  The only evidence is that UMMC "demanded that Turner fix the damage."  (Ex. H, Ans. No. 10).  The damage was fixed by Turner's subcontractors.  (Ex. D).  Thus, this "demand" was satisfied.  In the absence of a claim, there can be no duty to indemnify under Article XXIII.  Second, there is no evidence that Turner itself actually paid any sum to UMMC for any portion of its claimed personal property damage.  If Turner did not incur any "loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements" in connection with the alleged "claim" asserted by UMMC, then it has no right to indemnity from BFPE under Article XXIII.

Third, the subcontract specifically identifies "the Owner", in this case UMMC, as an "Indemnified Party" under Article XXIII, (Ex C, Article XXIII, "Assumption of Liability & Indemnity", p. BFPE 0381).  Thus, UMMC is not a third party of the type whose claim would trigger BFPE's indemnity obligations to Turner.  Rather, UMMC stands in the same position as Turner with regard to BFPE. Any "claim" by UMMC for payment for uninsured personal property damage to Turner is no different than a claim by Turner itself against BFPE for damages – it is not within the contemplation of Article XXIII as a reasonable person would interpret that provision. Indemnity provisions provide protection for the General Contractor and Owner against claims from *outside parties* for injury or damages caused by the subcontractor. They are not a means to re-allocate losses between the contracting parties. *Nat'l Labor College, Inc.*, 739 F.Supp.2d at 829-830; *Levin*, 34 Fed. Appx. at 76; *Tony Guiffre Distributing Co.*, 740 F.2d 295; *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 Del. Super. LEXIS 13, *25.

Because no third-party claims for actual or potential damage to persons or property resulting from the January 21, 2014 discharge were or could be made against Turner, as a matter of law, BFPE has no obligation to indemnify Turner for any sums it paid or attorney's fees it incurred in connection with

repairing that damage or seeking to compel BFPE to do so. As a result, Turner is not entitled to summary judgment on liability and its motion must be denied. These same conclusions compel the grant of BFPE's motion for summary judgment on Plaintiff's claims.

       2.   <u>There is No Admissible Evidence Establishing BFPE's Actions or "Work" as the Cause of the Discharge.</u>

Turner has not provided this Court with any admissible evidence that would support an inference that the water loss at issue was caused by, resulted from, arose out of or occurred in connection with the execution of BFPE's Work or its preparation for the Work that it was obligated to perform under the subcontract.[4] Instead, Turner's Motion asserts without support that BFPE failed to "properly coordinate" the outage and that because the water escaped when BFPE loosened a coupling, the loss necessarily arose out of or occurred in connection with BFPE's "Work" under the subcontract.  This position overlooks undisputed evidence regarding both coordination of the outage and the scope of BFPE's "work" in connection with outages.

Turner has not produced any expert reports in this case despite the passage of its deadline to do so.  (Ex. O, Ex. I, ¶ 6).  Thus, Turner has provided no evidence of what "proper" coordination consists of and how BFPE failed to comply with it or what the standard of care requires of a sprinkler contractor who is working on pipes in a situation where they did not physically implement the outage.  Without such evidence, Turner cannot establish negligence by BFPE and thus cannot establish that any act or omission by BFPE in coordinating the outage led to the presence of water in the sprinkler pipe or to the discharge

---

[4] The only evidence submitted by Turner in support of its motions pertaining to BFPE's actions in this case are the two Declarations of Gregory Stortstrom. However, despite his affirmations, Mr. Stortstrom  cannot have personal knowledge of the events leading up to the water discharge or the events occurring at UMMC involving BFPE, Turner and UMMC on that date of the incident. It is undisputed that neither Mr. Stortstrom nor any other person from Turner was present during BFPE's conversations with Keith Geffen of UMMC or at the time when BFPE actually began its work.  (Ex. M, ¶ 8; Ex. N, ¶ 8, 13). When asked to identify all eyewitnesses and persons with personal knowledge of relevant events, Turner did not identify Mr. Stortstrom. (Ex. H, Ans. No.  1).

    Further, the incident report appended to Mr. Stortstrom's Declarations is a hearsay document that contains further hearsay.  The document was prepared by Craig Coulter of Turner, however, Mr. Coulter was also not present immediately prior to and at the time of the events at issue and therefore has no personal knowledge of what actually occurred that morning. (Ex. N, ¶13).  These documents are not admissible evidence in support of a motion for summary judgment under F.R.Civ.P. 56, and as a result, cannot support Turner's argument that it is entitled to indemnity because the loss at issue arose out of or in connection with BFPE's performance of or preparation for its Work.

of that water on January 21st. The only evidence before this Court on the issue of coordination establishes that BFPE did coordinate, both prior to the date of the incident and on that date, with both Turner and UMMC's outage coordinator.  (Ex. L, ¶ 6; Ex. M, ¶ 6-7; Ex. N, ¶ 6-9, 11-12).

