# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TURNER CONSTRUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-00368-WDQ |
| | ) | |
| BFPE INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |
| _____ | ) | |

### TURNER'S MEMORANDUM IN OPPOSITION TO
### BFPE'S CROSS-MOTIONS FOR SUMMARY JUDGMENT
### AND IN REPLY TO BFPE'S OPPOSITIONS TO
### TURNER'S SUMMARY JUDGMENT MOTIONS

Plaintiff/Counter-Defendant Turner Construction Company ("Turner"), by counsel, respectfully submits this memorandum (a) in opposition to Defendant/Counter-Plaintiff BFPE International, Inc.'s ("BFPE") Cross-Motion for Summary Judgment on Turner's claim and in reply to BFPE's opposition to Turner's Motion for Summary Judgment as to liability on Turner's claim and (b) in opposition to BFPE's Cross-Motion for Summary Judgment on BFPE's counterclaim and in reply to BFPE's opposition to Turner's Motion for Summary Judgment relating to BFPE's counterclaim.

Dated:  September 4, 2015

Respectfully submitted,

/s/ Eric A. Frechtel
Eric A. Frechtel (Bar No. 24945)
Kevin B. Mattingly (Bar No. 29610)
Bradley Arant Boult Cummings LLP
1615 L Street, NW, Suite 1350
Washington, DC 20036
Telephone: 202-393-7150
Fax: 202-347-1684
Email: efrechtel@babc.com
       kmattingly@babc.com
*Counsel for Turner Construction Company*

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................... 1

II.     OPPOSITION TO BFPE'S CROSS-MOTION ON TURNER'S CLAIM AND REPLY
        IN SUPPORT OF TURNER'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS
        TO LIABILITY ........................................................................................................... 2

        A.      Introduction ................................................................................................... 2

        B.      Turner does *not* lack standing ..................................................................... 4

        C.      Turner did *not* waive its claim against BFPE ........................................... 5

                1.      BFPE's position perverts the allocation of risk defined in the Turner-BFPE
                        Subcontract .................................................................................... 5

                2.      BFPE cannot invoke the "waiver of subrogation" provision ..................... 8

                3.      BFPE's interpretation of the Subcontract is otherwise flawed ................ 11

                4.      BFPE has not shown coverage under an owner property insurance policy
                        in accordance with the terms of the prime contract ................................... 13

                5.      The AIA A201 waiver of subrogation extends only to the "Work" ......... 14

        D.      BFPE is liable for the property damage ............................................................. 21

III.    OPPOSITION TO BFPE'S CROSS-MOTION ON ITS COUNTERCLAIM AND
        REPLY IN SUPPORT OF TURNER'S MOTION FOR SUMMARY JUDGMENT
        RELATING TO BFPE'S COUNTERCLAIM ............................................................. 27

IV.     CONCLUSION ............................................................................................................. 29

I.      **BACKGROUND**

This is a simple case.  BFPE was the fire sprinkler subcontractor to Turner on a hospital

renovation project, and under the parties' contract (the "Turner-BFPE Subcontract"), BFPE was

obligated to perform certain work, including coordinating all necessary fire sprinkler "outages,"

i.e., turning off sections of the fire sprinkler system to accommodate certain activities such as the

demolition of piping and the removal of old sprinkler hose cabinets.  Further, the Turner-BFPE

Subcontract states that BFPE "assumes the entire responsibility and liability for any and all

actual or potential damage … to all property … caused by, resulting from, arising out of or

occurring in connection with the execution of the Work, or in the preparation for the Work …."[1]

The property damage at issue in this case was caused by water bursting from a pipe that BFPE

opened in performing its work on the project.  Because the outage was not properly coordinated,

the system was not turned off in the area where BFPE "cracked" the pipe.  The subcontract

language could not be more plain, and BFPE cannot dispute (at least not genuinely) that the loss

occurred in connection with BFPE's work.  Under the Turner-BFPE Subcontract, BFPE is

responsible for the damage, and Turner is entitled to summary judgment as to liability on

Turner's claim and to summary judgment against, and the dismissal of, BFPE's counterclaim.

In response to Turner's motions, BFPE filed a 33-page brief, 3 declarations, and an

inadmissible expert report.[2]  At the same time that BFPE makes legal arguments in support of its

summary judgment motions, BFPE submits three declarations asserting "facts."  BFPE is wrong

on the law, and the facts it offers are irrelevant (and also mostly disputed).

---

[1] For the Court's convenience, a copy of the Subcontract is attached hereto as **Exhibit A**.

[2] Contemporaneous with this filing, Turner is filing a motion to strike certain documents
submitted by BFPE in support of its motions, including the expert report that was attached to
BFPE's brief at Exhibit Q.

II.     **OPPOSITION TO BFPE'S CROSS-MOTION ON TURNER'S CLAIM AND REPLY IN SUPPORT OF TURNER'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

A.     **Introduction**

BFPE contends first that Turner lacks standing to recover from BFPE.  (BFPE brief at 15-16).  But BFPE offers no evidence in support of that position except documents showing that Turner was obligated to pay subcontractors to fix the property damage.  Regardless, BFPE's argument lacks merit because Turner *did* incur costs as a result of the property damage.  Further, Turner incurred obligations to pay subcontractors to perform the repairs, and to the extent it recovers money from BFPE, Turner is obligated to pay back the money advanced by its liability insurance carrier.

Next, BFPE argues that Turner waived its claims against BFPE based on a provision in the prime contract between Turner and the University of Maryland Medical Center ("UMMC") – a contract to which BFPE is not even a party.  (BFPE brief at 16-23).  BFPE's position completely perverts the clear allocation of risk of property damage defined in the contract to which BFPE *is* a party – the Turner-BFPE Subcontract.  The Subcontract states plainly that BFPE is responsible for property damage, and further, that BFPE is required to procure and maintain insurance to underwrite that risk.  Indeed, contrary to BFPE's arguments, the "waiver of subrogation" provision in the prime contract is *not* incorporated into the Turner-BFPE Subcontract.  Nor, according to the express terms of the prime contract, is BFPE a third-party beneficiary thereof.  And even if BFPE can overcome those hurdles, BFPE's argument fails because the "waiver of subrogation" provision in the UMMC-Turner prime contract is trumped by BFPE's greater obligation under the "assumption of liability" clause in the Turner-BFPE

Subcontract.  Further, BFPE has failed to prove coverage under an owner property insurance policy in accordance with the terms of the prime contract, and, in any event, the "waiver of subrogation" provision does not even apply to property damage outside the project footprint.

Third, BFPE submits that it is not liable because the "prerequisites for indemnification have not occurred."  (BFPE brief at 23-33).  BFPE argues that no third-party claims were made and that there is no admissible evidence establishing that BFPE "caused" the damage.  These arguments lack merit.  BFPE is liable for the property damage under the plain language of Article XXIII of the Subcontract because the damage occurred in connection with BFPE's work.  Further, BFPE is liable because it breached the Turner-BFPE Subcontract in numerous ways, including failing to coordinate the sprinkler outage, to drain the system, to properly perform its demolition operations, to provide supervisory personnel, and to fix or otherwise remedy the damage after the incident.  Also, contrary to BFPE's contention, UMMC *did* make a "claim."  Turner was obligated under its contract with UMMC to remedy the property damage and also to indemnify UMMC – obligations that were "flowed down" to BFPE in the Turner-BFPE Subcontract.  Turner did what a responsible general contractor would do when property damage occurs as a result of work on its construction project -- it held itself accountable to the project owner and repaired the damage.  BFPE, in contrast, denied responsibility and seeks in its brief to vindicate its position.  Its arguments, however, are unavailing.

