## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| TURNER CONSTRUCTION COMPANY | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 1:15-cv-000368-WDQ |
| | : |
| BFPE INTERNATIONAL, INC. | : |
| | : |
| Defendant. | : |

### BFPE INTERNATIONAL INC.'S REPLY TO TURNER'S MEMORANDUM IN OPPOSITION TO BFPE'S CROSS-MOTIONS FOR SUMMARY JUDGMENT

Defendant/Counter-Plaintiff BFPE International Inc. (hereinafter "BFPE"), by its undersigned counsel, respectfully submits the following in reply to Turner's Memorandum in Opposition to BFPE's Cross-Motions for Summary Judgment.

## I.  INTRODUCTION

As previously stated, this case is about the meaning, scope, and applicability of three contracts:  the General Contract (and Contract Documents), the subcontract, and UMMC's all-risk property insurance policy.  When the plain language of those documents is interpreted together so as to give meaning to all of their provisions, as the parties intended and as Maryland law requires, the only reasonable conclusion that can be drawn is that Turner may not recover against BFPE and BFPE is entitled to judgment as a matter of law on both Turner's claims and BFPE's counter-claims. Nothing argued or submitted by Turner creates a genuine dispute of material fact that precludes this Court from granting both of BFPE's cross-motions.

## II.   ARGUMENTS

### A.   BFPE is Entitled to Summary Judgment on Turner's Claims.

Turner's argument that it did not waive its claim against BFPE is based either on a willful refusal to accept the plain language of the contracts at issue or a lack of understanding of the various types of insurance at play in the relevant contracts and how the parties intend to rely upon those different types of insurance depending upon the nature of the loss alleged. Either way, the fact remains that Turner expressly waived its claims against BFPE in §11.3.7 of the General Conditions to the General Contract and BFPE is entitled to enforce that provision.

#### 1.   The Purpose of Waivers of Subrogation in Construction Contracts Supports Application of § 11.3.7 to Turner's Claims.

Courts across the country, including in Maryland, have recognized that waivers of subrogation in construction contracts serve valid and appropriate purposes. "Waiver of subrogation is useful in construction contracts because it avoids disrupting the project and eliminates the need for lawsuits because it offers certainty as to the liability of the parties." *Westfield Ins. Group v. Afinia Devl., LLC*, 2012 Ohio App. LEXIS 4674, *45, 2012 WL 5845366, **33 (Ohio App. 2012). Such clauses also "seek to avoid 'the prospect of extended litigation which would interfere with construction' by shifting the risk of loss to the insurance company regardless of which party is at fault." *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, 2003 Del.Super. LEXIS 13, *14 (quoting *Behr v. Hook*, 787 A.2d 499, 503 (Vt. 2001) and citing numerous other authorities). "The intent is to avoid disruption during construction and provide certainty and eliminate litigation by having the contracting parties look only to the Owner's insurance….a waiver of subrogation clause substitutes the protection of insurance for the uncertain and expensive protection of liability litigation." *Hartford Underwriters Ins. Co. v Phoebus*, 979 A.2d 299, 304-305 (Md. App. 2009) (quoting *Tx. C.C., Inc. v. Wilson/Barnes Gen. Contractors, Inc.*, 233 S.W.2d 562, 567-68 (Tex. App. 2007).

### 2.   **BFPE is Entitled to Enforce the Waiver of Subrogation.**

The fact that BFPE is not a party to the General Contract is immaterial to the motions at bar. Under the unambiguous language of §11.3.7, there can be no question that BFPE is an intended third-party beneficiary of the waiver of subrogation provision with the right to enforce that provision.  That section expressly states that the owner and contractor "waive all rights against (1) each other and any of their **subcontractors, sub-subcontractors,** agents and employees, each of the other…for damages caused by fire or other cases of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work, . . .." (General Conditions of the Contract AIA A-201, Doc. 22-4, §11.3.7) (emphasis added). Section §11.3.1, of the same document requires the owner to purchase and maintain property insurance written on a builder's risk "all-risk" or equivalent policy comprising  the total value for the entire Project, which insurance "shall include the interests of the Owner, the Contractor, **Subcontractors and Sub-subcontractors** in the Project." (*Id.* at §11.3.1). This language reflects a clear identification of persons to whom the waiver will extend, including those who have not directly contracted with the Owner and the express intention that §11.3.7 is to confer a benefit upon subcontractors who are not parties to the General Contract. *See e.g., Great Am. Ins. Co. v. W. States Fire Protection Co.*, 730 F.Supp.2d 1308, 1322-23 (D.N.M. 2009); *Indiana Ins. Co. v. Ehrlich*, 880 F.Supp. 513 (W.D. Mich. 1994). If there was no intention to allow subcontractors to claim the benefit of the waiver of subrogation in the face of claims by Owners and/or Contractors, this Court would have to conclude that the parties included the words "Subcontractors" and "Sub-subcontractors" in both the waiver and insurance procurement provisions for no reason. Such an interpretation cannot be supported when there is a reasonable interpretation that gives those words meaning. *Sagner v. Glenangus Farms, Inc.*, 234 Md. 156, 167, 198 A.2d 277, 283 (1964).

