## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**TURNER CONSTRUCTION COMPANY,**   *

    **Plaintiff**   *

    **v.**   *   **CIVIL NO. JKB-15-368**

**BFPE INTERNATIONAL, INC.**   *

    **Defendant**   *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Turner Construction Company ("Turner" or "the Contractor"), a corporation organized under the laws of New York, brought a breach-of-contract action in diversity against BFPE International, Inc. ("BFPE" or "the Subcontractor"), a corporation organized under the laws of Maryland.[1]  Turner demands that BFPE reimburse it for costs it sustained in connection with a construction incident.  (ECF No. 1.)  BFPE answered Turner's Complaint and pleaded a counterclaim, alleging that Turner owes it $27,863.02 for services performed under a subcontract agreement.  (ECF No. 8.)

Now pending before the Court are cross-motions for summary judgment filed by Turner (ECF Nos. 18 & 19) and BFPE (ECF No. 22) pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Also pending is Turner's Motion to Strike Inadmissible Matter (ECF No. 25).  The issues have been briefed, and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014).  For the reasons explained below, all pending motions will be DENIED.

---

[1] *See* 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between—(1) citizens of different States[.]").

I.    *Background and Procedural History*[2]

A.    *The Contracts*

In April 2013, Turner executed a contract ("the General Contract") with the University of Maryland Medical Center ("UMMC" or "the Owner") whereby Turner agreed to perform certain renovation services at the UMMC Anesthesia Faculty Offices, located on the eleventh floor of the South Hospital at 22 South Greene Street, Baltimore, Maryland ("the Work" or "the Project"). (ECF No. 22–3.)[3]  Thereafter, Turner entered into a subcontract agreement with BFPE ("the Subcontract") whereby BFPE agreed to "perform and furnish all the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances and other things necessary for Fire Protection" on the Project ("the Subcontract Work").  (ECF No. 22–5 at 2.)[4]

The General Contract comprises two primary documents, both boilerplate forms promulgated by the American Institute of Architects ("AIA"):  Document A133™–2009, titled "Standard Form of Agreement Between Owner and Construction Manager as Constructor" ("A133"); and Document A201™–2007, titled "General Conditions of the Contract for

---

[2] At the summary-judgment stage, the facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).  Because both parties here moved for summary judgment, the Court has evaluated each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir.1997)).  Having analyzed the parties' arguments and the relevant authorities, the Court is of the opinion that neither party is entitled to judgment at this time.  Throughout this Memorandum, the Court highlights the ambiguities giving rise to the Court's determination.

[3] The Work is defined in the General Contract as "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations.  The Work may constitute the whole or a part of the Project."  (ECF No. 22–4 at 10.)  The Project, in turn, is defined as "the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner and by separate contractors."  (*Id.*)

[4] R. Gregory Stortstrom, Turner's Insurance/Legal Coordinator, elaborated that "BFPE was required to perform all of the work associated with the fire protection system, including demolishing sprinkler piping and coordinating sprinkler outages to accommodate the renovations and to permit the work to be performed safely and efficiently." (ECF No. 18–1 at 1-2.)

Construction ("A201").[5]   Several provisions of A201 are particularly relevant to the Court's

analysis of the pending motions.   Section 11.3.1 provides that "the Owner shall purchase and

maintain . . . property insurance written on a builder's risk 'all-risk' or equivalent policy form . . .

comprising total value for the entire Project at the site on a replacement cost basis without

optional deductibles." (ECF No. 22–4 at 31.)[6]   The specified insurance "shall include interests of

the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Project."   (*Id.*)   Section

11.3.7, the "Waiver of Subrogation," then provides as follows:

> The Owner and Contractor waive all rights against . . . each other *and any of their*
> *subcontractors* . . . for damages caused by fire or other causes of loss to the extent
> covered by property insurance obtained pursuant to this Section 11.3 or other
> property insurance applicable to the Work . . . . A waiver of subrogation shall be
> effective as to a person or entity *even though that person or entity would*
> *otherwise have a duty of indemnification*, contractual or otherwise . . . .

(*Id.* at 32 (emphasis added).)   Section 11.3.5 amplifies the Waiver of Subrogation:

> If during the Project construction period the Owner insures properties, real or
> personal or both, at or adjacent to the site by property insurance under policies
> separate from those insuring the Project . . . the Owner shall waive all rights in
> accordance with the terms of Section 11.3.7 for . . . causes of loss covered by this
> separate property insurance.

(*Id.* at 31-32.)

Several provisions of the Subcontract are also essential to the Court's analysis.   Article II

cross-references and incorporates the General Contract, providing that

> the Subcontractor agrees to be bound to Contractor by each and all of the terms
> and provisions of the General Contract . . . and to assume toward Contractor all of
> the duties, obligations and responsibilities that Contractor . . . assumes toward the
> Owner, and the Subcontractor agrees further that Contractor shall have the same
> rights and remedies as against the Subcontractor as the Owner . . . has against

---

[5] The General Contract also includes certain exhibits appended to A133, but those exhibits have no bearing on the Court's analysis here.

[6] Instead of purchasing a freestanding builders'-risk policy, UMMC added a $5,000,000 builders'-risk endorsement to its existing all-risk policy guaranteed by Factory Mutual Insurance Company (Policy No. LQ096).   (*See* ECF No. 22–12 at 2.)

Contractor with the same force and effect as though every such duty, obligation, responsibility, right or remedy were set forth [in the Subcontract] in full.

(ECF No. 22–5 at 2.)  Article II adds that the Subcontract's terms and provisions "are intended to be and shall be in addition to and not in substitution for any of the terms and provisions of the General Contract" and that the provisions of the two documents are "intended to supplement and complement each other and shall, where possible, be thus interpreted." (*Id.*)[7]

In spite of the parties' apparent intent to integrate the two agreements, the Subcontract includes several provisions that seem inconsistent with the General Contract—and specifically, with the Waiver of Subrogation.  Foremost among these seemingly contrary provisions is Subcontract Article XXIII, the "Assumption of Liability" (and the primary bone of contention in this lawsuit):

> The Subcontractor hereby assumes the entire responsibility and liability for any and all actual or potential damage or injury of any kind or nature whatsoever . . . to all persons and entities . . . or to all property . . . caused by, resulting from, arising out of or occurring in connection with the execution of the [Subcontract] Work, or in preparation for the [Subcontract] Work . . . . Should any claims for such actual or potential damage or injury . . . be made or asserted, whether or not such claims are based upon an Indemnified Party's[8] alleged active or passive negligence or participation in the wrong . . . the Subcontractor agrees to indemnify and save harmless the Indemnified Party from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, that the Indemnified Party may directly or indirectly sustain . . . as a result thereof . . . .

(*Id.* at 12.)  In the event that any such "claims, loss, cost, expense, liability, damage, penalties, fines or injury" arise or are asserted, Article XXIII authorizes Turner to "withhold from any payments due or to become due to the Subcontractor an amount sufficient in its judgment to protect and indemnify the Indemnified Party." (*Id.*)

---

[7] Nevertheless, if any provision of the Subcontract "irreconcilably conflicts" with a provision of the General Contract, "the provision imposing the greater duty or obligation on the Subcontractor shall govern." (ECF No. 22–5 at 2.)

[8] The Subcontract defines "Indemnified Party" to include the Contractor (Turner) and the Owner (UMMC). (*Id.* at 12.)

4

In keeping with its obligations—including its duties of indemnification—BFPE is required, per Article XXIV, to maintain a $5,000,000 commercial general liability insurance policy inclusive of "CONTRACTUAL LIABILITY INSURANCE AGAINST THE LIABILITY ASSUMED HEREINABOVE." (*Id.* at 12.)[9] Turner and UMMC must be listed as additional insureds on BFPE's policy; the "coverage to be provided to the additional insureds shall be for all liability arising out of the [Subcontract] Work." (*Id.* at 14.)

> It is expressly agreed . . . that all insurance . . . afforded the additional insureds shall be primary insurance to any other insurance available to the additional insureds and that *any other insurance* carried by the additional insureds shall be excess of *all other insurance* carried by the Subcontractor and shall not contribute with the Subcontractor's insurance.

(*Id.* (emphasis added).)

Finally, the Court notes the compensation arrangements under Article IV, which specifies five conditions precedent to final payment from Turner to BFPE:  (1) Turner's receipt of final payment from UMMC; (2) Turner's acceptance of BFPE's completed work; (3) BFPE's provision of evidence that no outstanding claims, obligations, or liens remain in relation to its work; (4) BFPE's execution of a general release in favor of Turner and UMMC; and (5) BFPE's "complete and full satisfaction of all claims, demands and disputes, and all obligations and responsibilities . . . arising out of or related to the Subcontract," including those as between Turner and BFPE. (*Id.* at 4.)[10]

---

[9] "Contractual liability insurance" is nowhere defined in the Subcontract, and at least one other court has recognized that the term is "somewhat enigmatic." *See James v. Burlington N. Santa Fe Ry. Co.*, 636 F. Supp. 2d 961, 976 (D. Ariz. 2007).