It is undisputed that all parties were aware prior to January 21st that, on that date, BFPE was scheduled to demolish the 11th Floor C Wing hose cabinets and that it needed an appropriate outage in place to do so. On the day of that work, BFPE and Turner and then BFPE and UMMC's Keith Geffen walked the work area and discussed the areas where work was to be performed and that an outage was needed.  (Ex. M, ¶ 6-7; Ex. N, ¶ 6-9, 11-12).  At no time did anyone from Turner, who submitted the outage request, or UMMC, who implemented the outage, ask any questions of BFPE or seek their input into the outage process. (Ex. L, ¶ 7; Ex. M, ¶ 6; Ex. N, ¶ 11).

In addition, BFPE's expert, William E. Koffel, P.E., opines that BFPE exercised due care in the performance of its work on the date in question.  (Ex. Q, § 4.2.2).  He notes that BFPE coordinated the outage with Turner and UMMC and that Mr. Rivera did not begin work until he was told by Mr. Geffen that he could safely do so.  (Id. at § 4.2.2.5) He also noted that in removing the coupling, Mr. Rivera slowly loosened it in order to check for possible leaks.  (Id. at § 4.2.2.6).

Although Turner acknowledges that the water loss happened because "the sprinkler system was not turned off in the right location," (Turner's Motion for Partial Summary Judgment on Liability, Doc. No. 18, p. 4 of 9), the admissible evidence supports only one reasonable conclusion about who was at fault for that condition: either Turner, UMMC, or both concurrently were responsible for the failure to implement the proper outage and that BFPE did not contribute in any way to that failure.  Turner had sole responsibility for submitting outage requests and submitted the request for the outage on January 21, 2014 without requesting any language for that outage from BFPE and without providing a copy to BFPE prior to the incident. (Ex. L, ¶ 6, 9; Ex. P, § 8.8.5(2)).   UMMC had sole responsibility for implementing requested outages, including the outage on January 21, 2014. (Ex. L, ¶ 9; Ex. M, ¶ 1-; Ex. N, ¶ 17; Ex. P, § 8.8.5(8), (10)).   BFPE had no role in or right to perform either task at the time of the events at issue.

UMMC's outage coordinator told BFPE, after coordination, that it could begin its work.  (Ex. N, ¶ 12).

Moreover, the outage request submitted by Turner was unclear and did not correctly indicate the work to

be performed or the portion of the system that would be out of service, (Ex. Q, § 4.2.1), and UMMC's

coordinator turned off a control valve that was past the point at which the standpipe feeding the hose

cabinets was located.  (*Id.* at § 4.1.8).

Based on this evidence, the only conclusion a reasonable juror could reach is that the water loss

was caused by, resulted from, or arose out of the performance of Turner's work and/or UMMC's work,

and not that of BFPE. If the loss did not arise from or in connection with BFPE's work, a necessary

prerequisite for indemnity under Article XXIII is missing and BFPE cannot be held liable to Turner.  The

mere fact that BFPE's work revealed the flow in the work of Turner, UMMC or both of them, does not

mean that the loss was caused by, resulted from, or arose out of or in connection with BFPE's work.

Based on the undisputed admissible evidence, summary judgment cannot be granted to Turner on the

issue of liability.

## II.        BFPE is Entitled to Summary Judgment on its Counterclaim.

### A.   Turner Had no Right to Withhold Final Payment from BFPE.

Turner's alleged authority for withholding BFPE's $27,863.02 final payment is Article XXIII of the

subcontract.   While that articles does permit Turner to withhold sums in certain situations, no such

situation exists in this case.  Just as Turner's right to indemnity from BFPE does not arise unless and until

there is a claim or lawsuit for actual or potential damage to person or property asserted against Turner by

a third party (that is, not another contracting party), *see* discussion in § I(C), above, its right to withhold

payment from BFPE is premised on the existence of exactly the same type of claim.   Immediately

following the language regarding when an obligation of indemnity arises on the part of the subcontractor,

Article XXIII states "In the event that any such claims, loss, cost, expense, liability, damage, penalties,

fines or injury arise or are made, asserted or threatened against the Indemnified Party," Contractor shall

have the right to withhold certain sums.  (Ex. C, Article XXIII, "Assumption of Liability & Indemnity," p.