In its introduction, BFPE says this case is about "contracts:  what they say, what they mean, to whom they apply, and what they cover."  BFPE is right in a sense.  This is a breach of contract case about the Turner-BFPE Subcontract, which BFPE breached by shirking its obligations thereunder.

**B.      Turner does *not* lack standing**

BFPE contends that Turner lacks standing to sue BFPE.  (BFPE brief at 15-16).

However, BFPE offers no evidence in support of its position other than certain change orders to

subcontractors that contain the phrase "insurance recovery."  (BFPE brief at Exhibit F).[3]  Such

evidence is not sufficient to support a legal determination that Turner lacks standing in this case.

In any event, Turner *does* have standing to recover damages from BFPE.

First, contrary to BFPE's assertion, Turner *did* incur actual costs as a result of the

property damage that occurred in connection with BFPE's work on the Project.  After the

incident occurred on January 21, 2014, Turner personnel managed both the cleanup effort as well

as the performance of the repairs.  (*See* Declaration of R. Gregory Stortstrom ("Stortstrom

Declaration" or "Stortstrom Decl."), attached hereto as **Exhibit B**, at ¶ 10).

Second, as BFPE acknowledges, Turner entered into agreements with subcontractors to

perform the repairs.  (*See* Exhibits F and G to BFPE's brief).  By incurring legal obligations to

pay those subcontractors, Turner has standing to recover damages from BFPE.  Furthermore,

while those costs were paid predominantly by Turner's commercial liability insurance carrier,

Liberty Mutual Insurance Company ("Liberty Mutual"), Turner is obligated to pay back those

amounts to the extent of its recovery.  After the incident, both Turner and Liberty Mutual

demanded that BFPE and/or BFPE's insurance carriers accept responsibility for the incident and

finance the repairs, but BFPE and its carriers repeatedly rejected those demands.  (Stortstrom

Decl. at ¶¶ 5-7).  As a result, Turner and Liberty Mutual entered into an agreement whereby

Liberty Mutual agreed to loan money to Turner, which Turner agreed to pay back to the extent of

any recovery obtained thereafter.  (Stortstrom Decl. at ¶ 8).

---

[3] Turner, through a motion to strike filed contemporaneously with this brief, requests that the
Court strike those references and exclude them in its consideration of the parties' motions.

### C.      Turner did *not* waive its claim against BFPE

Next, BFPE argues on pages 16-23 of its brief that Turner waived its claim against BFPE

based on Section 11.3.7 of the General Conditions portion of the prime contract, which states in

part as follows:

> The Owner and Contractor waive all rights against … each other and any of their
> subcontractors … each of the other … for damages caused by fire or other causes of
> loss to the extent covered by property insurance obtained pursuant to this Section
> 11.3 or other property insurance applicable to the Work ….

(BFPE brief, Exhibit B at BFPE 0354).  BFPE contends that the damages at issue are covered by

UMMC's property insurance policy and therefore Turner waived its right to pursue any recovery

from BFPE.  This argument lacks merit for several reasons.


### 1.      BFPE's position perverts the allocation of risk defined in the Turner-BFPE Subcontract

BFPE's waiver position is based on a contract to which it is *not* a party, and its argument

completely upsets the clear allocation of risk defined in the contract to which it *is* a party -- the

Turner-BFPE Subcontract.  Article XXIII of the Subcontract states in part as follows:

> The Subcontractor hereby assumes the entire responsibility and liability for any
> and all actual or potential damage … to all property … caused by, resulting from,
> arising out of or occurring in connection with the execution of the Work, or in
> preparation for the Work, or any extension, modification, or amendment to the
> Work by change order or otherwise.  Should any claims for such actual or
> potential damage or injury (including death resulting therefrom) be made or
> asserted, whether or not such claims are based upon an Indemnified Party's
> alleged active or passive negligence or participation in the wrong or upon any
> alleged breach of any statutory duty or obligation on the part of an Indemnified
> Party, the Subcontractor agrees to indemnify and save harmless the Indemnified
> Party from and against any and all such claims and further from and against any
> and all loss, cost, expense, liability, damage, penalties, fines or injury, including
> fees and disbursements, that the Indemnified Party may directly or indirectly
> sustain, suffer or incur as a result thereof …

(Exh. A at TCC_01394; emphasis added).  This provision could not be more plain.  BFPE is

responsible and liable for property damage occurring in connection with BFPE's work.  The

provision is also noteworthy for what it does *not* say.  BFPE's obligations are not qualified in

any way.  Article XXIII does *not* say that BFPE is responsible and liable *unless there is property*

*insurance provided by UMMC that covers the loss*.

   Also debunking BFPE's position, the Subcontract required BFPE to obtain insurance to

underwrite its contractual liability.  Relevant here, the Subcontract states as follows:

   ARTICLE XXIV.  Insurance

   A.  Required Insurance

     Before commencing the Work, the following insurance coverages from
insurance companies satisfactory to Contractor shall be in place and maintained
until completion and final acceptance of the Work:

             ***

   2.  COMMERCIAL GENERAL LIABILITY INSURANCE INCLUDING …
CONTRACTUAL LIABILITY INSURANCE AGAINST THE
LIABILITY ASSUMED HEREINABOVE ….

(Exh. A at TCC_01394; capital letters in original).  Like BFPE's assumption of "the entire

responsibility and liability" for property damage under Article XXIII, this provision in the

Turner-BFPE Subcontract is clear.  BFPE was required to procure and maintain

"CONTRACTUAL LIABILITY INSURANCE AGAINST THE LIABILTY ASSUMED

HEREINABOVE."  Simply, BFPE was obligated to obtain insurance to underwrite the liability it

assumed elsewhere in the Subcontract – including its liability for property damage "occurring in

connection with the execution of the Work, or in preparation for the Work" under Article XXIII.

   In addition, the Subcontract required BFPE to name UMMC and Turner as "additional

insureds" under its insurance policies.  The Subcontract also states that BFPE's liability

insurance is "for all liability arising out of the Work" and that BFPE's insurance is "primary" to

any other insurance that might cover a loss.  Specifically, Article XXIV states in part as follows:

> The Subcontractor shall name the Indemnified Parties and such other
> entities as may be reasonably requested as additional insureds under the policies
> of insurance listed in paragraph A maintained by the Subcontractor (with the
> exception of Workers Compensation insurance), whether during the performance
> of the Work or any time thereafter.  The coverage to be provided to the additional
> insureds shall be for all liability arising out of the Work.  ….
>
> It is expressly agreed by and between Subcontractor and Contractor that
> all insurance, whether issued on a primary or excess basis, afforded the additional
> insureds shall be the primary insurance to any other insurance available to the
> additional insureds and that any other insurance carried by the additional insureds
> shall be excess of all other insurance carried by the Subcontractor and shall not
> contribute with the Subcontractor's insurance.