It is also untenable to argue that the General Contract and Contract Documents are not incorporated by reference into the subcontract when BFPE and Turner's rights are expressly defined

in connection therewith. (Subcontract, Doc. 22-5, Articles I, II). BFPE is expressly bound by the terms and conditions of those documents. (*Id.* at Article I, Article II "Plans and Specifications"). If not incorporated by reference, there would be no need for the provision in the subcontract that says the subcontract, the provisions of the General Contract, and the other Contract Documents "are intended to supplement and complement each other and shall, where possible, be thus interpreted." (*Id.* at Article II "Contract Documents"). Moreover, if terms and conditions of the General Contract and Contract Documents were not incorporated into the subcontract, it would be unnecessary and improper to state that that in the event of an "irreconcilable conflict" between a subcontract provision and a provision in the General Contract or Contract Documents, "the provision imposing the greater duty or obligation on the Subcontractor shall govern." (*Id.*). There could never be such a conflict because the Subcontractor could have no obligations under the General Contract.

Turner may wish that only those provisions of the General Contract that it finds beneficial to its position "flow down" to BFPE under the subcontract, but that interpretation is unsound. It is unreasonable to interpret the subcontract to mean that only the "good" rights or remedies available to UMMC against Turner under the General Contract (such as indemnity and the supposed right to require Turner to repair) "flow down" to BFPE under the subcontract, but not any limitation on those rights or remedies, such as the waiver of subrogation. Under §11.3.7 of the General Conditions, UMMC has no right to assert a claim against Turner for property damage to the extent covered by UMMC's property insurance. Turner's rights against BFPE are equally limited - both expressly under the terms of § 11.3.7 to which Turner agreed as part of the General Contract, and through the incorporation of the General Contract into the Subcontract.

### 3. Enforcement of the Waiver in favor of Subcontractors is Part of the Parties' Intended Allocation of Risks, Not in Conflict with it.

When the relevant contracts are read together so as to "supplement and complement each other," rather than with an eye toward creating conflicts between them, as Turner does, it becomes

4

clear that enforcing the waiver of subrogation in favor of BFPE does not alter or "pervert" the parties' intended allocation of risks. First, as a matter of Maryland statutory law and public policy, BFPE cannot agree to indemnify any indemnified party –whether Turner or UMMC or both – for "all" liability, loss or damage caused by, arising out of, resulting from or occurring in connection with the execution of the work, or in preparation for the Work…."  A party to a construction contract may not be required in that contract to indemnify another person or entity for that person or entity's sole negligence.  *See* Md. Code Ann., Cts & Jud Proc. §5-401(a). Thus, Turner's assertion that the parties intended for BFPE to be liable for every loss is simply incorrect, because BFPE cannot be "allocated" liability for the sole negligence of indemnified parties, which in this case are UMMC and Turner.

Further, there is no irreconcilable conflict between any of the other contract provisions cited by Turner and the waiver of subrogation. That waiver can reasonably be read so as to give meaning to each and every provision of the contracts. With regard to BFPE's alleged indemnity obligations under the subcontract and Turner's indemnity obligations to UMMC under the General Contract, the clear intent of the waiver of subrogation is to supersede any existing indemnity obligation insofar as it pertains to property damage to the extent of the Owner's applicable insurance coverage.  (§11.3.7). To the extent that the property damage sustained is not covered by that insurance, the existing indemnity provisions come into effect. *See, e.g., Davlar Corp v. Superior Court*, 53 Cal.App. 4th 1121, 1125, 62 Cal. Rptr. 2d 199, 201 (Cal. App. 1997) ("Clearly, the subrogation waiver applies to claims covered by insurance, the indemnity provision to those that are not covered, and there is no inconsistency between these two distinct provisions."); *Summit Contrs., Inc. v. Gen. Heating & Air Conditioning, Inc.*, 595 S.E.2d 472, 475-76 (S.C. 2004); *see also Liberty Mutual Ins. Co. v. CB Richard Ellis, Inc.*, 242 Fed Appx. 32, 36 (4th Cir. 2007) (discussing interplay between waiver of subrogation and indemnity provisions in property management contract).

Similarly, there is no conflict or alteration of the parties' agreed allocation of risk insofar as it concerns the provision in the subcontract stating that the insurance provided by BFPE shall name Turner and the Owner as additional insureds and shall be "primary" to all other insurance. The insurance that BFPE is required to provide under the subcontract is *liability* insurance intended to protect against third-party claims of injury, loss or damage. (Subcontract, Doc. 22-5, Article XXIV "Insurance," at BFPE 0381-0383**).** That is a horse of a different color than the *property* insurance that comes into play with regard to the waiver of subrogation. That insurance, to be procured by the Owner, is intended to provide protection against first party damage to personal or real property only. These two insurances serve different purposes, and a waiver of subrogation of claims for property damage to the extent covered by the first-party property insurance of the owner in no way changes the parties' agreed allocation of risks with regard to third party liability claims.  The waiver of subrogation clearly applies to "damages caused by fire or other causes of loss" to the extent covered by the Owner's *property* insurance.  That being so, BFPE's obligation to procure various types of *liability* insurance has no impact on damages already covered by UMMC's property insurance.  *See, e.g., Board of Comm'rs v. Teton Corp.*, 30 N.E. 3d 711, 716-717 (Ind. 2015).