[10] Article IV adds that, should BFPE damage the Project, Turner "shall have the right . . . to retain from any payment then due or thereafter to become due an amount which it deems sufficient to . . . make good any such . . . damage." (ECF No. 22–5 at 5.)  Article XI similarly provides that, should BFPE "cause by any act or omission . . . damage to the . . . Project, or fail in the performance of any of the terms and provisions of [the Subcontract]" (which acts and omissions "shall constitute a default" on BFPE's part), then Turner "shall have the right . . . to perform and furnish . . . any [necessary] labor or materials for all or any portion of the [Subcontract] Work and to deduct the cost thereof from any monies due or to become due" to BFPE. (*Id.* at 7.)  Under such circumstances, BFPE "shall not be entitled to receive any further payment . . . until the [Subcontract] Work shall be wholly completed" to the satisfaction of

## B.    *The Sprinkler Incident*

As noted above, Turner hired BFPE to perform fire-protection services on the Project. Certain of these services, such as demolition tasks, could only be performed if UMMC's sprinkler system was first deactivated.   BFPE was required to "[c]oordinate all necessary outages with Turner and UMM[C]."  (*Id.* at 22.)[11]

On or about January 9, 2014, Dennis Reter, Sr., BFPE's project superintendent, spoke with Craig Coulter, Turner's project supervisor, about demolition work to be performed in the C wing of the South Hospital's eleventh floor.   (ECF No. 22–14 at 3.)   Following their conversation, Coulter "prepared . . . [a] sprinkler outage request and submitted the same to UMMC as required by UMMC procedures."  (*Id.*)[12]

The Subcontract requires BFPE to supply "competent supervisory personnel," and it further provides that the appointed supervisor (Reter) "shall [be] present on site at any time work is being performed."  (ECF No. 22–5 at 21.)  Yet on January 21, 2014—the day of the scheduled C wing outage—Reter was not on site.  Instead, Joe Palle, another BFPE superintendent, walked the C wing with Craig Coulter and two BFPE technicians, Dennis Rivera and Kaylin Ortiz.

---

Turner and UMMC.  (*Id.*)  At such a time, should the costs attributable to BFPE's default—including, *inter alia*, legal fees incurred in seeking recovery from BFPE—exceed the unpaid balance, then BFPE must pay the difference to Turner.  (*Id.* at 7-8.)

[11] BFPE downplays its role in the outage-request process.  Dennis Reter, Sr., BFPE's project superintendent, averred that in fourteen years of experience working on jobs at UMMC, "BFPE personnel did not submit outage requests to UMMC and were not permitted to implement sprinkler outages.  The outages were requested by the general contractor . . . and the physical operation of the sprinkler valves . . . was always performed by UMMC personnel." (ECF No. 22–14 at 3-4.)

[12] Turner appended copies of Craig Coulter's outage request (OTG–51) to its pending summary-judgment motions. (*See* ECF Nos. 18–1 at 32-35 & 19–1 at 32-35.)  BFPE's hired expert, William E. Koffel, P.E., having reviewed OTG–51, opined that the request was defective in that it (1) misstated that BFPE was responsible for deactivating, draining, and refilling the subject sprinkler system; (2) failed to indicate that the standpipe system would also need to be deactivated and drained; (3) misidentified the hose cabinets to be demolished; and (4) misstated that the cabinets were fed by branch piping.  (ECF No. 22–19 at 10.)

Turner did not address Koffel's critique in its opposition brief; instead, Turner moved to strike Koffel's expert report altogether (a request the Court will deny for reasons explained below).  It appears, however, that Turner disputes at least one of Koffel's assertions:  per a declaration by Keith Geffen, UMMC's outage coordinator, "UMMC does not drain the fire protection system.  The fire protection subcontractor is expected to perform that work."  (ECF No. 27–4 at 3.)

(ECF No. 22–15 at 3.)  Coulter informed the team that they were to (1) demolish certain hose cabinets and (2) perform work on certain sprinkler pipes.  Palle "advised Mr. Coulter that [they] would begin with the hose cabinets and then do the other sprinkler work."  (*Id.*)  Palle placed a call to Keith Geffen, UMMC's outage coordinator; Palle then departed for another job site, leaving Rivera and Ortiz to walk the floor with Geffen.  Rivera asserts that he "identified to Mr. Geffen all work that BFPE had been told by Turner to perform that day and pointed out all areas where that work was to take place."  (ECF No. 22–16 at 3.)  Geffen "did not seem confused," and he advised the technicians that they were "good to go."  (*Id.* at 3-4.)  Rivera then "began to loosen a coupling on the pipe feeding the . . . C wing hose cabinets.  Shortly after [he] began doing so, pressurized water came shooting out of the pipe and it was impossible to replace the coupling to stop the flow" (*id.* at 4) ("the Sprinkler Incident").[13]

Geffen elaborated on the circumstances surrounding the Sprinkler Incident, explaining that—following his walk with Rivera—he had "turned off the main branch valve serving the C Wing."  (ECF No. 27–4 at 2.)  Rivera had watched as Geffen closed the valve.  After the incident was under control, Geffen realized that "Rivera had loosened a fitting on a pipe upstream from the valve that [Geffen] had closed.  Consequently, the system in th[at] location had not been turned off."  (*Id.*)  A diagram of the C wing, placed in the summary-judgment record by Turner,

---

[13] Turner appended an Incident Investigation Report, prepared by Coulter the day after the Sprinkler Incident, to its pending summary-judgment motions.  (*See* ECF Nos. 18–1 at 28-29 & 19–1 at 28-29.)  In its cross-motion, BFPE contends that the report is a "hearsay document that contains further hearsay," since Coulter was not present immediately prior to or at the time of the events and "therefore has no personal knowledge of what actually occurred that morning."  (ECF No. 22–1 at 31 n.4.)  Turner does not respond to BFPE's hearsay argument in its opposition brief; however, per Coulter's declaration, he prepared the report "in the course of performing [his] duties as a Project Superintendent," and "it is the regular practice of Turner to make and keep such reports."  (ECF No. 27–3 at 3.)  It appears, then, that the report itself would likely fit within the business records exception to the hearsay prohibition, *see* Fed. R. Evid. 803(6).  Moreover, to the extent that the information in the report was supplied by Dennis Rivera and/or Kaylin Ortiz (BFPE employees), such information would presumably be admissible as the statement of an opposing party's agent, *see* Fed. R. Evid. 801(d)(2)(D).  Nevertheless, because Turner failed to address BFPE's argument, and because the Court cannot ascertain to what extent the information in the report may be attributable to Keith Geffen or another nonparty, the Court will exclude the contents of the report from its consideration at this stage without prejudice to the potential admissibility of the exhibit in later proceedings.

illustrates the problem:  the main branch valve is located downstream of the cabinet feed, which is itself downstream of the second-floor riser valve that controls the flow throughout the C wing. (ECF No. 27–3 at 16.)  Geffen opined that "[i]f Mr. Rivera had been familiar with the system, he would have understood that [Geffen] had turned off the [main branch valve] to facilitate the sprinkler pipe work, not the fire hose cabinet demolition, and he would not have loosened the fitting on [the] pressurized pipe." (ECF No. 27–4 at 2.)  Geffen added that, had Rivera "opened one of the valves at the sprinkler hose cabinets before commencing demolition operations," he would have discovered that water was still flowing in that location:  "[a] few drops would have come out, and BFPE would have closed the valve and alerted Turner and/or UMMC." (*Id.*)

UMMC sustained significant property damage as a result of the Sprinkler Incident, particularly to elevators located on the tenth and eleventh floors.  Craig Coulter averred that the "costs of repairing property damage and replacing furniture totaled approximately $218,499.30," 77% of which amount represents damage to property located outside the Project footprint.  (ECF No. 27–3 at 4.)

### C. *Claim History and the Instant Litigation*

After the Sprinkler Incident, UMMC's project development team "demanded that Turner immediately respond to the incident and repair any and all property damage resulting from the incident." (ECF No. 27–5 at 1.)  In turn, Jay Twilley, a project manager for Turner, contacted Bill McDermott of BFPE to inform him that BFPE was responsible for any damages "arising through the performance of work on site leading to [the] flooding event" and that Turner expected BFPE or its insurer to "fund the repairs required for correction of all damaged work associated with this event." (ECF No. 27–2 at 6.)  BFPE disclaimed any responsibility. (*Id.* at 10.)  Turner then notified its commercial liability carrier, Liberty Mutual Insurance Company

("Liberty"), which dispatched a notice of claim to BFPE and two insurance companies, Indian

Harbor Insurance Company ("Indian Harbor") and Navigators Specialty Insurance Company

("Navigators").  (*Id.* at 12.)  By letter dated April 8, 2014, a claims-administration entity called

Integrated Risk Management denied responsibility on behalf of BFPE and Indian Harbor.  (*Id.* at

14.)  By separate letter dated January 28, 2015, an entity called the XL Group contacted Turner's

coverage counsel on behalf of Greenwich Insurance Company ("Greenwich")—ostensibly

BFPE's commercial liability carrier during the Project timeframe—to further disclaim

responsibility.  (*Id.* at 15.)[14]

Having failed to secure BFPE's assistance with the repairs, Turner arranged for Liberty

to cover the bulk of the costs.  By contract dated December 22, 2014, Liberty agreed to loan

Turner "an amount equal to the cost of coverage for the Claim and defense against any future

related civil action," which loan was repayable only "[f]rom the proceeds of any amounts

obtained by Turner from Indian Harbor, to the extent such recovery represents Indian Harbor's

liability to Turner for coverage."  (*Id.* at 20.)  The loan agreement expressly provides that

"Turner shall have *no obligation* to repay Liberty for any claim coverage . . . or other amounts

paid by Liberty in defense of the Claim, except in the case of recovery of those amounts by

Turner from Indian Harbor, and then only to the extent of such recovery."  (*Id.* at 21 (emphasis

added).)  Pursuant to the loan agreement, Liberty paid a total of $190,636.28 to UMMC and to

various subcontractors that undertook the repairs.  (*Id.* at 3.)[15]  For its part, Turner paid out

---

[14] Judging from the XL Group letterhead, it appears that XL Group, Greenwich, and Indian Harbor may be related entities—but the Court cannot ascertain the nature of their relationship from the summary-judgment record.