BFPE 0381).   Given that this sentence uses the phrase "*such* claims, loss, cost. . .," the logical interpretation is that it is referring to exactly the same types of claims and losses that give rise to a right to indemnity.   Since indemnity will only arise out of a claim by a third-party for actual or potential injury to damage or property, this language makes clear that a right to withhold payments also arises only in the event of a third party claim or an actual or threatened "loss, cost, expense, liability. . .," incurred in connection with a third party claim.   Since none of the repair costs were "claims" or were for damage to the repairing subcontractor's own property, none of those repair costs justified withholding BFPE's final payment.   Further, since UMMC is an "Indemnified Party" under Article XXIII, it is not a third party and any "claims" it may have asserted (to the extent not waived by § 11.3.7 and/or § 11.3.5 of the General Contract)  would not give rise to a right on the part of Turner to withhold any payment from BFPE.   For these reasons, Turner's decision to withhold the $27,863.02 owed to BFPE was unjustified and improper.

B.  <u>All Conditions Precedent for Final Payment Were Met.</u>

The subcontract identifies four conditions precedent for final payment. (Ex. C, Article IV, "Final Payment," p. 0373).   Turner has identified only one allegedly unmet condition precedent to justify its refusal to make final payment to BFPE:  the failure to satisfy all "claims, demands and disputes and all obligations …arising out of the Subcontract."   (Turner's Motion for Summary Judgment on BFPE Counterclaim, Doc. 19, p. 6 of 11, ¶ 6, p. 9 of 11).   However, as previously discussed, Turner expressly waived any claims against BFPE for property damages to the extent covered by UMMC's insurance.   Thus, there was no valid "claim, demand and dispute" between Turner and BFPE related to the costs to repair the damage from the January 21st water discharge and Turner's demand that BFPE pay for repairs to the insured property of UMMC was unwarranted and improper.   Indeed, by clarifying in writing the parties' intent to look to the owners' insurance for recovery of property damage and subjugating existing indemnity provisions to that waiver for covered losses, it is this very type of "claim, demand and dispute" that waivers of subrogation are intended to prevent.   Turner's baseless and unsupportable "demand" to

BFPE for payment of the repair costs and BFPE's refusal to do so does not constitute a failure to satisfy claims sufficient to warrant Turner's refusal to make final payment to BFPE under the subcontract.

Further, the existence of the waiver, covering as it did claims between Turner and BFPE, between UMMC and Turner, and UMMC and BFPE, prevented there from being any "obligation and responsibility" on the part of BFPE to pay for any damages that were covered by UMMC's insurance. Again, the recognized intention of the waiver provision in § 11.3.7 and § 11.3.5 is to remove any "obligation" or "responsibility" from subcontractors for property damage that is covered by insurance.

Turner's reliance on the "failure" to satisfy claims, demands and disputes" condition precedent is mere pretext for an otherwise unjustifiable failure to pay that constitutes breach of its contractual obligations and does not entitle it to summary judgment on BFPE's counterclaim. There were no actual unsatisfied claims, demands, disputes or other obligations or responsibilities of BFPE under the subcontract. Moreover, Turner has admitted that BFPE completed its Work under the subcontract. (Ex. H, Ans. No. 21). There is no dispute that the remaining two conditions precedent to final payment were also met by BFPE. Thus BFPE is entitled to be paid. Turner cannot make demands of BFPE that violate Turner's contractual promises and obligations and then use those improper demands to deny payment to BFPE. BFPE did what it was required to do in order to receive payment and it is therefore entitled to judgment as a matter of law.

C.      Turner's Failure to Produce Admissible Evidence Establishing BFPE as the Cause of
        The Discharge Preclude Summary Judgment In Turner's Favor on the Counterclaim.

Turner maintains that the water discharge was BFPE's fault and responsibility and that, as a result, Turner was entitled to refuse to make final payment to BFPE. As noted in §I(C)(2), above, there is a dearth of admissible evidence supporting Turner's bald allegation that BFPE bears any responsibility for causing the water discharge. To the contrary, the only admissible evidence, both factual and expert, is that Turner and/or UMMC, either individually or jointly, are the parties whose actions caused the discharge. Based on the evidence of record, a jury can only conclude that BFPE was not negligent and that the water discharge did not arise out of or in connection with BFPE's "work." Thus, there is no basis

on which Turner can justify its failure to pay BFPE the amount admittedly owed to it under the subcontract. As a result, Turner's motion for summary judgment on BFPE's counterclaim must be denied.

## CONCLUSION

For the foregoing reasons, BFPE respectfully requests that its Cross-Motion for Summary Judgment on Plaintiff's Claims Against BFPE and on BFPE's Counter-Claim be granted and that Turner's Motion for Partial Summary Judgment on Liability and Motion for Summary Judgment on BFPE's Counter-Claim be denied.

Respectfully submitted,

*/s/  George D. Bogris*
George D. Bogris (Bar. No. 10458)
Sandra T. Carson (Bar No. 24699)
WHITNEY & BOGRIS, LLP
Twelfth Floor
401 Washington Avenue
Towson, MD  21204
(410) 583-8000 (ph)
(800) 893-1239 (fax)
gbogris@whitneybogris.com
scarson@whitneybogris.com
**Attorneys for Defendant**
**BFPE International, Inc.**