(Exh. A at TCC_01396; emphasis added).[4]

Instead of honoring the allocation of risk of property damage outlined in the Turner-

BFPE Subcontract, BFPE attempts to escape liability (and the liability of its insurer) by pointing

to a provision in Turner's contract with UMMC.  Under Maryland law, however, "where a

contract is plain and unambiguous, there is no room for construction, and it must be presumed

that the parties meant what they expressed." *Kasten Constr. v. Rod Enterprises*, 268 Md. 318,

328, 301 A.2d 12, 18 (1973).  Indeed, "[t]he written language embodying the terms of an

agreement will govern the rights and liabilities of the parties …." *Gilbane Building Company v.*

*Brisk Waterproofing Company, Inc.*, 86 Md. App. 21, 27-28, 585 A.2d 248, 251 (1991) (quoting

*Slice v. Carozza Prop., Inc.*, 215 Md. 357, 368, 137 A.2d 687, 693 (1958)).  "If the language of a

contract is unambiguous, we give effect to its plain meaning ….  Thus, our search to determine

the meaning of a contract is focused on the four corners of the agreement." *Cochran v.*

*Norkunas*, 398 Md. 1, 16-17, 919 A.2d 700, 709-10 (2007).  The terms of the Turner-BFPE

---

[4] "Indemnified Party" is defined in Article XXIII to include Turner and UMMC, among others.

Subcontract are "plain and unambiguous" -- BFPE "assumes the entire responsibility and liability" for property damage; BFPE must maintain insurance "against the liability" assumed under the Subcontract; Turner and UMMC are to be "named insureds" under BFPE's insurance policies; BFPE's insurance coverage is "for all liability arising out of the Work;" and BFPE's insurance is "primary insurance to any other insurance available to the additional insureds." There is only one reasonable interpretation of this language:  <u>Turner and BFPE agreed to an arrangement whereby BFPE and/or its insurance carriers would take care of property damage occurring in connection with BFPE's work</u>.[5]

### 2.   BFPE cannot invoke the "waiver of subrogation" provision

BFPE's waiver argument also fails because BFPE does not have the right to assert the provision as a defense against Turner's claim.  In support of its position, BFPE cites Article II of the Turner-BFPE Subcontract, which states in part as follows:

> With respect to the Work to be performed and furnished by the Subcontractor hereunder, <u>the Subcontractor agrees</u> to be bound to Contractor by each and all of the terms and provisions of the General Contract and the other Contract Documents, and <u>to assume toward Contractor all of the duties, obligations and responsibilities that Contractor by those Contract Documents assumes toward the Owner</u>, and <u>the Subcontractor agrees further that Contractor shall have the same rights and remedies as against the Subcontractor as the Owner under the terms and provisions of the General Contract and the other Contract Documents has against Contractor</u> with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth herein in full. The terms and provisions of this Agreement with respect to the Work to be performed and furnished by the Subcontractor hereunder are intended to be and

---

[5] On pages 19-20 of its brief, BFPE cites decisions from other jurisdictions in support of its position that the waiver under the prime contract applies to Turner's claim against BFPE.  But those cases are inapposite.  None of them involves a claim by a prime contractor against a subcontractor based on breach of provisions in a subcontract that clearly allocate the risk of property damage occurring in connection with the subcontractor's work to the subcontractor and the subcontractor's insurance.

shall be in addition to and not in substitution for any of the terms and provisions of the General Contract and the other Contract Documents.

(Exh. A at TCC_01384; emphasis added).  Through this provision, Turner "flowed down" to

*BFPE* the "duties, obligations and responsibilities" that Turner has to UMMC under the prime

contract and affords Turner, against BFPE, the "rights and remedies" that UMMC has against

Turner under the prime contract.  BFPE maintains that Article II offers BFPE any defenses that

Turner may assert under the prime contract against a claim of UMMC, but that is not what it

says.  Article II in no way limits a claim that Turner may have against BFPE.  Accordingly,

Article II does not cloak BFPE with a "waiver" defense against Turner's claim for breach of the

Turner-BFPE Subcontract.

Indeed, Article II of the Subcontract actually supports *Turner's* position that BFPE is

responsible for the property damage.  Unlike Section 11.3.7 of the General Conditions, certain

provisions in the General Conditions *are* incorporated into the Turner-BFPE Subcontract – i.e.,

the provisions that state "duties, obligations and responsibilities" of Turner to UMMC and those

that state "rights and remedies" of UMMC against Turner.  For example, Section 10.2 of the

General Conditions, entitled "Safety of Persons and Property," includes the following provisions:

§ 10.2.1    The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to

.1    employees on the Work and other persons who may be affected thereby;
.2    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and
.3    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

***

> § 10.2.5      The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them …. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Section 3.18.

(BFPE brief, Exh. B at BFPE 0350; emphasis added).  Through Article II of the Subcontract, Turner "flowed down" to BFPE the obligations under Section 10.2 of the General Conditions. BFPE is obligated to Turner in the same way Turner is obligated to UMMC, and Turner has the same rights and remedies against BFPE that UMMC has under the prime contract against Turner. Consequently, BFPE was obligated to "remedy damage and loss" to "other property at the site or adjacent thereto."

Likewise, Section 3.18.1 of the General Conditions was flowed down to BFPE through Article II.  That section states as follows:

> To the fullest extent permitted by law the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity that would otherwise exist as to a party or person described in this Section 3.18.

(BFPE brief, Exh. B at BFPE 0339).  Because Turner is obligated to indemnify UMMC (and UMMC is entitled to indemnification by Turner) against property damage "arising out of or resulting from performance of the Work," BFPE is obligated to indemnify Turner (and Turner is

entitled to indemnification by BFPE) against property damage arising out of or resulting from BFPE's work.

Additionally, despite BFPE's insistence otherwise, BFPE is *not* a third-party beneficiary of the "waiver of subrogation" provision.  Under Maryland law, "[a]n individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise."  *CR-RSC Tower I, LLC v. RSC Tower 1, LLC*, 429 Md. 387, 457, 56 A.3d 170 (2012).  "The primary source for determining whether the parties intended a third party to have standing to enforce the contractual provisions is the language of the contract itself." *Volcjak v. Washington County Hosp. Ass'n,* 124 Md. App. 481, 509, 723 A.2d 463 (1999) (affirming dismissal of third party beneficiary claim on summary judgment).  Section 1.1.2 of the General Conditions portion of the prime contract states in part as follows:  "The Contract Documents shall not be construed to create a contractual relationship of any kind … between the Owner and a Subcontractor …."  (BFPE brief, Exh. B at BFPE 0332).  This provision shows that UMMC and Turner unequivocally intended to prevent third parties from enforcing their private bargain.  For this reason also, BFPE cannot assert the "waiver of subrogation" provision as a defense against Turner's claim for breach of the Turner-BFPE Subcontract.

### 3.        BFPE's interpretation of the Subcontract is otherwise flawed

Even if BFPE can assert a waiver based on the prime contract, BFPE's argument fails because the "waiver of subrogation" provision in the prime contract is trumped by the "assumption of liability" provision in the Turner-BFPE Subcontract.  Article II of the Subcontract states in part as follows:

> This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted. <u>If, however, any provision of this Subcontract Agreement irreconcilably conflicts with a provision of the General Contract and the other Contract Documents, the provision imposing the greater duty or obligation on the Subcontractor shall govern</u>.