To "complement and supplement" the parties' agreement that first party property damage would be covered by the UMMC's property insurance, the provision in the subcontract requiring BFPE to procure liability insurance that is declared to be "primary" can, and therefore must, be interpreted to evidence the parties' intent that BFPE's liability insurance would be the primary insurance with regard to claims of liability for bodily injury or property damage asserted by *third parties* against the insured or an additional insured. To read the provision as Turner suggests – that BFPE's liability insurance is primary to *all* insurance obtained by Turner or UMMC, whether liability or property – would make the requirement that the Owner procure property insurance under §11.3.1 superfluous, as that insurance would never come into play.  It would also render the waiver

of subrogation provision meaningless, because no loss would ever be covered by UMMC's property insurance. This is an untenable conclusion.

The Owner's property insurance procurement obligation and the waivers of subrogation to the extent of coverage under that insurance establish the parties' intent that, in the event of first-party property damage suffered by the Owner or other persons performing work in connection with the construction at the Owner's property, the parties will look to the Owner's insurance for recovery rather than to the other entities identified. *See* §II.A.1, *supra*. In the event the property damage exceeds the amount of that insurance coverage or is not covered by that insurance, or in the event of non-property damages, the other risk allocation provisions come into play.

### 4.     The Scope of the Waiver is Determined by the Scope of Applicable Insurance Coverage, Not the Scope of the "Work."

With regard to the scope of the §11.3.7 waiver, Turner advocates adoption of a minority position that requires the Court to disregard the unambiguous language of that provision. In that provision, Owner and Contractor waive claims against each other and their subcontractors "*to the extent covered* by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work . . . ." (General Conditions, Doc. 22-4, §11.3.7). BFPE cited numerous cases from multiple jurisdictions holding that this language means just what it says – to the extent the policy covering the "Work" insures the property that is damaged – whether that property is part of the "Work" or not – claims by the Owner and Contractor are waived. (*See* BFPE Memorandum in Support of Cross-Motions, Doc. 22-1, p. 21-22). In addition to the well-reasoned discussions in those cases, an excellent analysis of this issue was recently set out by the Supreme Court of Indiana, and its opinion explains precisely why the position advanced by BFPE should be followed in this case.

> The waiver applies to all "damages caused by [covered causes of loss]," but only "*to the extent covered* by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work." Thus, to determine which [ ]

damages are covered by the subrogation waiver, we must look at everything that follows the phrase "to the extent." The positioning and plain meaning of the word "covered" restricts the scope of the subrogation waiver based on the source and the extent of the insurance *coverage*, not the nature of the *damages* or of the *damaged property*.

One of two kinds of property insurance coverage will trigger the waiver: (1) "property insurance obtained pursuant to this Paragraph 11.3" or (2) "other property insurance applicable to the Work." As discussed earlier, paragraph 11.3 coverage can be either "property insurance in the amount of the initial Contract Sum" (i.e., builder's risk insurance) or an existing "all-risk" property insurance policy that covers both the entire existing property and the work. See P. Bruner & P. O'Connor, Jr., supra § 5:220. Obtaining either form of insurance triggers 11.3 coverage,[3] and consequently triggers the subrogation waiver. The second kind of coverage that triggers the waiver is *any* other property insurance policy "applicable to the Work." This alternative is broader than paragraph 11.3 coverage, and serves as a catch-all provision describing any other property insurance that may cover construction-related damages. In sum, if property damages (of any sort) are "covered" by an insurance policy that fits within one of these two descriptions, the waiver applies.

*       *       *       *

Because the AIA contract requires Jefferson County to procure insurance only for the work, not the entire courthouse, Jefferson County believes the scope of the waiver should be just as narrow. But even though the scope of the insurance requirement is indeed narrow, the plain meaning of the waiver is not. Nothing in the AIA contract links the scope of the waiver to the minimum coverage property owners must provide under paragraph 11.3. Property owners are certainly free to use limited builder's risk insurance, which covers only the construction project and nothing else. But property owners are also free to use existing – and broader – "all-risk" insurance policies to cover *both* existing property and the work. Contrary to Jefferson County's argument, damages are waived "to the extent" the damages are "covered," not "to the extent" they are "applicable to the Work."

_____

[3]Courts that have considered the AIA subrogation waiver have disagreed on whether a pre-existing "all-risk" property insurance policy that covers all of an owner's property – including the work-fits under the paragraph 11.3 coverage or under the general category of "other property insurance applicable to the Work." Lexington Ins. Co v. Entrex Com'n Servs., Inc., 275 Neb. 702, 749 N.W.2d 124, 143 (Neb. 2008). But courts generally agree that such a policy is clearly one of the two. Id. at 433-34.