[15] The Court was troubled to learn, per defense counsel Sandra T. Carson's September 19, 2015, declaration (ECF No. 29–1), that neither the checks issued by Liberty to various subcontractors nor the loan agreement executed between Liberty and Turner were produced to BFPE in discovery:  BFPE only learned of the existence of these documents upon reviewing Turner's response in opposition to BFPE's cross-motion.  Liberty's role in the repair process here is incontrovertibly material, given that Turner seeks to recover *all* damages associated with the repairs. Moreover, in response to BFPE's First Interrogatory No. 10 (requesting details of claims and a list of all documents reflecting, relating, or referring to claims arising out of the Sprinkler Incident), Turner simply noted that "UMMC

only $27,863.02,[16] an amount equal to the balance due BFPE under the Subcontract—though Turner also believes that it incurred some modest costs associated with its management of the repair process.  (*Id.* at 4.)

Turner sued BFPE on February 10, 2015, demanding judgment in the amount of at least $240,000 plus costs and attorneys' fees.  (ECF No. 1 at 9.)[17]  Turner's basic theory of the case is that, through Article XXIII of the Subcontract, BFPE assumed all liability for damages arising out of its work; by refusing to repair the water damage or to indemnify Turner for the repair costs, BFPE allegedly breached the Subcontract.  BFPE answered Turner's Complaint on March 10, 2015, and it pleaded a counterclaim for the $27,863.02 Subcontract balance.  (ECF No. 8 at 14.)  On July 20, 2015, Turner filed a Motion for Partial Summary Judgment as to Liability (ECF No. 18) and a Motion for Summary Judgment Relating to Defendant/Counter-Plaintiff's Counterclaim (ECF No. 19).  On August 14, 2015, BFPE filed a Cross-Motion for Summary Judgment as to both claims (ECF No. 22); Turner filed a response in opposition (ECF No. 27), and BFPE replied (ECF No. 29).  The case was transferred to the undersigned on January 14, 2016.  All pending motions are ripe for decision.

## II.    *Turner's Motion to Strike Inadmissible Matter (ECF No. 25)*

Before addressing the pending cross-motions for summary judgment, the Court must resolve an ancillary evidentiary dispute.  On September 4, 2015, together with its response in

---

demanded that Turner fix the damage to the facility" and then referred BFPE to its document production (a single compact disc that evidently did not include the checks or the loan agreement).  (*See* ECF No. 22–10 at 6.)

Because Attorney Carson raised this discovery concern in BFPE's reply brief, and given the briefing schedule under Local Rule 105.2(a) (D. Md. 2014), Turner has had no formal opportunity to proffer an explanation for its apparent lapse, and the Court will refrain from further action at this time.  However, all counsel are on notice: discovery obligations are to be taken with the greatest seriousness.

[16] Turner remitted the $27,863.02 payment to Otis Elevator Company ("Otis Elevator"); Liberty made a separate $82,991.70 payment to Otis Elevator.  (ECF No. 27–2 at 3-4.)

[17] Turner believes it is entitled to recover damages equal to the funds paid out by Liberty on its behalf.  As discussed below, however, given the unique loan arrangement between Liberty and Turner and the fact that Indian Harbor is neither a party to this action nor, apparently, BFPE's insurer on the Project, the Court is skeptical whether Turner can advance a justiciable claim for the costs that Liberty incurred.

opposition to BFPE's cross-motion, Turner moved to strike certain material appearing in exhibits appended to that cross-motion.  (ECF No. 25.)   BFPE filed a response in opposition on September 18, 2015 (ECF No. 28); thereafter, Turner did not file a reply brief within the period prescribed by Local Rule 105.2(a) (D. Md. 2014).

As grounds for its motion, Turner cites Rules 12(f) and 56(e) of the Federal Rules of Civil Procedure.  The Court initially observes that neither rule specifically authorizes the relief that Turner seeks.  Rule 56(e) empowers the Court to take appropriate action, within its discretion, when a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)."  Rule 12(f) authorizes the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"—but a motion for summary judgment is plainly not a pleading.[18] Nevertheless, the Fourth Circuit has recognized that district courts have inherent power to strike other types of documents for just cause, *see Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 149-50 (4th Cir. 2009).  But because of their very potency, "inherent powers must be exercised with restraint and discretion."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).[19]

Turner objects to aspects of four of BFPE's exhibits:  Exhibit F (ECF No. 22–8); Exhibit I (ECF No. 22–11); Exhibit P (ECF No. 22–18); and Exhibit Q (ECF No. 22–19).  The Court addresses each objection in turn.

Exhibit F comprises certain change orders that were issued to subcontractors for repair work after the Sprinkler Incident.  Turner complains that references to "insurance recovery,"

---

[18] "Although some cases have held that Rule 12(f) may be used to strike documents other than pleadings, the weight of authority is that such an action is not contemplated or permitted by the Rules."  *Anusie–Howard v. Todd*, 920 F. Supp. 2d 623, 627 (D. Md. 2013) (footnotes omitted), *aff'd*, 615 F. App'x 119 (4th Cir. 2015) (per curiam).

[19] This is not to suggest, of course, that parties are precluded from objecting to inadmissible evidence at the summary-judgment stage:  on the contrary, Rule 56(c)(2) specifically contemplates such objections.  But as the Advisory Committee recognized, "[t]he objection functions much as an objection at trial, adjusted for the pretrial setting. . . . *There is no need to make a separate motion to strike*." Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment (emphasis added).

printed on the change orders, constitute inadmissible hearsay.  (ECF No. 25 at 2.)  The Court is mystified by Turner's complaint.  First, the change orders were issued *by Turner*, so, as exhibits to BFPE's cross-motion, they presumably qualify as opposing party statements under Rule 801(d)(2) of the Federal Rules of Evidence.  Second, Turner introduced evidence of *these very insurance payments* as an exhibit to its opposition brief.  (*See* ECF No. 27–2 at 23-31.)  It is axiomatic that "a party waives any objection to the admissibility of evidence on summary judgment by offering that evidence in support of its own motion."  *Brown v. White's Ferry, Inc.*, 280 F.R.D. 238, 243 (D. Md. 2012) (citing *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005)).  Turner's motion to strike Exhibit F is DENIED.

Exhibit I is a short declaration by defense counsel Sandra T. Carson in which Ms. Carson avers, *inter alia*, that "Turner did not produce any documents reflecting or referring to any claims or lawsuits made or asserted against Turner by any person or entity not a party to the contracts" and that "Turner did not produce any documents reflecting or identifying any payment made by Turner itself to UMMC."  (ECF No. 22–11 at 2-3.)  Turner objects that such statements are "overly broad, vague, and self-serving."  (ECF No. 25 at 3.)  The Court fails to see how Ms. Carson's statements are vague—and if they are broad, it is only because Turner produced *no documents* pertaining to third-party claims or payments flowing from Turner to UMMC (presumably because no such claims or payments were made).

Turner further objects to two statements of authentication in Exhibit I:  (1) Ms. Carson's statement that "Exhibit P . . . is a true and correct copy of UMMC's 'Outages/Interventions and Hot Work Permits' procedure"; and (2) Ms. Carson's statement that "Exhibit Q . . . is a true and correct copy of the expert report of William E. Koffel, P.E."  (ECF No. 22–11 at 4.)  Turner contends that Ms. Carson failed to lay a sufficient foundation of personal knowledge to make

such statements.  (ECF No. 25 at 4.)  As for Exhibit P, however, the Court need not rely on or even consider Ms. Carson's attempted authentication, because the document was produced by UMMC along with a Certification of Custodian of Records executed by an agent of UMMC. (*See* ECF Nos. 22–13 at 2 & 28 at 9.)  As for Exhibit Q, that exhibit comprises a report drawn up by BFPE's expert witness.  Presumably, *BFPE's attorney* is sufficiently familiar with *BFPE's expert* so as to authenticate the expert's report.  *Cf. Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 545 (D. Md. 2007) (describing the proponent's light burden of proof in authenticating an exhibit).  And regardless, as discussed below, BFPE has submitted a supplemental Exhibit Q inclusive of a declaration by the expert—a second tier of authentication that should allay any lingering concerns Turner may harbor.  Turner's motion to strike Exhibit I is therefore DENIED.

Finally, Turner objects to the substance of Exhibits P and Q.  With respect to Exhibit P, Turner protests that the document is a "facially incomplete copy of a *purported* procedures manual implemented or used by UMMC."  (ECF No. 25 at 4 (emphasis added).)  The Court is unsure who *purported* that Exhibit P is a manual:  for its part, BFPE describes the exhibit as a UMMC "procedure" (ECF No. 22–1 at 16), which is plainly what it is.  The Court has reviewed the document and sees no reason to question its authenticity.[20]  With respect to Exhibit Q (the expert report), Turner complains that it is "incomplete on its face because [it] recites at paragraph 2.5 that [it] contains an attachment, but such attachment is not part of the exhibit."  (ECF No. 25 at 5.)  The attachment to which Turner refers is Koffel's "standard summary of [his] background and experience, as distributed by Koffel Associates, Inc."  In response to Turner's objection, BFPE appended a supplemental Exhibit Q to its summary-judgment reply brief:  the supplemental exhibit includes Koffel's standard summary as well as a declaration by Koffel

---

[20] The Court also considers the document to have marginal utility in this case; the Court has placed little importance on UMMC's prescribed outage procedures while reviewing and analyzing the parties' arguments in support of their cross-motions.

attesting to the veracity of his report.  (*See* ECF No. 29–3.)  Even were the Court inclined to sustain Turner's objection as to the initial submission, BFPE has corrected the problem, and the Court sees no reason to take any further action at this time.  Accordingly, Turner's motion to strike Exhibits P and Q is DENIED.