(Exh. A at TCC_01384; emphasis added).[6]  As stated above, under Article XXIII of the Turner-BFPE Subcontract, BFPE is responsible and liable for property damage occurring in connection with BFPE's work.  That obligation is not qualified in any way whatsoever.  Accordingly, *even if it applies*, Section 11.3.7 of the General Conditions portion of the prime contract concedes to BFPE's greater duty under Article XXIII of the Subcontract.

In addition, BFPE's interpretation offends Maryland law.  To trigger a waiver under Section 11.3.7, there must be coverage by property insurance obtained by the Owner.  However, under Article XXIV of the Turner-BFPE Subcontract, BFPE is required to procure and maintain liability insurance that "shall be primary insurance to any other insurance …." (Exh. A at TCC_01396).  There is no way to reconcile these two provisions.  Indeed, BFPE's interpretation of the Subcontract renders meaningless the language in Article XXIV of the Subcontract.  In Maryland, "'a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'"  *Dumbarton Improvement Assoc., Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 52, 73 A.3d 224, 233 (2013) (quoting *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964).  BFPE's attempt to incorporate Section 11.3.7 into the Subcontract is untenable.

---

[6] It is noteworthy that BFPE omitted the last sentence of the paragraph when it quoted this provision in its brief.  (*See* BFPE brief at page 19).

### 4.   BFPE has not shown coverage under an owner property insurance policy in accordance with the terms of the prime contract

As noted above, BFPE's waiver position is based on Section 11.3.7 of the General

Conditions portion of the Prime Contract, which states in part as follows:

> The Owner and Contractor waive all rights against … each other and any of their
> subcontractors … each of the other … for damages caused by fire or other causes
> of loss to the extent covered by property insurance obtained pursuant to this
> Section 11.3 or other property insurance applicable to the Work ….

(BFPE brief, Exh. B at BFPE 0354).  BFPE therefore must establish that the damages are

"covered by property insurance obtained pursuant to Section 11.3 or other property insurance

applicable to the Work."  But BFPE has failed to meet its burden.  BFPE has not offered any

evidence that a claim was ever submitted to UMMC's property insurance carrier.  Consequently,

BFPE cannot establish that the damages are "covered," which is a predicate to the applicability

of the "waiver of subrogation" defense under Section 11.3.7.  Moreover, BFPE must establish

that the damages are covered by property insurance obtained pursuant to Section 11.3 or other

property insurance applicable to the Work.  In support of its argument, BFPE offered only a

document entitled "Evidence of Property Insurance" (BFPE brief, Exhibit J) and a series of

insurance documents (BFPE brief, Exhibit K).  BFPE submitted no evidence that the documents

compiled as Exhibit K to its brief constitute "property insurance obtained pursuant to Section

11.3" or "other property insurance applicable to the Work."

In fact, the documents submitted to the Court by BFPE actually show that there is *no*

coverage under UMMC's property insurance policy.  First, the policy requires the insured to

"give immediate written notice to the Company of any loss" and to "give a signed and sworn

proof of loss to the Company within 90 days after the loss, unless that time is extended in writing

by the Company."  (BFPE brief, Exh. K at page 58, ¶¶ 1(1) and 1(4)).  BFPE offers no evidence

that those requirements were met.[7]  Second, the policy states in part that "[i]f there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not."  (BFPE brief, Exh. K at page 65, ¶ 7(A)).  Here, as discussed above, the Turner-BFPE Subcontract required *BFPE* to provide insurance and to name UMMC and Turner as additional insureds under that policy; and states further that such insurance "shall be primary insurance to any other insurance available to the additional insureds."  (Exh. A at TCC_01396).  Accordingly, there is no coverage under the UMMC policy, or, at minimum, that coverage is secondary to BFPE's policy.  In either case, the waiver under Section 11.3.7 of the General Conditions is not triggered.

### 5.    The AIA A201 waiver of subrogation extends only to the "Work"

BFPE also incorrectly interprets the "waiver of subrogation" provisions under Sections 11.3.7 and 11.3.5 of the AIA A201 General Conditions of the Contract for Construction.  The waiver only applies to damages to the "Work,"[8] and the vast majority of the property damage at issue in this case was to portions of the building outside of the project footprint, i.e., "non-Work" property.  (*See* Declaration of Craig W. Coulter ("Coulter Declaration" or "Coulter Decl."), attached hereto as **Exhibit C**, at ¶ 18).

---

[7] BFPE cannot complain that UMMC or Turner failed to submit a claim under UMMC's insurance policy because *BFPE*, as a subcontractor to Turner, is an additional insured under the policy and therefore also could have submitted a claim.  Indeed, given BFPE's position that the loss is covered under UMMC's policy, Turner asked BFPE if it wished to suspend this case and pursue a claim against that policy, but BFPE declined.  (Storstrom Decl. at ¶ 12).

[8] The term "Work" is defined in Section 1.1.3 of the General Conditions as "the construction and services required by the Contract Documents … and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations."  (BFPE brief, Exh. B at BFPE 0332).

Section 11.3.7 states in part:  "The Owner and Contractor waive all rights … for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work."  Accordingly, the waiver is only for damages covered by (a) property insurance obtained pursuant to Section 11.3 or (b) other property insurance applicable to the Work.  In either case, the property insurance referenced in Section 11.3.7 is to insurance covering the "Work."  The phrase "property insurance obtained pursuant to Section 11.3" can only mean property insurance covering the "Work."  Indeed, Section 11.3.1 states in part as follows:

> Unless otherwise provided, the Owner shall purchase and maintain … property insurance written on a builder's risk "all-risk" or equivalent policy form in the amount of the initial Contract Sum, plus value of subsequent Contract Modifications and cost of materials supplied or installed by others ….  This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project.

(BFPE brief, Exh. B. at BFPE 0353).  Similarly, the phrase "other property insurance applicable to the Work" refers to insurance covering the "Work."  Consequently, to the extent Section 11.3.7 applies, UMMC and Turner waived claims for damages to the "Work," *not* for damages to *non-Work*.  Several courts throughout the country have interpreted Section 11.3.7 in this manner.  *See, e.g., Copper Mountain, Inc. v. Industrial Systems, Inc.*, 208 P.3d 692, 698-99 (Colo. 2009) (*en banc*) ("the plain language of [a contract provision containing language identical to Section 11.3.7] does not waive [the project owner's] claims for damages to non-Work property"); *Fidelity and Guaranty Ins. Co. v. Craig-Wilkinson, Inc.*, 948 F. Supp. 608, 614 (S.D. Miss. 1996) ("By its terms, the waiver clause does not apply to the claim arising from damage to non-Work property"); *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 22 (Mo. 1995) ("The obvious meaning of the quoted provisions of article 11.3.7 is that the waiver of subrogation is only effective to the extent of the value of the 'Work'"); *S.S.D.W. Co. v. Brisk Waterproofing Co.,*

*Inc.*, 556 N.E.2d 1097, 1100 (N.Y. 1990) ("the waiver clause, if given its plain meaning, bars

subrogation only for those damages covered by insurance which the owner has provided to meet

the requirement of protecting the contractor's limited interest in the building – i.e., damages to

the Work itself"); *Public Employees Mut. Ins. Co. v. Sellen Constr. Co., Inc.*, 740 P.2d 913, 916

(Wash. App. 1987) ("The waiver … applies only to damages to the Work").