*Bd. Of Comm'rs v. Teton Corp.*, 30 N.E.3d 711, 715-716 (Ind. 2015). Further, though Tuner

eschews the impact of § 11.3.5 of the General Conditions, the presence of that section (pertaining to

waiver of subrogation when there is property insurance applicable to property adjacent to the Work)

reflects that the parties to the contract are not adverse to waiving subrogation as to non-Work

property damage. *See Afinia Dev., LLC*, 2012 Ohio App. LEXIS 4674 at *43, 2012 WL 584536 at

**32; *Lexington Ins. Co. v. Entex Communication Servs. Inc.*, 749 N.W.2d 124, 135 (Neb. 2008) (citing *Lloyd's Underwriters v. Craig and Rush,* 26 Cal.App.4th 1194 (Cal. 1994)).

     *John L Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066 (Md. 2010), does not strengthen Turner's position.  That case neither stands for nor supports the position that the scope of the standard AIA waiver of subrogation language is limited to the "Work." In that case, Mattingly, a contractor, and the owner entered into a standard AIA contract for the construction of a restaurant. The owner was required under the contract to purchase and maintain property insurance in the amount of the Contract Sum plus the value of subsequent modifications and materials and that insurance was to be maintained until final payment has been made or until no person or entity other than the Owner had an interest in the property. *Id.* at 1070. The contract also contained a waiver of subrogation provision virtually identical to the one in the case at bar. *Id.* at 1071. Construction was completed and final payment made in October of 2003, after which the Owner purchased a policy of property insurance covering the restaurant from Hartford Underwriters Insurance Company, which had effective dates of October 1, 2004 through October 1, 2005. *Id.* at 1072.  In May of 2005, a fire caused substantial damage to the restaurant, for which Hartford paid over $1 million. *Id.* Hartford filed suit against Mattingly and its subcontractor and defendants filed motions for summary judgment based on the waiver of subrogation.  *Id.*

     The issue before the Court of Appeals was whether the property insurance issued by Hartford subsequent to the completion of the restaurant construction "comes within the phrase 'other property insurance applicable to the Work,' abrogating any rights of subrogation."  *Id.* at 327, 999. A2d at 1074.   Under the specific facts of that case, the Court found that, with regard to whether the insurance policy at issue *was applicable to the Work*, the contract was ambiguous, because the "Work" could reasonably have been interpreted to mean either the specific construction work performed by the defendant *or* the post-completion finished and operating restaurant. *Id.* at 328, 999 A.2d 1075.  Without being able to ascertain whether the policy under which the damages claimed

were paid was "applicable to the Work" as required under the waiver of subrogation provision, the Court held that summary judgment was not proper on the basis of the available record and remanded.

The *Mattingly* court was not asked to decide whether the waiver applied only to damage (during construction) to the "Work" or also to damaged, adjacent non-"work" property. In fact, in reaching its decision, the *Mattingly* court specifically stated that a case relied on by defendants, *Lexington Ins. Co., supra*, 749 N.W.2d 124 (Neb. 2008), discussing the "work" versus non-"work" scope of the waiver, was inapposite on the issue to be decided. *Mattingly*, 999 A.2d at 1078, n.10. Similarly, *Mattingly*'s analysis of whether AIA waivers of subrogation is triggered when payment for damages sustained after completion of construction and final payment is made by insurance also obtained after those events is inapposite here.

Turner decries the majority position on the grounds that it "benefits" "irresponsible" property owners who only insure the ongoing construction and "penalizes" "responsible" property owners who rely on existing "all-risk" property insurance policies.  (Turner's Memorandum in Opposition, Doc. 27, p. 21). This argument misapprehends the purpose and effect of the waiver of subrogation in §11.3.7 and completely disregards the presence and intent of §11.3.5. There is no "benefit" or "penalty" involved in an interpretation finding that the insurers of Owners purchasing different types of coverage have different degrees of subrogation rights *under §11.3.7*. If an Owner insures the "work" only, he waives subrogation only to the extent of that work under §11.3.7.  However, that same Owner, insofar as she insures property adjacent to the "work" under a separate policy, also waives subrogation for damages to non-"work" property *as a result of §11.3.5*. (*See* General Conditions, Doc. 22-4, §11.3.5). Thus, regardless of whether an Owner uses a broad existing policy to cover both the "work" and non-"work" property, or a separate policy to cover each, both Owners will be made whole for both "Work" and non-"Work" damages through insurance, as intended, and both have waived subrogation to the same extent – the full extent of their insurance coverage.

Because the contract in this case contains §§11.3.5 and 11.3.7, there is no difference in how property

owners and their insurers are treated and thus no "penalty" or "benefit."

One of the clearest statements against the approach advocated by Turner is contained in the

dissent of Justice Alexander in *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 556 N.E.2d 1097(N.Y.

1990). He stated:

> Rather than promoting certainty as to the liability of the parties to these standard
> contracts, the majority's construction of this standard waiver clause invites litigation
> as to whether the damages in any particular case fall within the scope of the work to
> be performed under the contract. In my view, a construction of the clause to bar the
> owner from seeking all damages as to which it has obtained insurance under the
> contract, thereby barring any subrogation action by the owner's insurer, best
> effectuates the intent of the parties to the contract. . . .
>
> The limited construction of the subrogation waiver clause adopted by the majority
> today requires further litigation, and perhaps a trial, to determine the extent to which
> the damages suffered by plaintiff was related to that Work. In my view, this
> construction leaves the contractor's liability uncertain in every case and thus
> completely undermines the purpose of the subrogation waiver clause.