In light of the foregoing, the Court DENIES IN FULL the requested relief in Turner's Motion to Strike (ECF No. 25).[21]

## III.   *Cross-Motions for Summary Judgment (ECF Nos. 18, 19 & 22)*

### A.   *Legal Framework*

#### 1.   *Standard of Review*

When faced with cross-motions for summary judgment, the Court must consider each motion separately on its own merits.  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). The Court will grant summary judgment to a party who demonstrates that (1) there is no genuine dispute as to any material fact and (2) that party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof.  *Celotex Corp.*, 477 U.S. at 322-23.  Moreover, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).  Even so, the opponent may not rest upon the mere allegations or denials of its pleading but must instead, by affidavit or other

---

[21] Ultimately, this was a *weak* motion.

evidentiary showing, set out specific facts showing a genuine dispute for trial.  Fed. R. Civ. P.

56(c)(1).  Supporting and opposing affidavits must be made on personal knowledge with such

facts as would be admissible in evidence and must affirmatively show the competence of the

affiant to testify to the matters stated therein.  Fed. R. Civ. P. 56(c)(4).

### 2.   *Choice of Law*

"A federal court sitting in diversity is required to apply the substantive law of the forum

state, including its choice-of-law rules."  *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir.

2013).   Maryland courts apply the rule of *lex loci contractus*, which requires that "the

construction and validity of a contract be determined by the law of the place of making of the

contract."  *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1300 (Md. 1995); *see*

*also Konover Prop. Tr., Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002)

("For choice-of-law purposes, a contract is made where the last act necessary to make the

contract binding occurs.").   The parties here agree that the Subcontract was executed in

Maryland; accordingly, Maryland law governs.

### 3.   *Contract Interpretation*

To prevail in an action for breach of contract, a plaintiff must prove "that the defendant

owed the plaintiff a contractual obligation and that the defendant breached that obligation."

*Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).   In analyzing contract terms,

Maryland courts follow the rule of objective contract interpretation:   "[t]he written language

embodying the terms of an agreement will govern the rights and liabilities of the parties,

irrespective of the intent of the parties at the time they entered into the contract, unless the

written language is not susceptible of a clear and definite understanding."  *Dumbarton*

*Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (alteration in

original) (quoting *Slice v. Carozza Props., Inc.*, 137 A.2d 687, 693 (Md. 1958)); *see also*

*Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 277 n.12 (Md. 2014) ("Under the objective

interpretation of contracts, the court will only look at extrinsic evidence if the contract is found

to be ambiguous[.]").

> [A] written contract is ambiguous if, when read by a reasonably prudent person, it
> is susceptible of more than one meaning.  The determination of whether language
> is susceptible of more than one meaning includes a consideration of "the character
> of the contract, its purpose, and the facts and circumstances of the parties at the
> time of execution[.]"

*Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999) (citations omitted).  Even so, "'[a]n

ambiguity does not exist simply because a strained or conjectural construction can be given to a

word.'  Nor does an agreement become ambiguous merely because two parties, in litigation,

offer different interpretations of its language." *Huggins v. Huggins & Harrison, Inc.*, 103 A.3d

1133, 1140 (Md. Ct. Spec. App. 2014) (alteration in original) (quoting *Dumbarton Improvement*

*Ass'n*, 73 A.3d at 233).

When interpreting a contract, the Court must construe the document in its entirety and, if

reasonably possible, give effect to each clause so that the Court does not "find an interpretation

which casts out or disregards a meaningful part of the language of the writing unless no other

course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n*, 73 A.3d at

233 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)).  A single,

integrated contract may consist of more than one document; moreover, a contract may

incorporate external documents by reference.  "Incorporation by reference is proper where the

underlying contract makes clear reference to a separate document, the identity of the separate

document may be ascertained, and incorporation of the document will not result in surprise or

hardship." *Logan & Kanawha Coal Co. v. Detherage Coal Sales, LLC*, 514 F. App'x 365,

16

367-68 (4th Cir. 2013). "However, incorporation by reference is ineffective . . . when the provisions to which reference is made do not have a reasonably clear and ascertainable meaning. Additionally, in order to uphold the validity of terms incorporated by reference, it must be clear that the parties . . . had knowledge of and assented to the incorporated terms . . . ." 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30.25 (4th ed. 2012) (footnote omitted); *cf. Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 674 A.2d 106, 142-43 (Md. Ct. Spec. App. 1996) ("Absent an indication of a contrary intention, the incorporation of one contract into another contract involving different parties does not automatically transform the incorporated document into an agreement between the parties to the second contract."), *aff'd*, 695 A.2d 153 (Md. 1997).

### B.    Turner's Claim

Turner contends that it is contractually entitled to reimbursement for the expenses it incurred in relation to the Sprinkler Incident. Not so, BFPE counters: pursuant to the General Contract's Waiver of Subrogation, UMMC's property-insurance carrier, Factory Mutual Insurance Company ("Factory Mutual"), should have borne the loss. This dispute illustrates the uncertainty and confusion that arise when participants in a multiparty venture rely on different boilerplate contracts that were plainly drafted without reference to one another. It falls to the Court to attempt to square the circle.

### 1.    Turner's Standing to Sue; Amount in Controversy

At the outset of its memorandum in support of its Cross-Motion for Summary Judgment, BFPE asserts that Turner lacks standing to sue, ostensibly because Turner sustained no actual damages in connection with the Sprinkler Incident. As the Supreme Court of the United States has recognized, "standing is an essential and unchanging part of the case-or-controversy

17

requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), such that if a plaintiff is found to lack standing, the Court has no subject-matter jurisdiction to hear the case. *See also United States v. Eligwe*, 627 F. App'x 263, 264 (4th Cir. 2016) (per curiam) (reciting the three required elements of Article III standing:  injury-in-fact, causation, and redressability).

Here, however, there can be no serious question that Turner has articulated a redressable injury-in-fact.  As Turner recounted in its moving papers, it paid $27,863.02—the balance it owed to BFPE under the Subcontract—to Otis Elevator Company ("Otis Elevator"), one of the subcontractors involved with the repair work at UMMC.  BFPE argues that "[s]ince Turner paid Otis with funds originally intended for BFPE . . . Turner cannot premise its standing to sue on a payment of claimed damages which was made with funds originally intended to be paid to the very party it is suing."  (ECF No. 22–1 at 17-18.)  But the $27,863.02 remains in controversy—it is, in fact, the subject of BFPE's counterclaim.  Were the Court to enter judgment for BFPE, Turner could not simply retrieve the funds from Otis Elevator; instead, it would be forced to make an additional $27,863.02 payment, presumably out of pocket.  Moreover, aside from these disputed funds, Turner contends that it sustained some costs in connection with its management of the repair process.[22]  Constitutional standing is not meant to be a particularly onerous hurdle, *see Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005), and the Court is satisfied that Turner has surmounted it.

---

[22] Gregory Stortstrom proposed that Turner is entitled to "a 5% markup on Liberty Mutual's payments to subcontractors," an amount "consistent with the 5% markup that BFPE would have recovered under the Turner-BFPE Subcontract for change order work performed by subcontractors to BFPE."  (ECF No. 27–2 at 4.) Since Liberty apparently paid out $190,636.28, Stortstrom's proposal would add $9531.81 to the amount in controversy here.  BFPE protests that (1) Turner "does not provide any evidence of [its] costs beyond the speculation and personal belief of Mr. Stortstrom" and (2) because Turner has not designated an expert, it cannot prove its damages to the requisite degree of certainty.  (ECF No. 29 at 17.)  The Court reserves judgment on the question whether an expert is necessary in this instance, but it is inclined to agree with BFPE that Turner would need to proffer additional evidence of its actual costs in the absence of an unambiguous liquidated-damages provision in the Subcontract.  However, these are issues better addressed at the trial stage—and in any event, Turner's potential inability to prevail on a particular damages theory does not deprive it of constitutional standing.