Indeed, interpreting the waiver under Section 11.3.7 to be limited to the "Work" is

consistent with the one Maryland case in which the language has been analyzed.  In *John L.*

*Mattingly Constr. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 999 A.2d 1066

(2010), the Court of Appeals considered the scope of a "waiver of subrogation" provision in an

American Institute of Architects ("AIA") form contract that is identical to the provision in the

prime contract between UMMC and Turner upon which BFPE bases its waiver argument.[9]  In

that case, the loss occurred after the project was completed, and the issue was whether the clause

"other property insurance applicable to the Work" meant insurance in place during construction

or extended to insurance in place after the project was completed.  The Court determined that the

clause was ambiguous as follows:

> "[T]he Work" is defined in Section 6.3 of the form contract as follows:
>
>> The term "Work" means the construction and services required by the
>> Contract Documents, whether completed or partially completed, and
>> includes all other labor, materials, equipment and services provided or to
>> be provided by the Contractor to fulfill the Contractor's obligations.  The
>> Work may constitute the whole or a part of the Project.
>
> In the first sentence of the definition, the phrase "construction and services
> required by the Contract" clearly refers to the construction period.  The next
> phrase, "whether completed or partially completed," however, could yield a
> different understanding because it could refer reasonably to the completed

---

[9] The Court affirmed the Maryland Court of Special Appeals' decision in *Hartford Underwriters Ins. Co. v. Phoebus*, 187 Md. App. 668, 979 A.2d 299 (2009), which is cited in BFPE's brief on pages 17-18.

restaurant.

The second sentence of the definition, which states, "[t]he Work may constitute the whole or a part of the Project," also could be construed to modify the prior phrase to include all actions necessary to constitute performance under the contract.  On the other hand, this phrase could be interpreted reasonably to refer to the completed Arby's restaurant.

<u>As a result, the waivers of subrogation clause, including "other property insurance applicable to the Work," may refer reasonably to "other property insurance applicable" to the ongoing construction, or, "other property insurance applicable" to the completed Arby's.  Thus, the waivers of subrogation clause, in which the words "the Work" are prominent, is internally inconsistent, and ergo, ambiguous, as also recognized by our colleagues on the intermediate appellate court.</u>

*Id.*, 415 Md. at 328, 999 A.2d at 1074-75 (emphasis added).  Although there is no temporal issue in the instant case, the *John L. Mattingly* decision is germane here because the Maryland Court of Appeals had no trouble recognizing that "other property insurance applicable to the Work" was limited to the "Work" as that term was defined in the contract.  And the definition of the "Work" in the contract in that case is identical to the definition of the "Work" in the prime contract between UMMC and Turner.  (*See* General Conditions §1.1.3 at BFPE brief, Exh. B at BFPE 0332).  Accordingly, "other property insurance applicable to the Work" limits the scope of the waiver under Section 11.3.7 to the "Work" and does *not* extend to "non-Work" property.[10]

Lending further support to that interpretation are the other provisions in the prime contract.  Under Section 11.1 of the General Conditions, for example, the Contractor is required to procure and maintain insurance to protect the Contractor from various claims, including claims for damages "other than to the Work itself …."  (BFPE brief, Exh. B at BFPE 0352; *see* Section 11.1.1.5).  If BFPE's interpretation of Section 11.3.7 is correct that the waiver extends to damage to non-Work property, then it would be unnecessary for the Contractor to maintain

---

[10] At a minimum, the Court of Appeals' decision indicates that the scope of the waiver under Maryland law is ambiguous and requires evidence of the parties' intent.

insurance for claims for property damage "other than to the Work itself …."  In *Brisk*

*Waterproofing*, New York's high court analyzed identical provisions and reached that very

conclusion, explaining as follows:

> Plaintiff owner's construction of article 17.6, unlike that of defendants, gives full
> effect to the bargain concerning the parties' respective insurance responsibilities
> set forth in article 17.   Under article 17.1, the contractor is required to obtain
> liability insurance protecting it from "claims for damages … to property … other
> than to the Work itself".   Under plaintiff's construction, in the event of a claim for
> non-Work property damage, the insurer under the contractor's liability policy
> would be responsible.   Under the construction of article 17.6 urged by defendants,
> however, this would not be so.   The contractor's liability insurer is relieved of
> responsibility for any damage caused by the contractor to parts of the building
> outside the Work.   Any responsibility for such a loss which the contractor's
> insurer might otherwise bear is transferred to the owner's insurer which in effect,
> is transformed into the liability carrier for the contractor.   This result is not
> consistent with either the natural and obvious meaning of article 17.6 or with what
> seems to be the over-all sense of the arrangement in article 17 – that the
> contractor is to be responsible for negligently caused damage outside the Work
> and must carry a policy insuring its liability therefor (*see*, art. 10.7 in which the
> contractor assumes responsibility to the owner for acts and omissions of its
> employees and its subcontractors).

*Brisk Waterproofing*, 556 N.E.2d at 1100 (emphasis added).  *See also, Copper Mountain*, 208

P.3d at 700 ("In this contract, the parties settled on a risk allocation scheme under which

[Contractor] would procure liability insurance for and remedy damages to non-Work, while

[Owner] insured the Work"); *Travelers Ins. Cos. v. Dickey*, 799 P.2d 625, 631 (Ok. 1990) ("The

roofing contract deals *not with allocating liability for the owner's water damaged interior,* but

holds each party harmless for those *losses of the other which are connected with the work*

*performed*.  The agreement clearly is ineffective to exonerate the contractor from liability for

negligently inflicted harm to the *owner's interior property*.  To conclude otherwise would render

meaningless the roofing contract's explicit terms requiring the contractor to purchase *liability*

insurance.").

Likewise, the Contractor's obligations under Section 10.2.5 of the General Conditions support the limitation of the waiver under Section 11.3.7 to damages to the "Work."  As stated above, under Section 10.2.5, the Contractor is required to "remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor …."  (BFPE brief, Exh. B at BFPE 0350).  Accordingly, the Contractor is required to remedy damage to property that is not insured by the Owner's property insurance.  BFPE's expansive reading of the waiver under Section 11.3.7 would render Section 10.2.5 meaningless because the Owner would have already waived any claim for damage to non-Work property.  The *Copper Mountain* Court explained this very point as follows:

> Paragraph 10.2.5 obligates [Contractor] to remedy damage, other than that insured under property insurance required by the Contract Documents, that [Contractor] or its subcontractors cause to the Work or other property at or adjacent to the site. The contract only "requires" [Owner] to insure the Work.  A harmonious reading of paragraphs 10.2.5 and 11.4.7 points to the conclusion that [Contractor] is responsible for damages to non-Work, while [Owner] is responsible for the cost of damages to the Work.

*Copper Mountain*, 208 P.3d at 699.

Finally, BFPE argues on page 22 of its brief that Section 11.3.5 of the General Conditions expands the scope of the waiver under Section 11.3.7 to non-Work property.  Section 11.3.5 states in part as follows:

> If during the Project construction period the Owner insures properties, real or personal or both, at or adjacent to the site by property insurance under policies separate from those insuring the Project, … the Owner shall waive all rights in accordance with the terms of Section 11.3.7 for damages caused by fire or other causes of loss covered by this separate property insurance.