*Brisk*, 556 N.E.2d at 1102 (Alexander, J., dissenting). In fact, Justice Alexander appears prescient in

light of subsequent decisions that expressly reject the holding in *Brisk*.

In *Mu Chptr. of the Sigma Pi Fraternity of the U.S., Inc. v. Northeast Constr. Servs.*, 709

N.Y.S.2d 677, 2000 N.Y. App. Div. LEXIS 6690 (NY App. Div., 3 Dep't, June 15, 2000), the

Appellate Division held that, under a contract containing both § 11.3.7 and § 11.3.5, the waiver of

subrogation extended to *all* damages covered by insurance.  It also stated:

> To the extent defendant relies on *S.S.D.W. Co. v. Brisk Waterproofing Co.* (76 NY2d
> 228) in urging a contrary result, we need note only that the Court of Appeals in *Brisk*
> was considering the effect of a waiver clause contained in the 1976 version of the
> [AIA] contract.  Such clause has since been amended for the express purpose of
> overcoming the holding in *Brisk* (*supra*) (*see* 2 Sweet on Construction Industry
> Contracts § 22.4, at 312-13 [3d ed]) . . . .

*Mu Chptr.*, 709 N.Y.S.2d at 582, n.2, 2000 N.Y.App. Div. LEXIS 6690 at *8, n.2. Similarly, in

*Allianz Ins. Co. v. Structure Tone (UK), Inc.*, 2005 U.S. Dist. LEXIS 44839 (S.D.N.Y. Aug. 15,

2005), the Southern District held that under a contract containing both §§11.3.5 and 11.3.7, where the

property owner relied on an existing property insurance policy covering all of its holdings worldwide to insure the "work" and not a separate policy applicable to just the building or the construction itself, the waiver of subrogation extended to the full extent of that insurance. *Id.* at *6-8. The court then noted that after the *Brisk* decision, the AIA amended its standard forms to add §11.3.5.  As a result of that amendment, the *Structure Tone* court stated that it was not constrained to follow *Brisk* "because the contract at issue is significantly different than the one considered in *Brisk*-indeed, it contains changes effectuated specifically in response to *Brisk*. . .."  *Id.* at *26. In light of the recognized fact that §11.3.5 was added to AIA A-201 for the specific purpose of extending the waiver of subrogation to non-Work property in all cases where the Owner had applicable property insurance and the presence of §11.3.5 in the General Conditions of the UMMC/Turner General Contract, *Brisk* is inapposite here as well. The only reasonable conclusion to be reached is that the waiver of subrogation was intended by the parties to extend to the full extent of the UMMC's property insurance, whether contained in a single "all-risk" policy or in two separate policies, one covering only the "work" and the other covering adjacent non-"work" property.

The decisions relied upon by Turner appear to be based on an interpretation of how those Courts think the waivers of subrogation *should be* written instead of how they are *actually* written. But Maryland law recognizes that it is not the function of the Court to "rewrite the Agreement between parties who had ample ability to bargain for contract terms that would have been more favorable to their respective interests." *Holzman v. Fiola Blum, Inc.*, 125 Md. App. 602, 622, 726 A.2d 818, 827, (Md. App. 1999).  Just as § 11.3.7 says, the waiver extends to the limits of *coverage*, whether that coverage is only for the "Work" or extends to non-"Work" property as well.

5.     **UMMC's "All-Risk" Policy Provided Coverage for the Alleged Damages Whether A Claim was Filed or Not.**

BFPE has established that UMMC relied on an "all-risk" insurance policy that covered the entire building in which the Anesthesia Project was located to insure the "Work" in this case.  The

"Evidence of Property Insurance" reflects UMMC's coverage for the "Anesthesia Project" under Policy Number LQ096.   (Evidence of Property Insurance, Doc. 22-12). The insurance policy produced by BFPE is Policy Number LQ096.  (Policy, Doc. 22-13, p. 1 of 1). It bears the same effective dates as the LQ096 policy identified in the "Evidence of Property Insurance," is issued by the company identified on the "Evidence of Property Insurance," and expressly insures the entire building located at 22 S. Greene Street, Baltimore, Maryland as well as "the interest of contractors and subcontractors in insured property during construction at an insured location or within 1,000 feet/3,000 metres thereof, . . . ." (*Id.* at p. 9, paragraph 1 and Schedule of Locations). Turner has offered no evidence that the policy did not provide insurance for the Anesthesia Project itself as well as for the building in which that project took place. Further, Turner has not identified any exclusion under that policy that applied to any of the damages claimed to have resulted from the water discharge. As a result, the record is undisputed that all of the damages resulting from the water loss were covered under the owner's property insurance.