Turner, however, seeks to recover not only the expenses that it actually incurred but also the $190,636.28 that Liberty paid out on its behalf.  The Court is skeptical about Turner's prospects of recovering such damages even if Turner prevails on the issue of liability.  It is true, of course, that in the usual case of partial subrogation—where a surety has paid some portion (but not all) of the damages sustained by the plaintiff—there are two real parties in interest, and either party may bring suit:  "the insurer-subrogee to the extent it has reimbursed the subrogor, or the subrogor for either the entire loss or only its unreimbursed loss."  *Va. Elec. & Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78, 84 (4th Cir. 1973); *see also Balcore Equity Props. XVIII v. Caligo Ltd.*, 44 F. App'x 623, 629 (4th Cir. 2002) (per curiam) ("In partial subrogation cases, the insured's right of action against the wrongdoer is 'single and indivisible, even though the insurer is subrogated to the rights of the insured to the extent of the loss paid.'" (emphasis omitted) (quoting *Spearman v. J & S Farms, Inc.*, 755 F. Supp. 137, 141 (D.S.C. 1990))).  It is also true that courts have in some instances allowed suits on the basis of "loan-receipt" transactions, whereby an "insurer lends the insured the amount due on the policy, and the insured pays it back only to the extent that the insured is able to obtain a recovery against defendant."  6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1546 (3d ed. 2010).  In such cases— assuming the court accepts the loan agreement as genuine—"[t]echnically the insurer is not the real party in interest, since it has not paid the insured's claim and therefore is not subrogated to the insured's rights."  *Id.*; *see also Jacobs Press, Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, 107 F.3d 866, 1997 WL 90665, at *6 (4th Cir. 1997) (unpublished table decision) (observing that "a number of circuits have upheld the validity of loan receipts when used by insureds on behalf of insurers to sue third parties").

This case, however, defies the typical partial-subrogation or loan-receipt scenario because, pursuant to the agreement between Turner and Liberty, Turner has no obligation to repay Liberty unless and until it recovers from *Indian Harbor*—an impossible feat in this action unless Indian Harbor is joined as a defendant; and an improbable feat in any action, as it appears from the record that BFPE's insurer on this Project was Greenwich, not Indian Harbor.  The Court doubts that Turner is entitled to recover damages it never actually incurred on the theory that it might altruistically remit those damages to a surety to which it owes no obligation.

Because Turner moved for summary judgment on liability alone, and because the payments by Liberty were first identified in Turner's response in opposition to BFPE's cross-motion, the damages issue has not been thoroughly briefed, and the Court declines to resolve it at this time. But if Turner seriously intends to pursue the full amount stated in its prayer for relief, it should ensure that any future memoranda include ample authority and detailed argument in support of its unlikely claim for the costs that Liberty sustained.

### 2.   *BFPE's Assumption of Liability*

The Court turns now to the merits of the parties' contract dispute.  From Turner's vantage point, this case is a simple one:  the Sprinkler Incident plainly arose out of BFPE's work on the Project, and BFPE pledged—through the Subcontract's Article XXIII—to "assume[] the entire responsibility and liability for any and all . . . damage . . . caused by, resulting from, arising out of or occurring in connection with the execution of the [Subcontract] Work," even in a scenario in which Turner and/or UMMC contributed to the damage.  (ECF No. 22–5 at 12.)

As BFPE observes, however, under Maryland law, a "covenant . . . in connection with or collateral to[] a contract or agreement relating to . . . construction . . . purporting to indemnify the promisee against liability for damages . . . resulting from the sole negligence of the promisee . . .

is against public policy and is void and unenforceable."  Md. Code Ann., Cts. & Jud. Proc. § 5-401(a)(1).  By its terms, § 5-401 "bars indemnification only where the indemnitee is *solely* negligent[] . . . but . . . does not bar indemnification where both the indemnitee and the indemnor are negligent." *Helm v. W. Md. Ry. Co.*, 838 F.2d 729, 734 (4th Cir. 1988) (emphasis added); *see also Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 578 A.2d 1202, 1206 (Md. 1990) ("If . . . 'a particular contract provision or sentence can properly be construed as reflecting two agreements, one providing for indemnity if the promisee is solely negligent and one providing for indemnity if the promisee and promisor are concurrently negligent, only the former agreement is voided by the statute.'" (quoting *Bethlehem Steel Corp. v. G.C. Zarnas & Co.*, 498 A.2d 605, 611 (Md. 1985))).  Article XXIII here includes a savings clause:

> IN THE EVENT THAT THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED . . . LIMITS THE INDEMNITY OBLIGATIONS OF THE SUBCONTRACTOR, THEN THE INDEMNITY OBLIGATIONS OF THE SUBCONTRACTOR SHALL BE ENFORCED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, AND THIS ARTICLE SHALL BE CONSTRUED TO CONFORM TO SUCH LAW.

(ECF No. 22–5 at 12.)  Thus, the Court must determine whether the evidence shows that BFPE bears at least some responsibility for the Sprinkler Incident.  If so, the Court may interpret and apply the Assumption of Liability in a manner that does not offend Maryland public policy.

While the Court cannot determine on the basis of this record the extent to which each party may be accountable for the Sprinkler Incident, a reasonable factfinder would necessarily conclude that BFPE indeed bears *some* responsibility.  As noted above, the Subcontract required BFPE to maintain a supervisor at the worksite at any time work was being performed.  (ECF No. 22–5 at 21.)  Yet it is undisputed that on the morning of January 21, 2014, BFPE's designated superintendent, Dennis Reter, was not present.  And while Joe Palle, another superintendent, initially walked the C wing with Turner's Craig Coulter, Palle also departed before work began.

By the time Keith Geffen, UMMC's outage coordinator,[23] arrived, the only BFPE employees in the C wing were the sprinkler technicians, Dennis Rivera and Kaylin Ortiz.  Geffen averred that Rivera watched him as he turned off the main branch valve serving the C wing; Geffen opined that "[i]f Mr. Rivera had been familiar with the system, he would have understood that [Geffen] had turned off the system in the location to facilitate the sprinkler pipe work, not the fire hose cabinet demolition, and he would not have loosened the fitting on [the] pressurized pipe."  (ECF No. 27–4 at 2.)[24]  Dennis Reter apparently agreed:  according to Coulter, Reter "admitted that if he had been on site on the day of the incident, it never would have happened," and that "BFPE was at fault for the incident."  (ECF No. 27–3 at 4.)  Following the Sprinkler Incident, UMMC issued BFPE a "strike" due to its "failure to perform its work properly."  (ECF No. 27–5 at 2.)[25]

To be clear:  the Court is not suggesting that BFPE was entirely or even primarily responsible for the Sprinkler Incident; the record contains insufficient evidence from which the Court might calculate the relative fault of the parties.   But in light of the foregoing, and particularly in light of BFPE's failure to properly supervise the worksite pursuant to the terms of the Subcontract,[26] a reasonable factfinder would conclude that BFPE bears *some* fault, such that enforcement of the Subcontract's Article XXIII would not violate Maryland law.

---

[23] Presumably, Geffen was the party most in need of accurate information about the planned demolition work, since he was the party responsible for physically operating the valves.

[24] Geffen added that BFPE's technicians "should have opened one of the valves at the sprinkler hose cabinets before commencing demolition operations":  had they done so, they would have discovered that water was still flowing in that area.  (ECF No. 27–4 at 2.)

[25] According to Linda Whitmore, Director of Project Development at UMMC, "[i]t is UMMC's policy that after a contractor receives three strikes, that contractor is no longer permitted to perform work on a project for UMMC." (ECF No. 27–5 at 2.)

[26] In its opposition brief, Turner points to several additional facts that, while insufficient proof of BFPE's negligence in and of themselves, might nevertheless bolster a factfinder's conclusion that BFPE played a role in the Sprinkler Incident.  First, while BFPE's expert blames Craig Coulter for drafting an inaccurate outage report, the information on which Coulter relied actually originated with BFPE.  (ECF No. 27 at 25.)  Second, BFPE failed to attend UMMC's weekly outage meetings, including a meeting scheduled for January 14, 2014, during which UMMC personnel discussed and approved the January 21 outage.  (*Id.*)  Third, as noted above, there is a material dispute of fact regarding whether BFPE's technicians were responsible for draining pipes before performing demolition work. (*Id.* at 27 n.13.)  If indeed they were so responsible, their failure to do so likely contributed to the damage here.

### 3.     *Applicability of the Waiver of Subrogation*

Although the Court is satisfied that BFPE played a sufficient role in the Sprinkler Incident such that enforcement of the Assumption of Liability does not offend Maryland public policy, that determination does little to resolve the dispute here.  As BFPE is quick to observe in its Cross-Motion for Summary Judgment, there is another contractual provision that may potentially absolve it of liability—the General Contract's Waiver of Subrogation.  That provision states that UMMC and Turner "waive all rights against . . . each other and any of their subcontractors" for "causes of loss to the extent covered by property insurance obtained pursuant to . . . Section 11.3 or other property insurance applicable to the Work."  (ECF No. 22–4 at 32.) The Waiver of Subrogation is "effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise."  (*Id.*)  While BFPE was not a signatory to the General Contract, the Subcontract incorporates the General Contract by reference, providing that (1) BFPE "agrees to be bound to [Turner] by each and all of the terms and provisions of the General Contract"; (2) Turner "shall have the same rights and remedies as against [BFPE] as [UMMC] . . . has against [Turner]"; and (3) the two agreements are intended to "supplement and complement each other and shall, where possible, be thus interpreted."  (ECF No. 22–5 at 2.)[27]  Reading the Subcontract in light of the General Contract,

---

BFPE counters that Turner has produced no expert reports in this case, and consequently has provided "no evidence of what 'proper' [outage] coordination consists of and how BFPE failed to comply with it or what the standard of care requires of a sprinkler contractor who is working on pipes in a situation where [such contractor] did not physically implement the outage."  (ECF No. 22–1 at 31.)  Were this a tort case, Turner's failure to timely designate an expert might prove problematic.  *But see Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1086 (Md. 2010) ("We do not . . . require expert testimony to establish the defendant's standard of care in every case involving alleged negligence by a professional.  To the contrary, we have explained that sometimes the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony.").  However, this is not a tort case; it is a breach-of-contract case in which the Subcontract, by its literal terms, makes BFPE responsible for all damages arising out of BFPE's work.  The Court is therefore not required to ascertain relative fault; the Court must simply confirm that enforcement of the Assumption of Liability would not have the effect of indemnifying Turner (or UMMC) for its *sole* negligence.