BFPE is wrong.  Under similar circumstances and identical provisions, the *Copper Mountain* Court rejected that very argument as follows:

It might appear that this clause expands the scope of the waiver in paragraph 11.4.7 to cover damages to any adjacent property the owner insures, including non-Work property, but a closer reading reveals that this is not the correct interpretation.  Rather, paragraph 11.4.5 makes clear that, should the owner purchase additional insurance coverage at or adjacent to the site of the Work either during or after construction, such insurance will be subject to "the terms of Subparagraph 11.4.7."  Paragraph 11.4.5 provides that if, "*during the Project construction period,*" the owner insures properties "at or adjacent to the site by property insurance under policies *separate from those insuring the Project,*" the owner waives rights "in accordance with the terms of Subparagraph 11.4.7 for damages caused by fire ... covered by this separate property insurance." (Emphasis added).

In this case, the record shows that [Owner] obtained insurance for the Work through an endorsement to its general SAPC policy.  ….  Paragraph 11.4.5 does not apply here, because [Owner's] insurance covering non-Work was not "separate" and was not procured "during the Project construction period."

Furthermore, paragraph 11.4.5 is limited by the terms of paragraph 11.4.7, because it states that "the Owner shall waive all rights *in accordance with* the terms of Subparagraph 11.4.7...." (Emphasis added).  Instead of expanding the scope of paragraph 11.4.7, paragraph 11.4.5 clarifies what type of insurance will be subject to the waiver in paragraph 11.4.7.  Specifically, the purpose of paragraph 11.4.5 is to clarify that if, subsequent to the execution of the contract and during the construction period, the owner acquires additional insurance under separate policies for properties at or adjacent to the site that have been added to the Project, the owner waives rights to the extent of that insurance.

The purpose of paragraph 11.4.5 cannot be to waive the owner's rights to sue for damages to non-Work, because that interpretation would render paragraph 11.4.5 inconsistent with paragraph 11.4.7, which only waives the owner's rights to sue for damages to Work.  Under such an interpretation, the more limited waiver in paragraph 11.4.7 would be superceded by the broader waiver of paragraph 11.4.5, and paragraph 11.4.7 would be superfluous.  We choose a construction of the contract that harmonizes provisions instead of rendering them superfluous.  If the intent of the contract were to waive all claims to the non-Work to the extent covered by [Owner's] insurance, the contract could have stated this explicitly.  It is significant that the contract did not do so.

*Copper Mountain*, 208 P.3d at 699-700.

For these reasons, BFPE misinterprets the scope of the waiver under Sections 11.3.7 and

11.3.5 to extend to non-Work property -- *if* the waiver provision is even applicable given the

clear allocation of property damage risk set out in the Turner-BFPE Subcontract and *if* BFPE has

standing to raise the defense.[11]  Not only is BFPE's interpretation incorrect, but there are policy

reasons to reject BFPE's position as well.  For one, BFPE's expansive reading of the waiver

would penalize responsible property owners and benefit irresponsible property owners.  In

*Copper Mountain*, the court observed as follows:

> [Contractor's] proposed interpretation of the contract would benefit owners who
> fail to insure their non-Work property by allowing those owners to pursue claims
> for damages to non-Work property, and would penalize owners who insure non-
> Work property by disallowing many claims by such owners.  Our construction of
> the contract … avoids penalizing owners who procure property insurance.

*Copper Mountain*, 208 P.3d at 700.


### D.      BFPE is liable for the property damage

Also in support of its cross-motion for summary judgment against Turner's claim, BFPE

argues the Turner is not entitled to indemnity because "the prerequisites for indemnification

under Article XXIII have not occurred" (pages 23-30).  BFPE contends that "no third-party

claims for damage or injury were made against Turner" (pages 26-28) and that "there is no

admissible evidence establishing BFPE's actions or 'Work' as the cause of the discharge" (pages

28-30).  BFPE apparently misapprehends Turner's claim and the Subcontract, and fails to

appreciate the abundant evidence of its breach.

As an initial matter, Turner is *not* required to prove that BFPE's actions or "Work"

"caused" the discharge.  As stated above, under Article XXIII of the Subcontract, BFPE

"assumes the entire responsibility and liability" for property damage "caused by, resulting from,

*arising out of or occurring in connection with the execution of the Work, or in preparation for*

---

[11] In addition, as discussed above, the Turner-BFPE Subcontract provides that Turner and
UMMC are "additional insureds" under *BFPE's* insurance policy and that BFPE's insurance is
"primary insurance to any other insurance available to the additional insureds …."  (Exh. A at
TCC_01396).  Accordingly, BFPE's position fails even as to damage to the "Work."

*the Work* ….”  (Exh. A at TCC_01394; emphasis added).  Even if it can be argued that BFPE did

not “cause” the damage (which Turner disputes), there is *no* question that the discharge “ar[ose]

out of or occurr[ed] in connection with the execution of the Work, or in preparation for the

Work.”

BFPE is also wrong when it states that “the admissible evidence supports only one

reasonable conclusion about who was at fault for that condition:  either Turner, UMMC, or both

concurrently were responsible for the failure to implement the proper outage and that BFPE did

not contribute in any way to that failure.”  (BFPE brief at page 29).  It is self-evident that there

was a failure to coordinate the outage on the date of the incident.  Had the outage been

coordinated, BFPE would not have cracked the pipe on the pressurized side of a closed valve.

Likewise, there is no question that *BFPE* was contractually responsible for coordinating outages.

In the “Additional Provisions” of the Turner-BFPE Subcontract, the “SCOPE OF WORK”

outlines BFPE’s obligations, including the obligation to: “Coordinate all necessary outages with

Turner and UMMS.”  (Exh. A at TCC_1404; *see* ¶¶ 16, 32).  Further, it is not disputed that

*BFPE* undertook to coordinate the fateful outage.

On December 31, 2013, Turner’s Superintendent, Craig Coulter, emailed BFPE’s Matt

Young asking Mr. Young to review the existing conditions in C Wing.  (Coulter Decl. at ¶ 5).

Then, on January 8, 2014, Mr. Coulter sent another email to Mr. Young requesting information

relating to BFPE’s work in C Wing, and in response, Mr. Young appreciated the “urgency” of

the request and asked for contact information for Keith Geffen, the UMMC employee in charge

of outages.  (Coulter Decl. at ¶ 6).  Despite these exchanges, BFPE contends that “the outage

request submitted by Turner was unclear and did not correctly indicate the work to be performed

or the portion of the system that would be out of service.”  (BFPE brief at page 30).  That

position ignores that <u>BFPE provided the information that Turner wrote on the outage request form</u>.  During the project, BFPE conducted multiple "walk-throughs" of the site and provided outage requirements to Turner during those walk-throughs.  (Coulter Decl. at ¶ 7).  Based on the information provided by BFPE, Turner filled out outage request forms, including Outage Request #51 for the outage that was scheduled to take place on January 21, 2014, the date of the incident.  (Coulter Decl. at ¶ 8).  To the extent the information was incorrect, *BFPE* is responsible.  In fact, during its walk-throughs, BFPE sketched an "as-built" of the sprinkler system, and Turner asked BFPE to submit the as-built to help arrange for the necessary outages.  However, BFPE refused Turner's request.  (Coulter Decl. at ¶ 7).