It defies logic to argue that because UMMC did not make a claim for the property damage resulting from the water discharge under policy LQ096, those losses were not "covered" and the waiver of claims set out in §11.3.7 does not come into play.[1] Section 11.3.7 does not state that claims are waived only to the extent "paid by" or "collected from" the owner's property insurance. It requires only that the damages be "covered" for the waiver to trigger. Waivers of subrogation express the understanding and agreement between the parties that they will look to the Owner's property insurance in the event of property damage. That intent must be upheld regardless of whether a

---

[1] Turner criticizes BFPE for not making a claim itself under UMMC's insurance policy as an alleged additional insured. However, Turner cites no authority, and BFPE is aware of none, that allows an additional insured (if indeed, BFPE was one) to make a claim under the Owner's property insurance to recover for property damage *suffered by the Owner*.  BFPE suffered no damage to its own property and thus had no claim to make.  UMMC, as the only insured to suffer property damage as a result of the water discharge, is the only party able to make a claim under the applicable policy. And when presented with UMMC's alleged request to "fix" the damages, Turner, as a direct party to §11.3.7 and 11.3.5, should have insisted that UMMC make a claim under UMMC's property insurance.

particular Owner decides, after the damage has occurred, to abide by it and the Contractor, like Turner, fails to insist upon compliance.

To hold as Turner urges defeats the purpose of waivers of subrogation in construction contracts. The certainty offered by such provisions is eviscerated if a party to that waiver can avoid its application simply by deciding not to file an insurance claim once property damage occurs. To so find would render the waiver provision a toothless tiger, subject to the individual whims of the party whose property was damages. An interpretation that creates such an outcome is not appropriate under Maryland law when the clear language of the provision does not support it. UMMC had an "all-risk" policy that covered all property damages unless expressly excluded. The damages allegedly incurred in this case were not excluded. Therefore, they were covered and the waiver of subrogation was triggered to the full extent of that coverage.

**6.      New Evidence Produced by Turner with its Opposition Reveals
that It Cannot Establish the Essential Element of Damages.**

Under F.R.C.P. 56, if a party against whom a motion for summary judgment is made fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, summary judgment is appropriate against that party, as there can be no genuine issue of material fact on that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273, (U.S. 1986). In order to recover on a breach of contract claim under Maryland law, "a plaintiff must prove that two or more parties formed a contract, that the defendant breached the contract, and that the plaintiff suffered *actual damages* as a result of the breach." *Parlette v. Parlette*, 88 Md. App. 628, 640, 596 A.2d 665, 671 (1991) (emphasis added). Based on evidence produced by Turner for the first time with its Opposition to BFPE's Cross-Motions, it is undisputed that Turner cannot establish that it suffered actual damages as a result of BFPE's alleged breach of the subcontract. For that reason, BFPE is entitled to summary judgment on Turner's claims against it.

In its Opposition, Turner argues that BFPE failed to sufficiently establish that Turner did not suffer actual pecuniary losses because it relied only on Turner change orders reflecting payments to Turner's subcontractors via "insurance recovery." Despite the fact that those documents were admitted by Turner to be its own business records and were produced under oath with its answers to interrogatories, Turner moved to strike the change orders from the record.[2] The audacity of these actions is startling in light of the Declaration of R. Gregory Stortstrom that was filed with Turner's Opposition – a Declaration that affirmatively states, under penalty of perjury, supported with authenticated documents, exactly what BFPE contended in its Cross-motion: that Turner made no direct payments to UMMC for its alleged property damage or to any subcontractor other than Otis Elevator for repairs performed in response to the water discharge in this case. (*See* Stortstrom Decl., Doc. 27-2, ¶ 9 and Ex. 7 thereto).

Mr. Stortstrom affirms that Turner's liability insurer, Liberty Mutual, paid sums to each of the subcontractors identified in BFPE's Exhibit F (the change orders) that match exactly the sums identified on the challenged change orders as "insurance recovery." (*Id.* at ¶ 9, *compare with* Change Orders, Doc. 22-8). In addition, Mr. Stortstrom attached and authenticated copies of the checks from Liberty Mutual reflecting those payments. (Stortstrom Decl., Doc. 27-2, ¶ 9 and Exhibits 6 & 7 thereto). With these documents, *which were never produced to BFPE during the course of discovery,* (*see* Exhibit A hereto, Declaration of Sandra T. Carson, Esquire, at ¶4), and the admission that Turner made its payment to Otis using money owed to but withheld from BFPE, it is now undisputed that Turner did not actually make any payment from its own funds as a result of the water discharge and that no payment to any subcontractor can constitute actual damages to Turner.[3]

---

[2]For full discussion on this point, *see* BFPE's Opposition to Turner's Motion to Strike (Doc. 28), which BFPE incorporates by reference herein. For the reasons set out therein, BFPE's reliance on the change orders is appropriate and admissible.

[3] Turner admits that the $27,863.02 it paid to Otis was not from its own funds, but was money withheld from the final payment owed to BFPE under the subcontract. (Decl. of R. Stortstrom, Doc. 19-1, ¶ 10). As a result, that payment does not constitute an "expense," "cost" or "loss" to Turner arising out of the water discharge, because

Turner cannot create "actual damages" sufficient to create a prima facie claim for breach of contract against BFPE by arguing that its agreements with those subcontractors for the repair work constituted "legal obligations" to pay them that it is entitled to enforce. Any such obligation vanished when Liberty Mutual paid those subcontractors. The subcontractors were satisfied by persons other than Turner; thus, Turner suffered no harm by the mere act of engaging those contractors to perform the work.