[27] BFPE additionally argues that, as a "member of the class of subcontractors, it is an intended third-party beneficiary of the waiver of subrogation provision."  (ECF No. 22–1 at 22.)  BFPE's theory finds some support in

BFPE proposes that the Assumption of Liability is trumped by the Waiver of Subrogation to the extent of UMMC's property-insurance coverage.

Although no court in Maryland or in this District has explicitly held that a construction subcontractor may rely on a prime-contract subrogation waiver,[28] courts in other jurisdictions have approved this theory. *See, e.g.*, *Tokio Marine & Fire Ins. Co. v. Emp'rs  Ins. of Wausau*, 786 F.2d 101, 105 (2d Cir. 1986) (waiver shielded subcontractor's insurer from claim by general contractor and its insurer); *Richmond Steel, Inc. v. Legal & Gen. Assurance Soc'y, Ltd.*, 821 F. Supp. 793, 800 (D.P.R. 1993) (waiver shielded subcontractor from claim by general contractor and its insurer); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, No. Civ.A. 98-11-262 WCC, 2003 WL 139775, at *5 (Del. Super. Ct. Jan. 17, 2003) (waiver shielded subcontractor from claims by owner's insurer and general contractor, subject to subcontractor's obligation to pay property-insurance deductibles); *Gray Ins. Co. v. Old Tyme Builders, Inc.*, 2003-1136, p. 6 (La.

---

the case law.  *See, e.g.*, *Lexington Mktg., LLC v. Franks Mech. Contractors, Inc.*, 2016 IL App (1st) 142655-U, ¶ 25 ("[A]lthough not a party to the Prime Contract, [subcontractor] can enforce the waiver of subrogation provision because it is a third-party beneficiary to the Prime Contract.  The plain language . . . stating that the parties 'waive all rights against . . . each other and any of their subcontractors' indicates that the contracting parties intended to confer this benefit directly upon nonparty subcontractors."); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 730 (Tex. App. 1992) ("The inclusion of the word 'sub-subcontractor' in the waiver clause indicates that a considerable depth of parties was contemplated and that the waiver was not meant to be limited only to those who contracted directly with the prime contractor. . . . As a third-party beneficiary, [subcontractor] is entitled to rely upon and to enforce all of the contract's provisions.").

Even so, the Court hesitates to characterize BFPE as an intended third-party beneficiary in this case. Maryland law takes a cautious approach to third-party contract enforcement.  *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (Md. 2012) ("An individual is a third-party beneficiary to a contract if the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise.  It is not enough that the contract merely operates to an individual's benefit:  An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee." (quoting *120 W. Fayette Street, LLLP v. Mayor & City Council of Balt.*, 43 A.3d 355, 368 (Md. 2012))); *cf. Weems v. Nanticoke Homes, Inc.*, 378 A.2d 190, 195 (Md. Ct. Spec. App. 1977) ("The rules are . . . quite precise as to whether a third-party may enforce a contract which might operate in its favor.  If the third-party is neither a creditor nor a donee of a party to the contract, the benefit is merely incidental, and no legal rights under the contract ensue.").  Moreover, the General Contract here specifically provides that it "shall not be construed to create a contractual relationship of any kind . . . between any persons or entities other than the Owner and the Contractor." (ECF No. 22–4 at 10.)  Thus, while BFPE *may* prevail on its theory of incorporation by reference, it likely cannot enforce the terms of the General Contract as a third-party beneficiary.

[28] *But see John L. Mattingly Constr. Co v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066 (Md. 2010) (assuming without explicitly holding that a subcontractor may invoke a prime-contract waiver, but remanding for further evidentiary review due to ambiguity in the waiver at issue).

App. 1 Cir. 4/2/04); 878 So. 2d 603, 607 (waiver shielded subcontractor from claim by general contractor's insurer); *Behr v. Hook*, 787 A.2d 499, 501 (Vt. 2001) (waiver shielded subcontractor from claim by owners and their insurer).

Even so, the Court has not identified a case in which a subcontractor invoked a prime-contract waiver of subrogation to supersede an assumption of liability drafted in such express and unqualified terms as Article XXIII in the Subcontract here.[29]  While the parties incorporated the General Contract by reference, they specifically agreed that BFPE would assume the "entire responsibility and liability for any and all actual or potential damage."  (ECF No. 22–5 at 12.)[30]  It is a well-established canon of contract interpretation that "[w]here two . . . parts of a written agreement are apparently in conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it." *Fed. Ins. Co. v. Allstate Ins. Co.*, 341 A.2d 399, 407 (Md. 1975); *cf. Morales Elec. Contracting, Inc. v. Siemens Bldg. Techs., Inc.*, No. 09-CV-2743 (ADS)(ETB), 2012 WL 1038865, at *12

---

[29] Two cases—*Summit Contractors, Inc. v. General Housing & Air Conditioning, Inc.*, and *Davlar Corp. v. Superior Court*—seem helpful to BFPE's position.  But even these cases are distinguishable.

In *Summit*, the Supreme Court of South Carolina enforced a waiver of subrogation even though the subcontractor agreed he would be "held responsible for all damages to the building or the work of others resulting from his negligence."  595 S.E.2d 472, 475 (S.C. 2004).  The waiver of subrogation appeared in a standard AIA document; the assumption of liability was included in an accompanying schedule.  *Id.* at 474-75.  Yet these documents together formed a single, integrated subcontract, and the court had little difficulty construing that single subcontract as a whole to conclude that subrogation was waived to the extent of property-insurance coverage.  *Id.* at 475.

*Davlar* arguably offers more relevant authority for BFPE's position.  There, as here, the subcontractor invoked a prime contract's waiver of subrogation to override a subcontract's indemnity provision.  62 Cal. Rptr. 2d 199, 201 (Ct. App. 1997).  In a brief opinion, the California Court of Appeal, Second Appellate District, held that "the subrogation waiver applies to claims covered by insurance, the indemnity provision to those that are not covered, and there is no inconsistency between these two distinct provisions."  *Id.*  Yet the indemnity provision in *Davlar*, though broad, did not expressly make the subcontractor liable for any and all damages of any kind arising out of or occurring in connection with its work, as Article XXIII purports to do here.  More importantly, the Court hesitates to overrely on a state-court opinion from another jurisdiction, particularly in a contract case where it is the objective manifestations of *these* contracting parties that most concerns the Court.

[30] The breadth of this language undercuts BFPE's theory that because "[n]o third party has made any claim against Turner for actual or potential damages or injury," a "necessary prerequisite to BFPE's obligation to indemnify Turner under Article XXIII is missing."  (ECF No. 22–1 at 29.)  Even if BFPE's characterization is correct (and the Court has its doubts, given that UMMC made demand on Turner shortly after the Sprinkler Incident), by its terms the Assumption of Liability is *not* limited to protection from third-party claims.  Rather, it makes BFPE "entire[ly] responsib[le] for "any and all actual or potential damage or injury of any kind or nature whatsoever."  (ECF No. 22–5 at 12.)  BFPE's preferred interpretation of Article XXIII would require the Court to insert qualifying language where there is none, a violation of the Court's duty of objective contract interpretation.

(E.D.N.Y. Mar. 28, 2012) (explaining that the effects of incorporation by reference "may be avoided by a finding of inconsistencies between the terms of the contract signed by the parties and the incorporated documents" (citation omitted)); *United States ex rel. DDC Interiors, Inc. v. Dawson Constr. Co.*, 895 F. Supp. 270, 273 (D. Colo. 1995) (treating prime-contract clause incorporated by reference into subcontract as general rather than specific provision), *aff'd*, 82 F.3d 427 (10th Cir. 1996) (unpublished table decision).

A separate provision of the Subcontract lends significant weight to Turner's interpretation. Article XXIV requires BFPE to maintain commercial general liability insurance—including contractual liability insurance against the liability assumed in the Subcontract. (ECF No. 22–5 at 12.) Such insurance must list both UMMC and Turner as additional insureds, and it is "expressly agreed . . . that all insurance . . . afforded the additional insureds shall be primary insurance . . . and that any other insurance carried by the additional insureds shall be excess of all other insurance carried by [BFPE] and shall not contribute with [BFPE's] insurance." (*Id.* at 14.) BFPE dutifully obtained a general liability policy, underwritten by Greenwich and Navigators, on which it listed Turner and UMMC as additional insureds. (*See* ECF No. 29–2.) It is difficult to square Article XXIV's requirement that *any* insurance carried by Turner and UMMC shall be excess of *all* insurance carried by BFPE with the Waiver of Subrogation, which purportedly makes UMMC's property insurance primary to the extent of its coverage.[31]

---

[31] BFPE proposes that Article XXIV's insurance requirement *can* be reconciled with the Waiver of Subrogation: "The insurance that BFPE is required to provide under the subcontract is *liability* insurance intended to protect against third-party claims . . . . That is a horse of a different color than the *property* insurance that comes into play with regard to the waiver of subrogation." (ECF No. 29 at 6.) BFPE's interpretation is not implausible; in fact, some courts have recognized this distinction between property and liability insurance when construing AIA contracts. *E.g.*, *Tokio Marine & Fire Ins. Co. v. Emp'rs Ins. of Wausau*, 786 F.2d 101, 104 (2d Cir. 1986) ("[T]he Contract for Construction between the owner . . . and the general contractor . . . required the owner to purchase property insurance that would cover the interests of the owner, contractor, and subcontractors in the projects. . . . In contrast, the insurance provided by defendants was liability insurance. This insurance covered damage to third parties arising from the construction project . . . ." (footnote omitted)). But given that BFPE was specifically required to maintain *contractual* liability insurance against the liability assumed in the Subcontract (presumably

26

Moreover, the parties to the Subcontract here included their own canon of construction for circumstances in which provisions of the General Contract (incorporated by reference) conflict with provisions of the Subcontract: "If . . . any provision of this Subcontract Agreement irreconcilably conflicts with a provision of the General Contract . . . the provision imposing the greater duty or obligation on the Subcontractor shall govern." (ECF No. 22–5 at 2.)  The Court is required to give force and effect to the parties' plain language—and the parties made plain that, in case of conflict, BFPE should bear the greater burden.