In addition, BFPE failed to attend outage meetings.  During the project, UMMC held weekly outage meetings with all contractors performing work on the UMMC campus to review outage requests.  (Coulter Decl. at ¶ 9).  However, even though BFPE was permitted to attend the meetings and did attend such meetings for other work performed at the hospital, BFPE failed to attend outage meetings during this particular project, including the meeting on January 14, 2014 during which UMMC discussed and approved Outage Request #51.  (Coulter Decl. at ¶ 9).

BFPE's coordination failures continued on the day of the incident.  Prior to January 21, 2014, BFPE informed Mr. Coulter that BFPE's Superintendent, Dennis Reter, who led BFPE's crew on the project, would be out of town and that a different crew led by Joe Palle would replace Mr. Reter's crew that day.  But Mr. Reter assured Mr. Coulter that Mr. Palle and his crew were competent and knowledgeable about the facility and the project.  (Coulter Decl. at ¶ 10).  On the morning of January 21, 2014, Mr. Palle arrived at the site and walked with Mr. Coulter.  Mr. Coulter helped Mr. Palle find the areas where BFPE was to perform work that day, including the route to the sprinkler hose cabinets that were to be removed by BFPE.  Mr. Palle then

departed the jobsite and left BFPE's Dennis Rivera to perform the sprinkler outage work and final coordination with UMMC.  (Coulter Decl. at ¶ 11).  After Mr. Palle left the site, UMMC's Mr. Geffen arrived, and he walked the C Wing with Mr. Rivera.  (Coulter Decl. at ¶ 12).  Mr. Rivera, a sprinkler technician employed by BFPE, was not accompanied at the site by a BFPE Superintendent.  (*See* Declaration of Keith Geffen ("Geffen Declaration" or "Geffen Decl."), attached hereto as **Exhibit D**, at ¶ 4).  While walking with Mr. Rivera, Mr. Geffen turned off the main branch valve serving the C Wing.  Mr. Rivera watched Mr. Geffen turn off the valve.  (Geffen Decl. at ¶ 5).  Shortly thereafter, Mr. Rivera loosened a fitting on a pipe upstream from the valve Mr. Geffen had closed, and water burst from the pipe, flooding the building.  (Geffen Decl. at ¶¶ 6-7; Coulter Decl. at ¶ 13).

    Even UMMC blames BFPE for the incident.  In his Declaration, UMMC's Outage Coordinator, Keith Geffen, clarifies that there were two distinct pieces of work to take place that morning – (1) demolition of a hose cabinet and (2) demolition of some sprinkler piping – and each portion of work required different valves to be turned off.  (Geffen Decl. at ¶ 11).  Mr. Geffen states:  "If Mr. Rivera had told me that he was going to demolish the hose cabinets before demolishing the sprinkler piping, I would have turned off the riser valve on the second floor."  (Geffen Decl. at ¶ 11).  Mr. Geffen concludes:  "BFPE failed to coordinate the outage properly.  If Mr. Rivera had been familiar with the system, he would have understood that I had turned off the system in the location to facilitate the sprinkler pipe work, not the fire hose cabinet demolition, and he would not have loosened the fitting on pressurized pipe."  (Geffen Decl. at ¶ 8).[12]

---

[12] Linda Whitmore, the Director of Project Development for UMMC, also blames BFPE for the incident.  In her Declaration, Ms. Whitmore states:  "Due to BFPE's failure to perform its work properly, UMMC issued a 'strike' against BFPE. …. It is UMMC's policy that after a

Indeed, BFPE failed to perform its work in accordance with the Specifications in the prime contract which were specifically incorporated into the Turner-BFPE Subcontract.  BFPE was obligated to possess a properly executed Outage Request Form at the time of the outage and to meet with UMMC "Operations" to review the proposed outage, to clarify any outstanding issues, and to formalize procedures to be used during the outage; and it is evident that BFPE failed to satisfy these requirements in performing its work on January 21, 2014.  (Coulter Decl. at ¶ 15).

BFPE also failed to drain the system and to perform its demolition work properly on the day of the incident.  (Geffen Decl. at ¶¶ 9-10).[13]  BFPE should have opened one of the valves at the sprinkler hose cabinets before commencing demolition operations.  Doing so would have revealed immediately that the water was not turned off.  A few drops would have come out, and BFPE would have closed the valve and alerted Turner and/or UMMC.  (Geffen at ¶ 10).

BFPE also breached its contractual obligation to provide supervisory personnel on the site that morning.  The Turner-BFPE Subcontract specifically identifies Mr. Reter as the "Project Superintendent" for the project, and states in part:  "The Subcontractor shall provide competent supervisory personnel ….  The appointed supervisor shall [be] present on site at any time work is being performed either by this Subcontractor or its subcontractors."  (Coulter Decl. at ¶ 16; *see* Exh. A at TCC_1403 (page 5 of 9) at ¶ 3).  BFPE violated these requirements.  Mr. Reter was

---

contractor receives three strikes, that contractor is no longer permitted to perform work on a project for UMMC."  (*See* Declaration of Linda Whitmore ("Whitmore Declaration" or "Whitmore Decl."), attached hereto as **Exhibit E**, at ¶ 5).

[13] There is an apparent dispute concerning who is responsible for "draining" pipes.  In his Declaration, UMMC's Mr. Geffen states:  "Also in his Declaration, Mr. Rivera states incorrectly that in implementing outages, UMMC not only turns off the system but also drains the system. (Rivera Declaration at ¶ 14).  Joe Palle makes a similar statement.  (Palle Declaration at ¶ 11).  Those statements are incorrect.  UMMC does not drain the fire protection system.  The fire protection subcontractor is expected to perform that work."  (Geffen Decl. at ¶ 12).

not present at all on the morning of January 21, 2014.  Nor was Joe Palle or any other BFPE supervisory personnel on site that morning to coordinate the outage with Mr. Geffen or to supervise the demolition work performed by BFPE's sprinkler fitter, Mr. Rivera.  (Coulter Decl. at ¶ 16).  Whether Mr. Rivera and his colleagues were incompetent or if they simply were not familiar with the system, the BFPE personnel at the site that day did not perform their work properly.  BFPE's Dennis Reter has admitted as much.  In a conversation with Mr. Coulter, Mr. Reter admitted that if he had been on site that day, the incident never would have happened. (Coulter Decl. at ¶ 17).[14]

Finally, BFPE failed to fix or otherwise remedy the damage.  After the incident, UMMC demanded that Turner immediately respond to the incident and repair any and all property damage resulting from the incident.  (Whitmore Decl. at ¶ 3).  UMMC also claimed that Turner was obligated to indemnify UMMC from and against any costs associated with the incident. (Whitmore Decl. at ¶ 3).[15]  The following day, Turner made a demand on BFPE to "fund the repairs."  (Stortstrom Decl. at ¶ 4).  And there is no question that BFPE was obligated to perform.  As discussed above, not only is BFPE responsible for property damage under Article XXIII of the Subcontract, but Turner's obligations under the prime contract to "remedy damage and loss" (General Conditions, Section 10.2.5) and to "indemnify and hold harmless the Owner … from and against claims, damages, losses and expenses" (General Conditions, Section 3.18.1)

---

[14] At minimum, there is a genuine dispute of material facts concerning the events leading to the property damage at issue in the case.