Turner's loan agreement with Liberty Mutual, (Stortstrom Decl., Doc. 27-2, ¶ 9 and Exhibit 6 thereto), also produced to BFPE for the first time with Turner's Opposition, (Ex. A hereto, ¶ 4), likewise does not constitute "damages" suffered by Turner. That document sets out very limited circumstances under which Turner is obligated to reimburse Liberty Mutual for the payments made: Turner has no obligation to reimburse Liberty at all unless it obtains a recovery against *Indian Harbor Insurance Company* and that recovery represents Indian Harbor's liability to Turner for coverage owed under an allegedly existing policy identified in that document, and then, only to the extent of that recovery. (Stortstrom Decl., Doc. 27-2, Exhibit 6 thereto at ¶1(a)-(c)). If Turner does not recover from *Indian Harbor*, it is not obligated to repay Liberty Mutual at all. (*Id.*, Exhibit 6 at ¶ 2).

Turner has not sued Indian Harbor in this case; thus, this suit cannot possibly give rise to a recovery against Indian Harbor. A judgment against BFPE does not give Turner any right to recover against Indian Harbor, even assuming Indian Harbor is actually BFPE's insurer for the incident at issue in this case. Thus, a recovery against BFPE would not, under the terms of the loan agreement, give rise to a legal obligation on the part of Turner to repay Liberty Mutual. As such, the loan agreement is not even "potential" damages in a suit against BFPE.

---

had there been no water discharge, Turner would have paid those funds to BFPE for its admittedly completed work under the subcontract, and would have made no payment to Otis. Turner paid nothing as a result of the water discharge that it was not already contractually obligated to pay.

Further, the loan agreement can *never* give rise to an obligation by Turner to reimburse Liberty Mutual, because Indian Harbor was not BFPE's insurer for the project at issue in this case. The Certificate of Insurance provided by BFPE to Turner for this project and produced again during discovery, specifically identifies the applicable insurance policy for BFPE on the UMMC Anesthesia project as having been issued by Greenwich Insurance Company.   (Exhibit B hereto, BFPE Certificate of Insurance).

Finally, though Turner asserts that it incurred "costs" because it "managed both the incident cleanup and the performance of the repairs," (Stortstrom Decl, Doc. 27-2, ¶ 10), it does not provide any evidence of those costs beyond the speculation and personal belief of Mr. Stortstrom. Turner has not provided any evidence showing extra time spent on such tasks or extra payments made to its employees in connection with those tasks. Instead, Turner relies on Mr. Stortstrom's personal belief that a 5% markup on Liberty Mutual's payments "is a fair and reasonable way to quantify Turner's costs." (*Id.* at ¶ 11).   Whether such a "markup" is, in fact, a fair and reasonable way to quantify costs in a construction management setting is not something that is within the ken of the average layperson, and thus is a subject on which expert testimony is required. *See Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 410 (D. Md. 2001) (*quoting Virgil v. "Kash 'N' Karry" Service Corp.,* 61 Md. App. 23, 484 A.2d 652, 656 (Md. App. 1984). Mr. Stortstrom was never identified as an expert and his Declaration provides no qualifications that would allow him, Turner's Insurance/Legal Coordinator, (Stortstrom Decl., Doc. 27-2, ¶ 2), to testify as an expert on construction costs, practice and estimating. Indeed, Turner did not identify any expert witnesses in this matter.  (Declaration of S. Carson, Doc. 22-11, ¶ 6). Thus, Mr. Stortstrom's "beliefs" on this point should not be considered by this Court, as to do so would severely prejudice BFPE.[4]

---

[4] Similarly, even if the payments to Turner's subcontractors made by Liberty Mutual could be considered "actual damages," Turner has also failed to provide the necessary expert testimony establishing that the work that was performed by the contractors was necessary and that the amounts charged were fair and reasonable. In the

As Plaintiff, Turner has the burden of proof to establish that it suffered actual damages as a result of BFPE's supposed breach of contract. It has failed to do so. As a result, it has failed to establish a prima facie claim for breach of contract and BFPE is entitled to judgment as a matter of law.

**B.        BFPE is Entitled to Summary Judgment on its Counter-Claim.**

Turner's claim that it does not need to establish that BFPE "caused" the water discharge is mistaken. The provision on which Turner relies purports to require BFPE to accept "all liability" and indemnify Turner for all losses even if BFPE was without fault and even if Turner and/or UMMC were the "cause" of the discharge, simply because it occurred while BFPE had wrench to pipe. However, BFPE cannot, as a matter of Maryland statutory law, be required in its subcontract to indemnify Turner for the sole negligence of any indemnified party, which in this case are both Turner and UMMC. Md. Code Ann., Cts. & Jud. Proc. § 5-401(a). Maryland Courts have held that any provision that can be read to require such indemnification is void and unenforceable. However, if the same provision can be read to require indemnity in the case of *concurrent* negligence of the indemnitee and indemnitor, it will be valid and enforceable to that extent alone. *See Heat & Power Corp. v. Air Products & Chemicals, Inc.*, 578 A,2d 1202, 1206 (Md. 1990). Thus, despite the actual language of the subcontract, the subcontract provision upon which Turner relies is void and unenforceable to the extent it purports to require BFPE to indemnify Turner and/or UMMC in the absence of any negligence by BFPE. (*Id.*; *see also* Subcontract, Document 22-5, at BFPE 0381) (stating that indemnity provision will be construed to conform to applicable law limiting indemnity obligations of the subcontractor).