Having scrupulously studied the record, the briefs, and the relevant authorities, the Court weighs the parties' relative positions as follows:  On one side of the scale sits BFPE, with a string of cases (albeit cases decided outside this jurisdiction) suggesting that subcontractors are generally entitled to invoke prime-contract subrogation waivers, ostensibly because the public interest is served when all parties to large construction ventures can rely on a single insurer to cover the damages that arise from time to time during the course of such ventures.  On the other side of the scale sits Turner, with the explicit language of the Subcontract purporting to shift the *entire* responsibility for any and all actual or potential damage flowing out of the Subcontract Work to BFPE.  As Turner correctly observes, BFPE executed *one* agreement here—the agreement containing the express Assumption of Liability.  And while the Court has examined the cases cited by BFPE, the Court has yet to find a case in which a subcontractor invokes a prime-contract subrogation waiver to trump an assumption of liability as breathtaking in scope as Article XXIII here.

inclusive of the liability defined by Article XXIII), the Court is not convinced that the property–liability distinction is especially useful here.  In any event, to adopt BFPE's preferred interpretation of Article XXIV, the Court would first have to conclude that, when the parties "expressly agreed" that "*any* other insurance" carried by Turner and UMMC would be excess of "*all* other insurance" carried by BFPE, they did not *actually* mean "any" and "all." Perhaps the Court will so conclude in light of a more robust evidentiary record—but it cannot draw such a conclusion from the record at this time.

The Court thus suspects that this case may be an outlier—a rare case in which the obvious public-policy benefit of orderly and predictable insurance planning at the outset of a venture must yield to the explicit arrangements between a general contractor and the subcontractors with which it chooses to transact.

However, the Court is not prepared to make that holding at this time.  Instead, the Court finds sufficient ambiguity to warrant consideration of extrinsic evidence corresponding to the parties' intentions when they executed the Subcontract—evidence that is presently lacking in the summary-judgment record.  *See John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1078 (Md. 2010) (finding the extent of a waiver of subrogation ambiguous and remanding for the trial court to consider "extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract" (quoting *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 547 (Md. 2003))).  It may be that, with additional discovery, BFPE can prove that the parties *actually* intended the Waiver of Subrogation to control.[32]  If BFPE manages to adduce such evidence, the Court will not hesitate to enforce the terms as contemporaneously understood by the parties.  But if BFPE fails to adduce such evidence, the Court anticipates that it will return to first principles of contract interpretation, enforcing the express language of the contract to which the parties *actually* agreed over terms and conditions generally incorporated by reference.

Because the Court cannot definitively establish at this stage whether the Waiver of Subrogation or the Assumption of Liability should be deemed to control, the parties' cross-motions for summary judgment will be DENIED WITHOUT PREJUDICE.

---

[32] Because waiver is an affirmative defense, the burden rests on BFPE to prove that the Waiver of Subrogation is effective and controlling here.  *See Bengston v. Gibbs*, 884 F.2d 1387, 1989 WL 100677, at *1 (4th Cir. 1989) (unpublished table decision) ("Generally, the defendant who pleads an affirmative defense has the burden of proof."); *City of Bowie v. Mie, Props., Inc.*, 922 A.2d 509, 534 (Md. 2007) ("The party seeking to prove waiver bears the burden of proof of establishing that defense.").

####    4.    *Scope of the Waiver of Subrogation*

As discussed at length in Part III.B.3, *supra*, the Court cannot determine definitively at this stage whether the General Contract's Waiver of Subrogation or the Subcontract's Assumption of Liability should be deemed to control—although the case here leans in Turner's favor, there remains the possibility that extrinsic evidence could save BFPE.  So, assuming purely *arguendo* that BFPE prevails on this foundational question, the Court appropriately considers the extent to which UMMC's property-insurance policy would have applied on the facts of this case.  If some portion of the damages stemming from the Sprinkler Incident would have been excluded from Factory Mutual's coverage, or if a deductible would have applied, the Assumption of Liability would presumably render BFPE liable to the extent of the uninsured damages.[33]

In AIA contract cases in which the property owner elects to provide insurance through a preexisting all-risk policy rather than through a freestanding builders'-risk policy, parties often disagree about the scope of the waiver of subrogation.  By its terms, the waiver reaches damages "to the extent covered by property insurance obtained pursuant to . . . Section 11.3 or other property insurance applicable to the Work."  (ECF No. 22–4 at 32.)  Courts have construed this language in one of two ways.  A clear majority of courts apply the "any insurance" approach, extending the waiver to "all damages insured by the owner's property insurance policy, regardless of whether they represent damages to the Work or non-Work property."  *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 133 (Neb. 2008).[34]  A minority of

---

[33] This is so because, by its terms, the Waiver of Subrogation applies only to "causes of loss *to the extent covered* by property insurance obtained pursuant to . . . Section 11.3 or other property insurance applicable to the Work."  (ECF No. 22–4 at 32 (emphasis added).)  *See Carlson Rests. Worldwide, Inc. v. Designline Constr. Servs., Inc.*, No. A-0506-07T30506-07T3, 2009 WL 2833259, at *6 (N.J. Super. Ct. App. Div. Sept. 4, 2009) (per curiam) (finding that waiver of subrogation applied to extent of covered losses but that owner could attempt to recover deductible); *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*, No. Civ.A. 98-11-262 WCC, 2003 WL 139775, at *7 (Del. Super. Ct. Jan. 17, 2003) (same).

[34] *See, e.g.*, *Hunt Constr. Grp., Inc. v. Hun Sch. of Princeton*, Civ. No. 08-3550, 2010 WL 3724279, at *10 (D.N.J. Sept. 16, 2010); *Lloyd's Underwriters v. Craig & Rush, Inc.*, 32 Cal. Rptr. 2d 144, 149 (Ct. App. 1994); *Bd. of*

jurisdictions apply a "work/non-work distinction," extending the waiver *only* to damaged work regardless of whether the owner's property insurance policy provides additional coverage. *E.g.*, *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009) (en banc). In this case, BFPE urges the Court to adopt the expansive "any insurance" approach; Turner, not surprisingly, recommends the restrictive "work/non-work" approach.[35]

The Court finds the majority "any insurance" approach more persuasive. First, the majority approach is more textually sound: it better accords with a separate provision of the A201 document—Section 11.3.5—which provides that "[i]f during the Project construction period the Owner insures properties . . . at or adjacent to the site by property insurance under policies separate from those insuring the Project . . . the Owner shall waive all rights in accordance with the terms of Section 11.3.7." (ECF No. 22–4 at 31-32.) As the *Lexington* court noted, the language appearing in Section 11.3.5 "shows that the contracting parties were not opposed to waiving damages to non-Work property." 749 N.W.2d at 135.[36] Second, the

---

*Comm'rs v. Teton Corp.*, 30 N.E.3d 711, 717 (Ind. 2015); *Fed. Ins. Co. v. Woodruff Constr.*, 826 N.W.2d 516, 2012 WL 5954588, at *3 (Iowa Ct. App. 2012) (unpublished table decision); *Haemonetics Corp. v. Brophy & Phillips Co.*, 501 N.E.2d 524, 526 (Mass. App. Ct. 1986); *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d 124, 134 (Neb. 2008); *Chadwick v. CSI, Ltd.*, 629 A.2d 820, 826 (N.H. 1993); *Westfield Ins. Grp. v. Affinia Dev., LLC*, 2012-Ohio-5348, 982 N.E.2d 132, at ¶ 42 (5th Dist.).

[35] Turner believes that the "any insurance" approach would render other provisions of A201, such as the general contractor's obligation to indemnify the owner for damages other than to the work itself, nugatory. (ECF No. 27 at 19-21.) Turner is mistaken: even those courts that fully embrace the majority position still recognize that the subrogation waiver extends only to damages covered by property insurance. While an owner may of course choose to protect its property with sweeping insurance coverage, A201 only requires a relatively modest builders'-risk policy—and an owner who opts for such a policy might well incur damages to uncovered property for which the waiver would have no effect.

Perhaps recognizing the error in its reasoning, Turner alternatively proposes that the majority approach "would penalize responsible property owners and benefit irresponsible property owners" (*id.* at 23), the former of whom adequately insure their property and the latter of whom do not. But Turner misapprehends the broader purpose of the AIA insurance scheme. AIA contracts are structured so that all losses are apportioned and insured, with the owner's policy paying first and contractors' (or subcontractors') policies filling the gaps, if any. This is an orderly, predictable system that should, theoretically, promote efficient construction ventures while minimizing litigation. Indeed, had the parties in this case uniformly employed AIA contracts (rather than an AIA general contract and a separate subcontract with seemingly contrary provisions), the Court suspects the posture here would look very different.