[15] BFPE argues on pages 23-28 that no "claim" was made on Turner and therefore BFPE's obligation to indemnify Turner under Article XXIII of the Subcontract was not triggered.  That is incorrect.  UMMC made a claim on Turner and, in accordance with its obligations under the prime contract, Turner responded to the claim.  (*See* Whitmore Decl. at ¶¶ 4-7).  Further, as discussed above, BFPE's argument on page 26 of its brief that UMMC waived its claims against Turner based on the "waiver of subrogation" provision has no merit.

were "flowed down" to BFPE through Article II of the Subcontract.  Despite its obligations

under the Subcontract, BFPE refused to accept responsibility for the property damage and to pay

for the repairs.  (Storstrom Decl. at ¶¶ 5-8).  Consequently, Turner had no choice but to repair

the damage and remedy the loss, and now seeks to recover those costs, plus legal fees and

associated costs, as damages for BFPE's breach.


**III.**     **OPPOSITION TO BFPE'S CROSS-MOTION ON ITS COUNTERCLAIM AND REPLY IN SUPPORT OF TURNER'S MOTION FOR SUMMARY JUDGMENT RELATING TO BFPE'S COUNTERCLAIM**

On pages 30-32 of its brief, BFPE argues that Turner did not have the right to withhold

final payment from BFPE and that all conditions precedent to final payment were met.  BFPE is

incorrect.  Turner had the right to withhold final payment from BFPE under at least two contract

provisions.

First, Article IV of the Subcontract includes a paragraph entitled "Final Payment," which

lists four conditions precedent to final payment.  The fourth condition is "complete and full

satisfaction of all claims, demands and disputes, and all obligations and responsibilities of

Subcontractor, arising out of or related to the Subcontract ...."  (Exh. A at TCC_01386).  There

is no question that UMMC made a "claim" and/or a "demand" on Turner to fix and/or remedy

the property damage, and that Turner, in turn, made a "claim" and/or "demand" on BFPE.  (*See*

Whitmore Decl. at ¶ 3, Storstrom Decl. at ¶ 4).  Moreover, as discussed above, BFPE failed to

satisfy "all obligations and responsibilities," including its responsibility for property damage

pursuant to Article XXIII of the Subcontract (Exh. A at TCC_01394) and its obligation to fix

and/or remedy to damage pursuant to Sections 10.2.5 and 3.18.1 of the General Conditions of the

prime contract (BFPE brief, Exh. B at BFPE 0350, 0339), which were "flowed down" to BFPE

under Article II of the Subcontract (Exh. A at TCC_01384).

Second, Article XXIII of the Subcontract states in part:

In the event that any such claims, loss, cost, expense, liability, damage, penalties, fines or injury arise or are made, asserted or threatened against the Indemnified Party, Contractor shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in its judgment to protect and indemnify the Indemnified Party from and against any and all such claims, loss, cost expense, liability, damage, penalties, fines or injury, including legal fees and disbursements ….

(Exh. A at TCC_01394).  As stated above, UMMC asserted a "claim" against Turner, and

Turner, in turn, asserted a "claim" against BFPE.  Further, Turner's right to withhold payment is

*not* limited to protection against "claims."  Rather, it expressly extends to "loss" and "cost" and

"expense …, including legal fees," among other things.  Turner utilized the BFPE subcontract

balance of $27,863.02 to pay a portion of the invoices of Otis Elevator Company, one of the

contractors that performed repairs.  (*See* Exh. A to Turner's Motion at ¶ 10).

Finally, on pages 32-33 of its brief, BFPE argues that "the only admissible evidence … is

that Turner and/or UMMC, either individually or jointly, are the parties whose actions caused the

discharge" and that "[b]ased on the evidence of record, a jury can only conclude that BFPE was

not negligent and that the water discharge did not arise out of or in connection with BFPE's

'work.'"  BFPE is wrong.  As discussed above, BFPE cannot genuinely dispute that the water

discharge "ar[ose] out of or occurr[ed] in connection with the execution of the Work, or in

preparation for the Work," and therefore BFPE is responsible for the property damage under

Article XXIII of the Subcontract.  Furthermore, there is ample evidence of BFPE's failure to

perform its work in accordance with the Subcontract.  Turner incorporates by reference the

section above entitled "BFPE is liable for the property damage."

IV.     <u>CONCLUSION</u>

There is no genuine issue as to any material fact concerning Turner's claim against BFPE.  Under the Subcontract, BFPE "assumes the entire responsibility and liability for any and all actual or potential damage … to all property … caused by, resulting from, arising out of or occurring in connection with the execution of the Work, or in the preparation for the Work[,]" and the property damage at issue occurred after water burst from a pipe that BFPE cracked while performing its work on the project.  BFPE cannot reasonably dispute that the damage "occurr[ed] in connection with the execution of the Work, or in the preparation for the Work."  <u>After all, the water that caused the property damage was discharged from a pipe that BFPE cracked</u>.  Even if it can be said somehow that the damage occurred as a result of some failure to plan the work, as opposed to perform the work, BFPE is still responsible because the clause extends beyond "execution of the Work" to "preparation for the Work."  Turner is entitled to a legal ruling that BFPE is liable for the property damage.

Likewise, there is no genuine issue as to any material fact concerning Turner's right to withhold the subcontract balance from BFPE.  When BFPE refused to accept responsibility for the property damage despite its obligations under the Subcontract, Turner was entitled to withhold payment from BFPE.  Accordingly, Turner is entitled to the dismissal with prejudice of BFPE's counterclaim.

Dated: September 4, 2015                              Respectfully submitted,


                                                     /s/ Eric A. Frechtel
                                                     Eric A. Frechtel (Bar No. 24945)
                                                     Kevin B. Mattingly (Bar No. 29610)
                                                     Bradley Arant Boult Cummings LLP
                                                     1615 L Street, NW, Suite 1350
                                                     Washington, DC 20036
                                                     Telephone: 202-393-7150
                                                     Fax: 202-347-1684
                                                     Email: efrechtel@babc.com
                                                            kmattingly@babc.com
                                                     *Counsel for Plaintiff/Counter-Defendant Turner
                                                     Construction Company*


                        **CERTIFICATE OF SERVICE**

       I hereby certify that on this 4th day of September 2015, this filing was made with the Court's

electronic court filing system, which should transmit a copy to the following counsel of record:

                        George Dean Bogris
                        Sandra Tofte Carson
                        Whitney and Bogris LLP
                        401 Washington Avenue, 12th Floor
                        Towson, MD 21204
                        *Counsel for Defendant/Counter-Plaintiff BFPE International, Inc.*


                                                     /s/ Eric A. Frechtel
                                                     Eric A. Frechtel (Bar No. 24945)
                                                     Kevin B. Mattingly (Bar No. 29610)
                                                     Bradley Arant Boult Cummings LLP
                                                     1615 L Street, NW, Suite 1350
                                                     Washington, DC 20036
                                                     Telephone: 202-393-7150
                                                     Fax: 202-347-1684
                                                     Email: efrechtel@babc.com
                                                            kmattingly@babc.com
                                                     *Counsel for Plaintiff/Counter-Defendant Turner
                                                     Construction Company*