Turner has no admissible evidence that BFPE acted negligently. BFPE has offered expert evidence that BFPE's actions fell within the applicable standard of care. (*See* Declaration of William

---

absence of such expert testimony, its claimed damages have not been properly established and Turner cannot recover.

E. Koffel, P.E., Supplemental Exhibit Q to BFPE's Cross-Motions, attached hereto).  Turner, on the other hand, has not identified or submitted any expert testimony on the applicable standard of care, on BFPE's supposed violation thereof in connection with the water loss. Though the recently-submitted Declarations of Mr. Coulter, (Coulter Decl., Doc. 27-3), and Mr. Geffen, (Geffen Decl., Doc. 27-4), attempt to opine that BFPE failed to act reasonably, neither of those individuals were identified by Turner as experts and nothing qualifying them as experts on the standard of care applicable to fire sprinkler contractors is presented.[5] For the same reasons this Court should not consider the "expert" opinions of Mr. Stortstrom, the opinions of Mr. Coulter and Mr. Geffen with regard to what was supposedly required of BFPE under the standard of care must be disregarded. In the absence of proof that BFPE was itself negligent in connection with the loss for which Turner seeks recovery, Turner cannot rely on the indemnity provision.

Further, though Turner argues, and submits a Declaration allegedly establishing, that UMMC did make a "claim" against it, that evidence is not sufficient to trigger BFPE's indemnity obligation under the subcontract. As pointed out in BFPE's original papers, only *third party* claims are contemplated as giving rise to potential indemnity obligations under the subcontract. (BFPE Memorandum in Support of Cross-Motions, Doc. 22-1, p. 25-26). Since UMMC is an "indemnified party" itself under the subcontract and its claim is for first-party damage, that "claim" is not one giving Turner a right to indemnity from BFPE. (*Id.* at p. 26-27). Moreover, UMMC waived its right to make any "claims" against Turner in §11.3.7, so not only is Turner not obligated to indemnify UMMC, as alleged, BFPE is not obligated to indemnity Turner.

Finally, BFPE did carry out all obligations necessary to obtain final payment.  Neither Turner nor BFPE had any "obligation" to repair (e.g., pay for repair of) the damage claimed in light of the waiver of subrogation and the Owner's insurance procurement responsibilities. The plain language of

---

[5]BFPE questions why these Declarations were not filed with Turner's own motion for summary judgment, wherein it bore the burden of establishing that BFPE was obligated to indemnify Turner.

the subrogation waiver puts the onus of paying for first party property damage on the Owner's insurance company.  UMMC waived any claims against Turner to the extent of that insurance, which covered both Work and non-Work property. Since the parties agreed that they would look to the UMMC's property insurance to cover losses from property damage to the full extent of available coverage, there can be no reasonable interpretation of the alleged obligation to "repair" such property damage that would require Turner or BFPE to do so at its own expense, because there were no damages in this case that were not covered under UMMC's insurance policy.

There being no obligation on BFPE to pay for, assume liability for, or indemnify for the property damage allegedly sustained by UMMC, Turner had no basis to withhold BFPE's final payment, and BFPE is entitled to recover that sum on its Counterclaims.

## III.  <u>CONCLUSION</u>

Turner, with its Opposition and Reply, has submitted Declarations that it hopes will distract from a proper analysis of the matters before the Court. However, no attempt by Turner to create a dispute of fact has created a genuine dispute of *material* fact that would preclude the grant of BFPE's Cross-Motions.  In particular, the issues concerning the waiver of subrogation and the interplay between the contracts at issue are matters of strict contract interpretation for the Court to determine as a matter of law based on the language of the documents themselves and as such, as immune from any of the facts related to BFPE's actions on the job site that Turner has attempted to dispute.

For the reasons set out above and those set out in BFPE's Cross-Motions for summary judgment and supporting papers, BFPE's cross-motions for summary judgment on Turner's claims and on BFPE's counter-claim should be granted.

Respectfully submitted,

*/s/  George D. Bogris*
George D. Bogris (Bar. No. 10458)
Sandra T. Carson (Bar No. 24699)
WHITNEY & BOGRIS, LLP

Twelfth Floor
401 Washington Avenue
Towson, MD  21204
(410) 583-8000 (ph)
(800) 893-1239 (fax)
gbogris@whitneybogris.com
scarson@whitneybogris.com
**Attorneys for Defendant**
**BFPE International, Inc.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of September, 2015, the foregoing was electronically filed, through which notification of such filing will be sent to all counsel of record who have registered with the electronic filing service for this matter.  Parties may access this document via the Court's electronic filing system.

*/s/ George D. Bogris*