[36] In fact, several of the minority "work/non-work" cases—including two cases on which Turner specifically relies, *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 556 N.E.2d 1097 (N.Y. 1990), and *Public Employees Mutual Insurance*

majority approach "furthers the policy underlying the use of waiver of subrogation clauses in construction contracts." *Id.* "A waiver of subrogation is useful in such projects because it avoids disruption and disputes among the parties to the project.  It thus eliminates the need for lawsuits, and yet protects the contracting parties from loss by bringing all property damage under the [owner's] property insurance." *Tokio Marine*, 786 F.2d at 104.  Finally, without a clear contrary signal in the Maryland case law, the Court—sitting in diversity—deems it more appropriate to apply an approach that has been adopted by the majority of federal and state courts.[37]

Although the Court is persuaded that the majority "any insurance" rule is truer to the text of A201 and analytically superior to the minority "work/non-work" distinction—a conclusion favorable to BFPE's position—two important questions remain concerning the extent of the insurance coverage here.  First, while BFPE appended as Exhibit J to its cross-motion a one-page document titled "Evidence of Property Insurance," which document purportedly shows that UMMC added a $5,000,000 builders'-risk endorsement to its existing all-risk Factory Mutual Policy No. LQ096, the Court cannot ascertain from Exhibit J what the contours and limits of

---

*Co. v. Sellen Construction Co.*, 740 P.2d 913 (Wash. Ct. App. 1987)—construe older AIA contracts that did not include the language now found in Section 11.3.5.  *See Mu Chapter of the Sigma Pi Fraternity of the U.S. Inc. v. Ne. Constr. Servs. Inc.*, 709 N.Y.S.2d 677, 680 n.2 (App. Div. 2000) ("[W]e . . . note . . . that the Court of Appeals in *Brisk* was considering the effect of a waiver clause contained in the 1976 version of the American Institute of Architect's contract.  Such clause has since been amended for the express purpose of overcoming the holding in *Brisk*[.]"); *accord Allianz Ins. Co. of Can. v. Structure Tone (UK), Inc.*, No. 03 Civ. 0833(KMW), 2005 WL 2006701, at *6 (S.D.N.Y. Aug. 15, 2005); *see also* 3 Jonathan J. Sweet, *Sweet on Construction Industry Contracts: Major AIA Documents* § 22.04 ("In 1987 the AIA added a sentence to A201 Section 11.3.5, which is carried through to A201-2007 Section 11.3.5.  This sentence requires the owner to waive subrogation if the owner insures the property adjacent to the site on a policy different than the one insuring the project . . . .").

[37] Turner notes that in *John L. Mattingly*, 999 A.2d 1066, the Court of Appeals of Maryland found that references to "the work" rendered the waiver of subrogation clause ambiguous on the facts of that case; Turner surmises that the Court of Appeals would therefore construe the waiver as applying only to the extent of the work.  (ECF No. 27 at 19.)  But *John L. Mattingly* was addressed to the question whether an owner waived subrogation by securing an insurance policy roughly a year *after* a construction project was complete.  The court was not called upon to address the spatial limitations, if any, of the waiver—nor could it have been, since the project in that case involved construction of a new building from the ground up.  *John L. Mattingly* instead considered the temporal limitations of the waiver.  Furthermore, rather than resolving the question, the court remanded for additional evidentiary review.  Given that there is no temporal issue in this case, the Court is disinclined to separate *John L. Mattingly* from its context and presume that Maryland courts would join the smattering of jurisdictions that read a strict work/non-work distinction into the AIA waiver of subrogation.

UMMC's builders'-risk coverage might have been.[38]   That is, the Court cannot determine whether all of the damages caused by the Sprinkler Incident would have fallen under the umbrella of builders' risk or whether some of the damages might have been covered instead by the underlying all-risk policy.   This distinction is potentially significant, because while the builders'-risk coverage apparently includes no deductible, the underlying policy includes a standard deductible as well as special deductibles for certain categories of loss.[39]   The Court has reviewed the underlying Factory Mutual policy (Exhibit K to BFPE's cross-motion):   though lengthy, that document does not specifically discuss the limits of builders'-risk coverage. Accordingly, even were the Court inclined to agree with BFPE that the Waiver of Subrogation should control in this case (a conclusion the Court has not drawn and cannot draw on the basis of this record), the Court would still deny summary judgment because it cannot confidently determine whether and to what extent a deductible might have applied to an insurance recovery here.

Finally, in a fleeting—yet potentially dispositive—portion of its opposition brief, Turner cites paragraph 7(A) of the General Provisions of Policy No. LQ096, which states that "[i]f there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not."  (ECF No. 22–13 at 74.)  In this case, of course,

---

[38] Nor can the Court necessarily conclude that the "Evidence of Property Insurance" is a comprehensive, accurate representation of the builders'-risk coverage that UMMC obtained.  On the contrary, the document includes the following disclaimer:

> THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW.  THIS EVIDENCE DOES NOT . . . AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

(ECF No. 22–12 at 2.)

[39] The standard deductible for all losses to which a special deductible does not apply is $25,000 per occurrence, while the deductible for losses at locations described on Appendix B to the policy—which appendix includes certain UMMC facilities located at 22 South Greene Street in Baltimore City, the location of the Anesthesia Faculty Offices—is $100,000.  (ECF No. 22–13 at 15-16, 87.)  The policy further provides that the applicable deductible is halved in case of damage attributable to water discharged from insured fire-protection equipment (*id.* at 17), a caveat that may be applicable here.

both Turner and BFPE maintained commercial liability coverage (Turner through Liberty, BFPE through Greenwich and Navigators).  If the $5,000,000 builders'-risk coverage is subject to the limitation stated in paragraph 7(A), it is not clear that the Waiver of Subrogation (which waives claims only to the extent of *coverage* by "property insurance applicable to the Work") is effective here.[40]  Somewhat surprisingly, BFPE did not address this concern in its reply brief. During the next round of briefing (whether in relation to additional dispositive motions or in advance of trial), counsel for BFPE should address (1) whether UMMC's Factory Mutual builders'-risk coverage was primary or secondary, and (2) if secondary, whether there is authority for the proposition that secondary coverage nevertheless triggers the Waiver of Subrogation.[41]

### C.   BFPE's Counterclaim

Pursuant to Article IV of the Subcontract, final payment from Turner to BFPE is not due and payable until, *inter alia*, all claims, demands, and disputes arising out of or relating to the Subcontract—*including disputes between Turner and BFPE*—are satisfied.  (ECF No. 22–5 at 4.)  Thus, until the controversy relating to the Sprinkler Incident is resolved (either through further action by the Court or through agreement by the parties), Turner is entitled to retain the $27,863.02 Subcontract balance.  BFPE's counterclaim is therefore not ripe for adjudication, and

---

[40] The Court is aware of two other courts that have confronted analogous problems.  Those courts drew conflicting conclusions.  *Compare Great Am. Ins. Co. of N.Y. v. W. States Fire Prot. Co.*, 730 F. Supp. 2d 1308, 1324 (D.N.M. 2009) ("Although the parties did not . . . obtain the [contractually required property] insurance, such a failure does not alter the consequences of the subrogation waiver.  Fulfilled or not, the requirement to obtain the insurance . . . demonstrates that the subrogation waiver was supposed to eliminate subrogation rights vertically as well as horizontally."), *with Hemingway v. Constr. by Design Corp.*, 2015 UT App 10, ¶ 13, 342 P.3d 1135 ("[T]here is no basis in the case law, even in the jurisdictions that have adopted the more sweeping [majority] approach, for extending the waiver provision to claims for damages covered by an insurance policy that does not cover damages to the Work itself. . . . [T]he insurance provided . . . must at least cover the Work before *either* the majority or the minority approach comes into play.").

[41] Although the primary–secondary coverage distinction may prove problematic for BFPE, the Court rejects Turner's further argument that because "BFPE has not offered any evidence that a claim was ever submitted to UMMC's property insurance carrier . . . BFPE cannot establish that the damages are 'covered.'"  (ECF No. 27 at 15.)  The existence of insurance *coverage* plainly does not turn on the fact of an insurance *claim*.

the parties' cross-motions for summary judgment with respect to that counterclaim are DENIED

WITHOUT PREJUDICE.[42]

## IV.   Conclusion

For the foregoing reasons, an Order shall enter DENYING Turner's Motion to Strike

Inadmissible Matter (ECF No. 25); DENYING WITHOUT PREJUDICE Turner's Motion for

Partial Summary Judgment as to Liability (ECF No. 18); DENYING WITHOUT PREJUDICE

Turner's Motion for Summary Judgment Relating to Defendant/Counter-Plaintiff's Counterclaim

(ECF No. 19); and DENYING WITHOUT PREJUDICE BFPE's Cross-Motion for Summary

Judgment (ECF No. 22).

DATED this 25th day of March, 2016.

BY THE COURT:

_____/s/_____

James K. Bredar
United States District Judge

---

[42] If, however, BFPE ultimately prevails with respect to Turner's breach-of-contract claim, then presumably BFPE will be entitled to the full $27,863.02 Subcontract balance.  Turner has admitted that "BFPE completed [its] work under the Subcontract" (ECF No. 22–10 at 12), and there is no suggestion that BFPE overbilled Turner or that some other condition precedent to final payment applies.